ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
BRIAN E. KLEIN (Cal. State Bar No.: 258486)
MONICA D. MANGE (Cal. State Bar No.: 234950)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6920/6529
    Facsimile: (213) 894-6269
    E-mail: brian.klein@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CR No. 10-1055-PA |
|---|---|---|
| Plaintiff, | ) | <u>GOVERNMENT'S TRIAL MEMORANDUM</u> |
| v. | ) | |
| EZRI NAMVAR,<br>    aka "Ezri Namvar<br>        Moghadam,"<br>and HAMID TABATABAI,<br>    aka "Hamid Taba," | ) | Trial Date/Time:<br>May 3, 2011 at 8:30 a.m. |
| Defendants. | ) | |

    Plaintiff United States of America, by and through its

attorney of record, the United States Attorney for the Central

//

//

//

1   District of California, hereby submits its trial memorandum in

2   the above-captioned case.

3   Dated: April 27, 2011          Respectfully submitted,

4                                  ANDRÉ BIROTTE JR.
                                   United States Attorney
5
                                   ROBERT E. DUGDALE
6                                  Assistant United States Attorney
                                   Chief, Criminal Division
7

8
                                   _____/s/_____
9                                  BRIAN E. KLEIN
                                   MONICA D. MANGE
10                                 Assistant United States Attorneys

11                                 Attorneys for Plaintiff
                                   United States of America
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iii

I.    CASE STATUS . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF THE CHARGES AGAINST DEFENDANTS . . . . . . . 1

III.  ELEMENTS OF THE OFFENSES AND PERTINENT LAW . . . . . . . . 1

      A.   Wire Fraud - 18 U.S.C. § 1343 . . . . . . . . . . . 1

           1.   Essential Elements of Wire Fraud . . . . . . . 1

           2.   Knowledge . . . . . . . . . . . . . . . . . . . 3

           3.   Liability for Scheme to Defraud . . . . . . . . 3

           4.   Fraudulent Intent . . . . . . . . . . . . . . . 4

           5.   Co-Schemer Liability . . . . . . . . . . . . . 5

           6.   Liability for Misrepresentations By Employees . 5

           7.   Use of Wire Transmissions . . . . . . . . . . . 6

           8.   Possible Defenses, Attempts and/or Obfuscation . 6

                a.   Victim's Negligence Not a Defense . . . . . 6

                b.   Good Faith Belief . . . . . . . . . . . . . 7

      B.   Liability of a Principal . . . . . . . . . . . . . 7

IV.   FACTUAL SUMMARY . . . . . . . . . . . . . . . . . . . . . 8

      A.   Background . . . . . . . . . . . . . . . . . . . . 8

      B.   The Scheme . . . . . . . . . . . . . . . . . . . . 12

           1.   Victim Client E.M.V. and S.V. (Count One) . . 14

           2.   Victim Client L. And I. K. Trust
                No. 2 Count 3) . . . . . . . . . . . . . . . . 15

           3.   Victim Client Sunnylane Partners, LLC
                Count Four) . . . . . . . . . . . . . . . . . 18

           4.   Victim Client P. and J. L. Family Trust
                Count Five) . . . . . . . . . . . . . . . . . 20

V.    LEGAL AND EVIDENTIARY ISSUES . . . . . . . . . . . . . . 22

      A.   Duplicates . . . . . . . . . . . . . . . . . . . . 22

i

**TABLE OF CONTENTS (CONTINUED)**

PAGE

B.   Authentication and Identification . . . . . . . . .   22

C.   Business Records  . . . . . . . . . . . . . . . .   23

D.   Certified Public Records  . . . . . . . . . . . .   24

E.   Admissibility of Electronic Communications  . . . .   25

F.   Victim Testimony  . . . . . . . . . . . . . . . .   26

G.   Other Grounds for Admissibility of
     Victim Testimony  . . . . . . . . . . . . . . . .   27

H.   A Defendant's Prior Statements  . . . . . . . . .   28

I.   Adoptive Admissions . . . . . . . . . . . . . . .   30

J.   Co-conspirator and Co-Schemer Statements  . . . . .   30

K.   Relationship  . . . . . . . . . . . . . . . . . .   34

L.   Charts and Summary Witnesses  . . . . . . . . . .   34

     1.   Summary Chart Admissible under Federal Rule
          of Evidence 1006 . . . . . . . . . . . . . .   34

     2.   Summary Chart Admissible under Federal Rule
          of Evidence 611(a) . . . . . . . . . . . . .   37

     3.   Overview of Summary Witness Testimony  . . . .   38

M.   Cross-Examination . . . . . . . . . . . . . . . .   40

N.   Reciprocal Discovery  . . . . . . . . . . . . . .   43

O.   Character Witnesses  . . . . . . . . . . . . . . .   44

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . .   45

1

## TABLE OF AUTHORITIES

2

**FEDERAL CASES:**                                                    **PAGE(S)**

Barsky v. United States,
    339 F.2d 180 (9th Cir. 1964) . . . . . . . . . . . . .   36

Bourjaily v. United States,
    483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . .   passim

Carpenter v. United States,
    484 U.S. 19 (1987) . . . . . . . . . . . . . . . . . .   4, 5

Crawford v. Washington,
    541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . .   24

Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.,
    466 F.2d 722 (7th Cir. 1972) . . . . . . . . . . . .   37

Garlington v. O'Leary,
    879 F.2d 277 (7th Cir. 1989) . . . . . . . . . . . .   32

Goldberg v. United States,
    789 F.2d 1341 (9th Cir. 1986) . . . . . . . . . . . .   40

Hilao v. Estate of Marcos,
    103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . .   34

Hunter v. Bryant,
    502 U.S. 224 (1991) . . . . . . . . . . . . . . . . .   23

Irwin v. United States,
    338 F.2d 770 (9th Cir. 1964) . . . . . . . . . . . .   4

La Porte v. United States,
    300 F.2d 878 (9th Cir. 1962) . . . . . . . . . . . .   24

Lemon v. United States,
    278 F.2d 369 (9th Cir. 1960) . . . . . . . . . . . .   6

Lorraine v. Markel America Insurance Co.,
    241 F.R.D. 534 (D. Md. 2007) . . . . . . . . . . . .   25

Michelson v. United States,
    335 U.S. 469 (1948) . . . . . . . . . . . . . . . . .   passim

Moody v. United States,
    376 F.2d 525 (9th Cir. 1967) . . . . . . . . . . . .   28

Neder v. United States,
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . .   2

Ohio v. Roberts,
    448 U.S. 56 (1980) . . . . . . . . . . . . . . . . .   24

TABLE OF AUTHORITIES (CONTINUED)

FEDERAL CASES:                                                    PAGE

Phillips v. United States,
      356 F.2d 297 (9th Cir. Cir. 1965) . . . . . . . . . . .   26

Kennedy v. Los Angeles Police Dept.,
      901 F.2d 702 (9th Cir. 1990) . . . . . . . . . . . . .   23

Sendejas v. United States,
      428 F.2d 1040 (9th Cir. 1970) . . . . . . . . . . . .   32

Shale v. United States,
      388 F.2d 616 (5th Cir. 1968) . . . . . . . . . . . .   26

United Sates v. Habel,
      613 F.2d 1321 (5th Cir. 1980) . . . . . . . . . . . .    7

United States v. Aceves-Rosales,
      832 F.2d 1155 (9th Cir. 1987) . . . . . . . . . .   43, 47

United States v. Allen,
      425 F.3d 1231 (9th Cir. 2005) . . . . . . . . . . . .   33

United States v. Amrep Corp.,
      545 F.2d 797 (2d Cir. 1976) . . . . . . . . . . . . .    5

United States v. Arbelaez,
      719 F.2d 1453 (9th Cir. 1983) . . . . . . . . . . . .   33

United States v. Armstrong,
      909 F.2d 1239 (9th Cir. 1990) . . . . . . . . . . . .    7

United States v. Arteaga,
      117 F.3d 388 (9th Cir. 1997) . . . . . . . . . . . .   27

United States v. Baker,
      855 F.2d 1353 (8th Cir. 1988) . . . . . . . . . . . .   24

United States v. Bailleux,
      685 F.2d 1105 (9th Cir. 1982) . . . . . . . . . . . .   42

United States v. Bansal,
      2006 WL 2246203 (E.D. Pa. 2006) . . . . . . . . . . .   26

United States v. Beecroft,
      608 F.2d 753 (9th Cir. 1979) . . . . . . . . . . . .    7

United States v. Benny,
      786 F.2d 1410 (9th Cir. 1986) . . . . . . . . . . . .    7

United States v. Black,
      767 F.2d 1334 (9th Cir. 1985) . . . . . . . . .   22, 23, 41

United States v. Blackwood,
      878 F.2d 1200 (9th Cir. 1989) . . . . . . . . . . . .   22

TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                                    **PAGE**

United States v. Boise,
    916 F.2d 497 (9th Cir. 1990) . . . . . . . . . . . . . . .   42

United States v. Bowman,
    215 F.3d 951 (9th Cir. 2000) . . . . . . . . . . . . . . .   34

United States v. Boyer,
    694 F.2d 58 (3d Cir. 1982) . . . . . . . . . . . . . . . .    7

United States v. Brien,
    617 F.2d 299 (1st Cir. 1980) . . . . . . . . . . . . . . .    6

United States v. Brooks,
    473 F.2d 817 (9th Cir. 1973) . . . . . . . . . . . . . . .   28

United States v. Burreson,
    643 F.2d 1344 (9th Cir. 1981) . . . . . . . . . . .   26, 29

United States v. Bush,
    522 F.2d 641 (7th Cir. 1975) . . . . . . . . . . . . . . .   27

United States v. Carrillo,
    16 F.3d 1046 (9th Cir. 1994) . . . . . . . . . . . . . . .   30

United States v. Childs,
    5 F.3d 1328 (9th Cir. 1993) . . . . . . . . . . . . . . .   24

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991) . . . . . . . . . . . . . . .   22

United States v. Ciccone,
    219 F.3d 1078 (9th Cir. 2000) . . . . . . . . . . . . . .    2

United States v. Cohen,
    516 F.2d 1358 (8th Cir. 1975) . . . . . . . . . . . . . .    5

United States v. Crespo De Llano,
    838 F.2d 1006 (9th Cir. 1987) . . . . . . . . . . . . . .   32

United States v. De Peri,
    778 F.2d 963 (3d Cir. 1985) . . . . . . . . . . . . . . .   37

United States v. Dixon,
    262 F.2d 1138 (9th Cir. 1977) . . . . . . . . . . . . . .   32

United States v. Emmert,
    829 F.2d 805 (9th Cir. 1987) . . . . . . . . . . . . . . .   28

United States v. Everidge,
    488 F.2d 1 (9th Cir. 1973) . . . . . . . . . . . . . . .   30

United States v. Gardner,
    611 F.2d 770 (9th Cir. 1980) . . . . . . . . . . . . . . .   37

TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                                    **PAGE**

United States v. Gay,
    967 F.2d 322 (9th Cir. 1992) . . . . . . . . . . . . 4, 42

United States v. George,
    960 F.2d 97 (9th Cir. 1992) . . . . . . . . . . . 31

United States v. Gibson,
    690 F.2d 697 (9th Cir. 1982) . . . . . . . . . . passim

United States v. Gordon,
    844 F.2d 1397 (9th Cir. 1988) . . . . . . . . . . 31

United States v. Gravenmeir,
    121 F.3d 526 (9th Cir. 1997) . . . . . . . . . . . 3

United States v. Green,
    745 F.2d 1205 (9th  Cir. 1984) . . . . . . . . . . 3

United States v. Habel,
    613 F.2d 1321 (5th Cir. 1980) . . . . . . . . . . . 7

United States v. Hadley,
    918 F.2d 848 (9th Cir. 1990) . . . . . . . . . . 42

United States v. Hanley,
    190 F.3d 1017 (9th Cir. 1999) . . . . . . . . . . 6

United States v. Hearst,
    563 F.2d 1331 (9th Cir. 1977) . . . . . . . . . . 41

United States v. Huber,
    772 F.2d 585 (9th Cir. 1985) . . . . . . . . . . 24

United States v. Hsia,
    2000 WL 195067 (D.D.C. Jan. 21, 2000) . . . . . . . 44

United States v. Hyde,
    448 F.2d 815 (5th Cir. 1971) . . . . . . . . . . 28

United States v. Isaacs,
    493 F.2d 1124 (7th Cir. 1974) . . . . . . . . . . 27

United States v. Johnson,
    594 F.2d 1253 (9th Cir. 1979) . . . . . . . . . . 35

United States v. Jones,
    472 F.3d 1136 (9th Cir. 2007) . . . . . . . . . . 5

United States v. Jones,
    425 F.2d 1048 (9th Cir. 1970) . . . . . . . . . . 5

United States v. Kenny,
    645 F.2d 1323 (9th Cir. 1981) . . . . . . . . . . 33

**TABLE OF AUTHORITIES (CONTINUED)**

FEDERAL CASES:                                                          PAGE

United States v. Kirk,
     844 F.2d 660 (9th Cir. 1988) . . . . . . . . . . . . .   27

United States v. Knigge,
     832 F.2d 1100 (9th Cir. 1987) . . . . . . . . . . . .   33

United States v. Krohn,
     573 F.2d 1382 (10th Cir. 1978) . . . . . . . . . . . 6, 26

United States v. Layton,
     855 F.2d 1388 (9th Cir. 1988) . . . . . . . . . . . .   31

United States v. Lothian,
     976 F.2d 1257 (9th Cir. 1992 . . . . . . . . . . . . )31

United States v. Loya,
     807 F.2d 1483 (9th Cir. 1987) . . . . . . . . . . . .   33

United States v. Marin,
     669 F.2d 73 (2d Cir. 1982) . . . . . . . . . . . . .   29

United States v. McCollom,
     664 F.2d 56 (5th Cir. 1981) . . . . . . . . . . . . .   45

United States v. Meyers,
     847 F.2d 1408 (9th Cir. 1988) . . . . . . . . . . . .   35

United States v. Miranda-Uriarte,
     649 F.2d 1345 (9th Cir. 1981) . . . . . . . . . . . .   41

United States v. Moore,
     208 F.3d 577 (7th Cir. 2000) . . . . . . . . . . . .   44

United States v. Munoz,
     233 F.3d 1117 (9th Cir. 2000) . . . . . . . . . . . 2, 3, 4

United States v. Norton,
     867 F.2d 1354 (11th Cir. 1989) . . . . . . . . . . . .   24

United States v. Olson,
     925 F.2d 1170 (9th Cir. 1991) . . . . . . . . . . . . .   4

United States v. Omer,
     395 F.3d 1087 (9th Cir. 2005) . . . . . . . . . . . . .   2

United States v. Oren,
     893 F.2d 1057 (9th Cir. 1990) . . . . . . . . . . . .  5, 7

United States v. Ortega,
     203 F.3d 675 (9th Cir. 2000) . . . . . . . . . . . .   29

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                                      **PAGE**

United States v. Ospina,
    739 F.2d 448 (9th Cir. 1984) . . . . . . . . . . . . . .   30

United States v. Portac. Inc.,
    869 F.2d 1288 (9th Cir. 1989) . . . . . . . . . . . . .   30

United States v. Pree,
    408 F.3d 855 (7th Cir. 2005) . . . . . . . . . .   36, 40

United States v. Radseck,
    718 F.2d 233 (7th Cir. 1983) . . . . . . . . . . . . .   36

United States v. Ranney,
    719 F.2d 1183 (1st Cir. 1983) . . . . . . . . . . . .   27

United States v. Ray,
    930 F.2d 1368 (9th Cir. 1990) . . . . . . . . . .   23, 24

United States v. Rubino,
    431 F.2d 284 (6th Cir. 1970) . . . . . . . . . . . . .   37

United States v. Sayakhom,
    186 F.3d 928 (9th Cir. 1999) . . . . . . . . . . . . . .   4

United States v. Scales,
    594 F.2d 558 (6th Cir. 1979) . . . . . . . . .   35, 36, 38

United States v. Schmit,
    881 F.2d 608 (9th Cir. 1989) . . . . . . . . . .   31, 32

United States v. Scholl,
    166 F.3d 964 (9th Cir. 1999) . . . . . . . . . . . . .   43

United States v. Siddiqui,
    235 F.3d 1318 (11th Cir. 2000) . . . . . . . . . . . .   25

United States v. Smith,
    893 F.2d 1573 (9th Cir. 1990) . . . . . . . . . .   22, 31

United States v. Spawr Optical Research, Inc.,
    685 F.2d 1076 (9th Cir. 1982) . . . . . . . . . . . . .   33

United States v. Stapleton,
    293 F.3d 1111 (9th Cir. 2002) . . . . . . . . . . . . .   3

United States v. Soulard,
    730 F.2d 1292 (9th Cir. 1984) . . . . . . . . . . . . .   37

United States v. Sullivan,
    522 F.3d 967 (9th Cir. 2008) . . . . . . . . . . . . . .   5

TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                                      **PAGE**

United States v. Tarallo,
       380 F.3d 1174 (9th Cir. 2004) . . . . . . . . . . . . . . 5

United States v. Utz,
       886 F.2d 1148 (9th Cir. 1989) . . . . . . . . . . . . . . 4

United States v. Vaandering,
       50 F.3d 696 (9th Cir. 1995) . . . . . . . . . . . . . . 7

United States v. Vaughn,
       797 F.2d 1485 (9th Cir. 1986) . . . . . . . . . . . . . . 6

United States v. White,
       673 F.2d 299 (10th Cir. 1982 . . . . . . . . . . . . . . 7

United States v. Williams,
       989 F.2d 1061 (9th Cir. 1993) . . . . . . . . . . . . . 32

United States v. Willis,
       759 F.2d 1486 (11th Cir. 1985) . . . . . . . . . . . . 29

United States v. Wilson,
       487 F.2d 510 (5th Cir. 1973) . . . . . . . . . . . . . 26

United States v. Woods,
       335 F.3d 993 (9th Cir. 2003) . . . . . . . . . . . . 2, 3

United States v. Yarbrough,
       852 F.2d 1522 (9th Cir. 1988) . . . . . . . . . . 32, 33

United States v. Zavala-Serra,
853 F.2d 1512 (9th Cir. 1988) . . . . . . . . . . . . . . passim

**FEDERAL STATUES AND RULES:**

18 U.S.C. § 2(a) . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . 1, 6, 46

Fed. R. Evid. 104 . . . . . . . . . . . . . . . . 23, 33, 34

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Evid. 405 . . . . . . . . . . . . . . . . 43, 44, 45

Fed. R. Evid. 611 . . . . . . . . . . . . . . . . . . 37, 40

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . 40

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL STATUES AND RULES:**

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . .   40

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . .   passim

Fed. R. Evid. 803 . . . . . . . . . . . . . . . . . . . .   passim

Fed. R. Evid. 804 . . . . . . . . . . . . . . . . . . . .   25, 28

Fed. R. Evid. 901 . . . . . . . . . . . . . . . . . . . .   22, 25

Fed. R. Evid. 902 . . . . . . . . . . . . . . . . . . . . . . .   24

Fed. R. Evid. 1001 . . . . . . . . . . . . . . . . . . . . . .   23

Fed. R. Evid. 1003 . . . . . . . . . . . . . . . . . . . . . .   37

Fed. R. Evid. 1004 . . . . . . . . . . . . . . . . . . . . . .   37

Fed. R. Evid. 1006 . . . . . . . . . . . . . . . . . . . .   passim

Fed. R. Evid. 1007 . . . . . . . . . . . . . . . . . . . . . .   25

# I.   **CASE STATUS**

A.   The criminal trial of defendants Ezri Namvar, aka Ezri Namvar Moghadam, and Hamid Tabatabai, aka Hamid Taba, is scheduled to commence on May 3, 2011, at 8:30 a.m., before the Honorable Percy Anderson, United States District Judge.

B.   The government estimates its case-in-chief will take approximately eight to ten days, including anticipated cross-examination.

C.   The government anticipates calling approximately 20 witnesses in its case-in-chief.  The government may need to call rebuttal witnesses, depending on the testimony of possible defense witnesses.

D.   Trial by jury has not been waived.

E.   The services of a translator will not be necessary.

F.   Defendants Namvar and Tabatabai are currently on bond.

# II.  **STATEMENT OF THE CHARGES AGAINST DEFENDANTS**

The Indictment, which was returned on September 21, 2009, charges defendants Namvar and Tabatabai with five counts of wire fraud, in violation of 18 U.S.C. § 1343.  The Indictment is attached to this memorandum as Exhibit 1.

# III. **ELEMENTS OF THE OFFENSES AND PERTINENT LAW**

## A.   **Wire Fraud - 18 U.S.C. § 1343**

### 1.   Essential Elements of Wire Fraud

The government must prove the following four elements to prove a scheme to defraud:

1.   The defendant knowingly participated in a scheme or plan to defraud;

2.   The scheme or plan to defraud was material; that is, it had a natural tendency to influence, or was capable of

influencing, a person to part with money or property;

3.  The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

4.  the defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part of the scheme.

Ninth Circuit Model Criminal Jury Instructions, No. 8.124 (2010 ed.)[Wire Fraud] and No. 8.121 (2010 ed.) (modified for wire fraud and to include definitions of elements); see e.g., United States v. Ciccone, 219 F.3d 1078, 1083-84 (9th Cir. 2000) (setting forth the elements of wire fraud as "(1) participat[ion] in a scheme to defraud, and (2) use [of] the wires to further the scheme."); see United States v. Omer, 395 F.3d 1087, 1089 (9th Cir. 2005) (holding in a bank fraud case where a specific statement or omission is not alleged, "[i]t is the materiality of the scheme or artifice that must be alleged; the materiality of a specific statement need not be pleaded."); Neder v. United States, 527 U.S. 1, 25 (1999) (holding materiality is an essential element of the crime of wire fraud); see also United States v. Woods, 335 F.3d 993, 999 (9th Cir. 2003) (finding the government need not prove "any particular false statement was made.  Rather there are alternative routes to a [wire] fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements.") (internal citations omitted).

In presenting its case, the government is not required to prove that any particular false statement was made.  United States v. Woods, 335 F.3d 993, 999 (9th Cir. 2003); United States v. Munoz, 233 F.3d 1117, 1131 (9th Cir. 2000), superseded on

1    other grounds, (same).  Instead, a defendant may be liable for a

2    scheme to defraud, which may or may not involve any specific

3    false statements.  Id.

4        As such, the jury may consider not only the defendant's

5    words and statements, but also the circumstances in which they

6    are used as a whole.  Woods, 335 F.3d at 998 (trial court was

7    correct in instructing jurors to consider not only the

8    defendant's words and statements but the context in which they

9    were said); Ninth Circuit Model Criminal Jury Instructions, No.

10   8.121 (2010 ed.).

11           2.   Knowledge

12       An act is done "knowingly" if the defendant is aware of the

13   act and does not act through ignorance, mistake, or accident.

14   United States v. Gravenmeir, 121 F.3d 526, 529 (9th Cir. 1997);

15   Ninth Circuit Model Criminal Jury Instructions, No. 5.6 (2010

16   ed.).  And the government is not required to prove that the

17   defendant knew that his acts were unlawful.  Id.

18           3.   Liability for Scheme to Defraud

19       The phrases "scheme to defraud" or "scheme for obtaining

20   money or property" as used in the wire fraud statute means "any

21   deliberate plan of action or course of conduct by which someone

22   intends to deceive or to cheat another or by which someone

23   intends to deprive another of something of value." See United

24   States v. Stapleton, 293 F.3d 1111, 1115 (9th Cir. 2002)(quoting

25   jury instructions issued by the trial court).  A scheme to

26   defraud includes any plan or course of conduct "reasonably

27   calculated to deceive persons of ordinary prudence and

28   comprehension." United States v. Green, 745 F.2d 1205, 1207 (9th

1   Cir. 1984); <u>Irwin v. United States</u>, 338 F.2d 770, 773 (9th Cir.

2   1964) (same).  The government is not required to prove that

3   defendant's scheme was successful, or that he actually caused

4   victims to lose money or property.  <u>See</u> <u>United States v. Olson</u>,

5   925 F.2d 1170, 1175-1176 (9th Cir. 1991); <u>United States v. Utz</u>,

6   886 F.2d 1148, 1151 (9th Cir. 1989).

7               4.   <u>Fraudulent Intent</u>

8        Intent to defraud is an essential ingredient of any scheme

9   to defraud.  Acting with "intent to defraud" means an intent to

10  obtain money or property from someone by deceiving or cheating

11  them.  Ninth Circuit Model Criminal Jury Instructions, No. 3.16

12  (2010 ed.); <u>see</u> <u>Carpenter v. United States</u>, 484 U.S. 19, 27

13  (1987).  In other words, it is knowingly acting with the

14  intention or the purpose to deceive or cheat.  <u>Id.</u>

15       "Intent to defraud" may be demonstrated by a defendant

16  making or causing to be made a false or misleading statement,

17  that in so doing the defendant acts with reckless indifference to

18  the truth or falsity of the statement, and that the statement was

19  made for the purpose of inducing another to part with money or

20  property.  <u>See</u> <u>United States v. Munoz</u>, 233 F.3d 1117, 1136 (9th

21  Cir. 2000) ("This Court has repeatedly held that reckless

22  indifference to the truth or falsity of a statement satisfies the

23  specific intent requirement in a mail fraud case."); <u>see also</u>

24  <u>United States v. Sayakhom</u>, 186 F.3d 928, 942 (9th Cir. 1999);

25  <u>Gay</u>, 967 F.2d at 326 (listing cases).  "Intent to defraud" may

26  also be established by a defendant making or causing to be made a

27  misleading statement after the transfer of money or property from

28  the victim to the defendant, and that the statement was made to

4

avoid returning misappropriated money or property to the victim.
<u>United States v. Sullivan</u>, 522 F.3d 967, 975 (9th Cir. 2008)
(statement made after transfer); <u>United States v. Jones</u>, 472 F.3d
1136, 1140 (9th Cir. 2007) (statement made to avoid returning
money or property).

Fraudulent intent may be, and often must be, shown by
circumstantial evidence.  <u>See United States v. Jones (Jones II)</u>,
425 F.2d 1048, 1058 (9th Cir. 1970).  Because of the difficulty
in proving intent, any proof properly connected to a defendant
that establishes the manner in which the fraudulent scheme was
carried into execution is admissible.  <u>United States v. Amrep
Corp. (Amrep I)</u>, 545 F.2d 797, 800 (2d Cir. 1976).

A defendant need not intend to cause an actual loss to the
victim.  <u>Carpenter v. United States</u>, 484 U.S. 19, 26-27 (1987);
<u>United States v. Oren</u>, 893 F.2d 1057, 1061-1062 (9th Cir. 1990).

### 5.   Co-Schemer Liability

Once it is established that the defendant knowingly
participated in the scheme, the defendant becomes liable for all
of the fraudulent acts of his co-schemers that are within the
general scope of the scheme.  <u>United States v. Tarallo</u>, 380 F.3d
1174, 1184 (9th Cir. 2004); <u>United States v. Cohen</u>, 516 F.2d
1358, 1364 (8th Cir. 1975).

### 6.   Liability for Misrepresentations By Employees

False statements made by sales representatives or employees
of a corporation are admissible against a corporate officer where
the government shows that the corporate officer "expressly or
impliedly authorized or ratified" the statements.  <u>United
States v. Gibson</u>, 690 F.2d 697, 701 (9th Cir. 1982) (quoting

1 United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978)).

2          7.   Use of Wire Transmissions

3      The wire fraud statute requires that the wires be used "for

4 the purpose of executing such scheme or artifice[.]"  18 U.S.C.

5 § 1343.  Each transmission by wire in interstate commerce to

6 advance, or to further, or to carry out the scheme or plan to

7 defraud and/or to obtain money or property by means of false or

8 fraudulent pretenses, representations, or promises, may be a

9 separate violation of the wire fraud statute.  2A O'Malley,

10 Grenig & Lee, Federal Jury Practice and Instructions, § 47.15

11 (5th ed. 2000) ["Each Use of the Mails and Each Transmission by

12 Wire Communication in Interstate Commerce" – Defined]; see also

13 United States v. Vaughn, 797 F.2d 1485, 1493 (9th Cir. 1986)

14 ("Each mailing in furtherance of the scheme constitutes a

15 separate violation.").

16          8.   Possible Defenses, Attempts and/or Obfuscation

17          a.   Victim's Negligence Not a Defense

18      A victim's negligence, carelessness, or even foolishness is

19 not a defense to a charge of fraud.  The laws against fraud are

20 designed to protect the naive and careless as well as the

21 experienced and careful.  United States v. Hanley, 190 F.3d 1017,

22 1023 (9th Cir. 1999) (citing Lemon v. United States, 278 F.2d

23 369, 373 (9th Cir. 1960), for the rule that a victim's naivete is

24 no defense to mail or wire fraud charges).  In fact, the lack of

25 guile on the part of those solicited may itself point with

26 persuasion to the fraudulent nature of the scheme.  See Lemon v.

27 United States, 278 F.2d at 373; United States v. Brien, 617 F.2d

28 299, 311 (1st Cir. 1980).

b.    Good Faith Belief

A belief that a victim will be repaid and will sustain no loss, even if that belief is held in good faith, is not a defense to a charge of wire fraud. <u>United States v. Oren</u>, 893 F.2d 1057, 1062 (9th Cir. 1990) (belief that property was worth price paid by victims of fraud scheme not a defense to federal fraud charge); <u>United States v. Benny</u>, 786 F.2d 1410, 1417 (9th Cir. 1986) ("a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all" to mail fraud charges). Similarly, a defendant's belief in the ultimate success of a venture, even if that belief is honestly held, does not justify or excuse knowingly making false or misleading statements or knowingly concealing material facts. <u>See</u> <u>United States v. Beecroft</u>, 608 F.2d 753, 757 (9th Cir. 1979) ("an honest belief in the ultimate success of an enterprise is not, in itself, a defense" to fraud charges); <u>United States v. Boyer</u>, 694 F.2d 58, 60 (3d Cir. 1982); <u>United Sates v. Habel</u>, 613 F.2d 1321, 1328 (5th Cir. 1980); <u>United States v. White</u>, 673 F.2d 299, 304-05 (10th Cir. 1982).

**B.    <u>Liability of a Principal</u>**

Under 18 U.S.C. § 2(a), a person is punishable as a principal if that person aids and abets another person in the commission of an offense. A theory of aiding and abetting is implicit in everysubstantive count of an indictment. <u>United States v. Vaandering</u>, 50 F.3d 696, 702 (9th Cir. 1995) (citing <u>United States v. Armstrong</u>, 909 F.2d 1239, 1241-42 (9th Cir. 1990)). To prove the defendant guilty of aiding and abetting any of the crimes charged in the indictment, the government must

7

prove beyond a reasonable doubt:

1.   The crime was committed by someone;

2.   The defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit each element of the crime; and

3.   the defendant acted before the crime was completed. It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the particular crime.

Ninth Circuit Model Criminal Jury Instructions, No. 5.1 (2010 ed.).  The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.  Id.

**IV.   FACTUAL SUMMARY**

     The government expects the evidence at trial will establish the following facts, among others:

**A.   Background**

     From offices on Wilshire Boulevard in Los Angeles, California, defendant Namvar ran and operated Namco Financial Exchange Corp. ("NFE"), which he founded in 2005.  He was the Chairman of the Board of Directors, President/Chief Executive Officer, and Chief Financial Officer of NFE.  He along with his wife and four children, were the sole shareholders.  Defendant Tabatabai was NFE's controller and Vice President.

     NFE was a 1031 exchange qualified intermediary.  Section 1031 of Internal Revenue Code permits owners of investment property to defer capital gains taxes after the sale of the investment property if the sale proceeds are used to purchase a

replacement investment property or properties within a specified time frame.  These transactions are commonly known as "1031 exchanges."  After the sale of the investment property, the owner has 45 days from the date of the sale to identify like-kind replacement property or properties and 180 days from the sale date to close on the purchase of the replacement property or properties.  To preserve the tax deferral, the original sale proceeds must be deposited with a "qualified intermediary," like NFE, which is supposed to hold the money in safekeeping until the owner requests the qualified intermediary use it to acquire a replacement property or properties, returning any unused funds to the owner.  NFE had responsibilities and obligations to the owner regarding the safekeeping and use of the exchange proceeds, which were set forth in a standard exchange agreement.  NFE charged a fee of under $1,000.

NFE had a small number of employees.  Among them, Val Muraoka made sure all the paperwork got done but had no real authority.  Another employee, Sasha Ettehadieh, was the bookkeeper and also had no real authority.  Defendants Namvar and Tabatabai held all decision-making authority at NFE.  Defendant Namvar brought in most, if not all, of the clients and was the only one who could authorize wires or sign checks (with the exception of two family members, who did so when he was unavailable).  Defendant Tabatabai signed all the uniform 1031 exchange agreements on behalf of NFE, under the name "Hamid Taba."  And when a customer had a substantive complaint (e.g., about their 1031 money not being available to them) defendant Tabatabai and/or defendant Namvar dealt with it.

NFE was a member of the Federation of Exchange Accomodators (the "FEA") from 2006 through 2008.  The FEA is the only recognized national trade organization formed to represent 1031 exchange qualified intermediaries, and it takes an active role in responding to federal and state regulation and legislation that concerns 1031 exchanges.  1031 exchange qualified intermediaries, like NFE, are not required to join the FEA to do business.  NFE included the fact of its membership on its marketing materials.

In renewing NFE's membership for 2008, defendant Namvar, on behalf of NFE, explicitly agreed to abide by the following terms, among others, by initialing next to them and signing at the bottom of the page:

> The Member Company agrees to abide by the following requirements as specified for licensees in the FEA Model State Act regarding investment of exchange funds:
>
> Accounting for Monies and Property: Every licensee under this chapter shall have the responsibility to act as a custodian for all exchange funds, being money, property, other consideration or instruments received by the licensee from, or on behalf of the client, except funds received as the licensee's compensation. Every licensee shall invest exchange funds in investments which meet a "Prudent Person Standard" and satisfy investment goals of liquidity and preservation of principal. For purposes of this section, a "Prudent Person Standard" shall be violated if:
>
> a.  Exchange funds are knowingly commingled by the Exchange Facilitator with the operating accounts of the Exchange Facilitator; or
>
> b.  Exchange Funds are loaned or otherwise transferred to any person or entity affiliated with or related to the Exchange Facilitator except that this subsection (b) shall not apply to the transfer or loan made to a Financial Institution which is the parent of or related to the Exchange Facilitator; or
>
> c.  Exchange funds are invested in a manner that does not provide sufficient liquidity to meet the Exchange Facilitator's contractual obligations

to its clients and does not preserve the principal of the exchange funds.

Despite defendant Namvar's commitment to abide by those terms, each of them, (a)-(c), were violated in the victims' 1031 exchange proceeds, with defendant Namvar, as well as defendant Tabatabai, playing key roles in those violations.

Before NFE was established, defendants Namvar and Tabatabai conducted 1031 exchanges through Namco Financial, Inc., another company defendant Namvar ran and controlled, which was also a member of the FEA.

Defendant Namvar also ran and operated a company called Namco Capital Group, Inc. ("NCG") out of the same office space in Beverly Hills. NCG was founded in 1988. Defendant Namvar was the Chairman of the Board of Directors, President, and sole shareholder of NCG. Defendant Tabatabai was the Controller.

At both NFE and NCG, defendant Tabatabai was defendant Namvar's right-hand man, with an office right next to defendant Namvar's office. He had worked for defendant Namvar for a number of years and was paid several hundred thousand dollars, which included a large bonus each year until 2008.

NCG was in the "hard money" lending and real estate development businesses. It received money to invest through numerous individuals and entities who signed short-term notes. Throughout the years, NCG took money from NFE and later repaid it - that is until the latter portion of 2008 when it was under severe financial distress.

From the same office space, defendant Namvar's brother Homayoun (aka "Tony") Namvar ran a company commonly called

11

Pentaco.  When defendant Namvar was not available, he signed checks or authorized wires for NFE and NCG.  Tony's and defendant Namvar's father, Eilel Namvar, signed checks or authorized wires when neither was available.  Neither Tony nor Eilel played an active role in NCG or NFE.

Defendant Namvar and his family also controlled Security Pacific Bank (SPB).  Defendant Namvar, NFE, NCG, and SPB (which had offices in the same building as NFE and NCG) were all experiencing severe financial difficulty in 2008.  SPB failed in late 2008.  NCG suffered financial setbacks and in August/September stopped making payments to all of its investors. In December 2008, nine creditors of NCG filed a petition to place NCG into involuntary bankruptcy.  (In January 2009, NCG consented to bankruptcy.)  In December 2008, six creditors of defendant Namvar filed a petition to place him into involuntary bankruptcy. (In January 2009, defendant Namvar consented to bankruptcy.)  In April 2009, three creditors of NFE, including two victims in this case, filed a petition to place NFE into involuntary bankruptcy. (In June 2009, the petition was granted by default due to no opposition.)

**B.   The Scheme**

Between March and December 2008, defendants Namvar and Tabatabai, and others, held NFE out to four clients (the "Four Victim Clients") as a 1031 qualified intermediary that would hold their 1031 exchange proceeds in a NFE bank account, which was FDIC-insured, during the exchange process.[1]  Defendant Tabatabai, on behalf of NFE, signed and entered into all the exchange

---

[1]   The government intends to seek the dismissal of Count Two, which relates to the La Crescenta Foothill Investments, LLC exchange.

1  agreements with the Four Victim Clients.  The uniform exchange

2  agreement states in part:

> Exchanger [the client] and [NFE] expressly agree that
> any cash proceeds received form the conveyance of the
> Relinquished Property will be deposited with other funds
> in a general account or accounts of [NFE] with any
> nationally insured bank or savings institution, and may
> be transferred to any other such general account or
> accounts by [NFE].

7  Thus, NFE held itself out to the Four Victim Clients as only

8  having the discretion to move a client's 1031 exchange proceeds,

9  once deposited in a NFE account, to another bank or saving

10  accounts of NFE.  Consistent with that fact, each of the Four

11  Victim Clients understood at the time they entered into the

12  exchange agreement with NFE that it would hold their 1031

13  exchange money the entire time in a NFE bank account that was

14  FDIC-insured.  This understanding was based on, among other

15  things, the exchange agreement, a general understanding of the

16  purpose of a 1031 exchange, and, in certain cases, materials NFE

17  provided to them and/or a general understanding of how 1031

18  exchanges operate due to prior experience with NFE.

19      After entering into exchange agreements, the Four Victim

20  Clients had the proceeds of their real estate sales deposited via

21  interstate wire transfer with NFE to hold and use to effectuate

22  1031 exchanges.  Instead of holding the Four Victim Clients'

23  exchange proceeds as promised, defendant Namvars and Tabatabai,

24  used those exchange proceeds for a variety of undisclosed and

25  unauthorized purposes, such as to pay off other 1031 clients of

26  NFE and the creditors of NCG.

27      Defendant Tabatabai was aware of the unauthorized transfers

28  of the Four Victim Clients' money, either through wires or

1  checks, because he had access to the on-line bank accounts of

2  NFE and NCG – he was the only person who had such access.  And he

3  was in charge of the bookkeepers of NFE and NCG.  Defendant

4  Namvar authorized most of the transfers.

5       In total, the Four Victim Clients provided NFE with

6  approximately $25 million in exchange proceeds via interstate

7  wire transfer, of which only approximately $4 million was

8  returned to or used on behalf of the Four Victim Clients pursuant

9  to the exchange agreements.

10               1.   <u>Victim Client E.M.V. and S.V. (Count One)</u>

11       On March 24, 2008, M.V. And S.V. (the "V. Family"), who are

12  husband and wife, jointly entered into an exchange agreement with

13  NFE, in connection with the sale of a rental house located

14  in Steamboat Springs, Colorado.  Their CPA had referred them to

15  NFE.  Defendant Tabatabai executed the agreement on NFE's behalf

16  but not in their presence.  The V. Family did not have any direct

17  contact with defendants Namvar or Tabatabai at any point in the

18  process.

19       The V. Family had done at least one 1031 exchange before

20  (but none with NFE).  Based on how the prior exchange worked, her

21  review of the agreement, and what the accountant told them (which

22  matched up with the agreement), S.V. understood that the V.

23  Family exchange proceeds would be held safely at a NFE bank

24  account throughout the entire exchange process.  (Nothing in the

25  documents and agreements M.V. and S.V. received from NFE

26  suggested otherwise.)  S.V. would have never used NFE if she had

27  known NFE was not going to do that and instead was going to,

28  among other things, pay off other 1031 exchange clients and

14

1  transfer thee money to another company.

2      On April 2, 2008, the escrow company, on behalf of the V.

3  Family, wired approximately $750,000 in sale proceeds to NFE's

4  business bank account at SPB.  Financial analysis reveals that

5  only six days after the V. Family wired money to NFE's business

6  bank account at SPB, $300,000 had gone to pay off other NFE 1031

7  exchange clients.  (The rest of the V. Family money was dispersed

8  over the following months unbeknownst to them.)

9      On May 15, 2008, the V. Family identified several

10 replacement properties, in compliance with the agreement.  That

11 October/November the V. Family decided not to purchase a

12 replacement property and instead withdraw their exchange

13 proceeds.  Their accountant had mentioned NFE was having

14 problems.  The V. Family e-mailed a letter to Muroaka at NFE on

15 November 14, 2008 canceling their exchange and requesting their

16 money back.  When they sent that demand letter, NFE's account

17 balances across all of the financial institutions where it had

18 accounts (SPB, Wells Fargo and Bank of America) was only

19 approximately $95,000.

20     The V. Family never received any money back.  Ultimately,

21 they retained an attorney and were part of a group of creditors

22 that petitioned to put NFE into bankruptcy in January 2009.

23          2.   Victim Client L. And I. K. Trust No. 2 (Count 3)

24     On June 17, 2008, the L. and I. K. Trust No. 2 (the "K.

25 Trust") entered into an exchange agreement with NFE, in

26 connection with the sale of a mobile home park in Canoga Park,

27 California, for approximately $20.3 million.  Defendant Tabatabai

28 executed the agreement on NFE's behalf but not in their presence.

15

H.G. executed the agreement on behalf of the K. Trust - she was
the designated trustee.  H.G. did not have any direct contact
with defendant Tabatabai and only much later had any type
of contact with defendant Namvar.

Years before a family friend named M.D., who was an attorney
and accountant, recommended NFE to H.G.  As a result, the L. And
I. K. Trust No. 1 used NFE for a 1031 exchange.  That 1031
exchange was completed without any problems.

When entering into the 1031 exchange agreement in June 2008,
on behalf of the K. Trust, H.G. understood, based on how the
prior exchange worked, an explanation from M.D., and her review
of the agreement, that the mobile home sales proceeds would be
held safely at a NFE bank account throughout the entire exchange
process.  (Nothing in the documents and agreements K. Trust
received from NFE suggested otherwise.)  The K. Trust would have
never used NFE if H.G. had known NFE was not going to do that and
instead was going to, among other things, pay off other 1031
exchange clients and transfer the money to another company, in
this case NCG.

On July 30, 2008, the escrow company, on behalf of the K.
Trust, wired the approximately $20.3 million in sale proceeds
from its bank account to NFE's business bank account at SPB.
Financial analysis reveals that by August 4, 2008, over $8
million had been transferred to NCG and from there quickly
dispersed.  By August 14, 2008, NFE had dispersed approximately
$8 million of K. Trust money to unrelated parties, including
other 1031 clients.

On August 1, 2008, H.G. received a letter confirming that NFE was holding her money and the money was "available for withdrawal upon demand."  H.G. and her two brothers soon began identifying replacement properties.  Each had a 1/3 interest in the $20.3 proceeds.  Around October 2008, H.G. authorized NFE to wire approximately $2.5 million to purchase a property in Bend, Oregon; however, the funds did not get sent.  H.G. got an attorney involved and he got NFE to wire the money.

At that point, H.G. became very concerned and in early November 2008, she tried to get NFE to wire the remaining balance of the approximately $17.5 million the K. Trust had originally placed with NFE to escrow accounts for properties she and her brothers wished to purchase.  When H.G. sent the authorization forms in to NFE, NFE's account balances across all of the financial institutions where it had accounts (SPB, Wells Fargo and Bank of America) was under $1 million and within ten days would be less than $100,000.

Because the money never went out, later that month, she and her attorney met with Namvar and NFE's attorney, among others, at her attorney's law firm.  H.G. and her family waited in another room while her attorney spoke with defendant Namvar and two other attorneys.  Defendant Namvar explained to her attorney that the K. Trust money had originally had wired to NFE had left for various things, not necessarily 1031 exchanges.  Namvar further admitted that he could not trace the money.

After the November 2008 meeting, the parties tried to reach a settlement.  The K. Trust and H.G. filed a lawsuit against Namvar and NFE that November.  The K. Trust lost approximately

17

1  $17.5 million.

2         3.   <u>Victim Client Sunnylane Partners, LLC (Count Four)</u>

3         On August 19, 2008, Sunnylane Partners, LLC ("Sunnylane")

4  entered into an exchange agreement with NFE, in connection with

5  the sale of a property in Oklahoma for approximately $2 million.

6  L.R. executed the agreement on Sunnylane's behalf.  Defendant

7  Tabatabai executed the agreement on NFE's behalf but not in

8  L.R.'s presence.

9         L.R. knew Namvar socially, and years before, after defendant

10  Namvar referred a client to him (L.R. is a business litigator),

11  he decided to use NFE.  L.R. is part of a group of family and

12  friends that owns properties throughout the country.  The first

13  time they used NFE in 2005 everything went as planned and the

14  same was true the next time in 2007.

15         When entering into the 1031 exchange agreement in August

16  2008, on behalf of Sunnylane, L.R. understood that the property

17  sales proceeds would be held safely at a NFE bank account

18  throughout the entire exchange process.  His understanding was

19  based on his general understanding of how 1031 exchanges worked,

20  prior use of NFE, the "welcome packet" NFE provided him, and his

21  review of the exchange agreement.  (Nothing in the documents or

22  agreements Sunnylane received from NFE suggested otherwise.)

23  L.R. would have never used NFE, on behalf of Sunnylane, if L.R.

24  had known NFE was not going to do that and instead was going to,

25  among other things, pay off other 1031 exchange clients.

26         On August 20, 2008, First American Title & Trust Co., on

27  behalf of Sunnylane, wired the approximately $2 million in sale

28  proceeds from its bank account to NFE's business bank account at

SPB.  That same day, because L.R. knew that SPB was on the FDIC watch list, he sent defendant Namvar an e-mail asking defendant Namvar to move Sunnylane's 1031 money to a Wells Fargo account. He also had R.A., a business partner in the deal, e-mail defendant Tabatabai several times to have the Sunnylane money moved to Wells Fargo.

Financial analysis shows that on August 29th Sunnylane's exchange proceeds were transferred to Wells Fargo and co-mingled with approximately $8 million in other funds.  Then on October 10th, approximately $900,000 of Sunnylane's money was wired to an entity unrelated to Sunnylane and never came back.  The rest of the money left the Wells Fargo account over the course of the next month for payments unrelated to Sunnylane.  Sunnylane received only approximately $27,000 on November 5, 2008, for attorney's fees.  The Wells Fargo account had a balance of approximately $340,000 that day.

In early December 2008, L.R. received a call from his cousin, who said defendant Namvar told him, "I [defendant Namvar] took all of your family's money."  Wells Fargo would not provide Sunnylane with an account balance, so he and R.A. called defendant Namvar, who admitted taking Sunnylane's money. Defendant Namvar refused to explain where it had gone, but he said it had "spread like the wind" and it was not traceable.

In mid-December 2008, Sunnylane started negotiating with defendant Namvar to get its money back, but the parties did not reach a settlement before Namvar went into bankruptcy.

Sunnylane only received from NFE approximately $27,000 of the approximately $2 million it gave to NFE to hold in

safekeeping.

### 4.   Victim Client P. and J. L. Family Trust (Count Five)

On August 28, 2008, the P. And J. L. Family Trust (the "L. Family") entered into an exchange agreement with NFE, in connection with the sale of an apartment complex in Palm Desert, California, for approximately $1.9 million.

A few years before, their accountant (M.D., who also worked for the V. Family), referred them to NFE.  P.L. spoke with Sasha Ettehadieh, NFE's bookkeeper, who explained the 1031 process. Ettehadieh told P.L. that the L. Family's exchange proceeds would be held safely and would be there when needed.  The L. Family subsequently completed a 1031 exchange.

When entering into the 1031 exchange agreement in August 2008, on behalf of P.L. understood that the property sales proceeds would be held safely at a NFE bank account throughout the exchange process.  (Nothing in the documents or agreements the L. Family received from NE suggested otherwise.)  P.L.'s understanding was based on his general understanding of 1031 exchanges, the L. Family's prior exchange with NFE, what Ettehadieh had told him, a brochure NFE provided him in connection with this exchange, and his review of the exchange agreement.  The L. Family would have never used NFE if P.L. had known NFE was not going to do that and instead was going to, among other things, pay off other 1031 exchange clients.

On September 9, 2008, Southland Title Corporation, on behalf of the L. Family, wired approximately $1.9 million from its bank account to NFE's business bank account at SPB.  The L. Family received approximately $1.2 million back from NFE.

1   The L. Family was able to identify two replacement
2 properties.  On September 15, 2008, NFE provided funds for one
3 replacement property, and in October 2008, NFE provided funds for
4 the second replacement property.  There was a delay in the funds
5 going out from NFE to purchase the second replacement property,
6 which concerned P.L.  After NFE provided those funds, it
7 presumably left the L. Family with a balance of approximately
8 $1.2 million in NFE's accounts.

9   Later in October 2008, the L. Family requested the rest of
10 their 1031 exchange proceeds so they could pay off their home
11 mortgage.  But they only got excuses back from NFE.  They tried
12 to reach defendant Namvar numerous time and eventually spoke with
13 him on the telephone and in person at NFE's offices.  Among the
14 things defendant Namvar told them when they spoke was he was
15 having a little bit of a problem but he would get them their
16 money back -- he was a man who kept his promises.  Defendant
17 Namvar also asked them if they would take something other than
18 money, like Persian rugs or a stake in a property, and he gave
19 them, at one meeting, a handwritten note, stating NFE would pay
20 them back with interest by November 3, 2008.

21   In early November 2008, Namvar wired $500,000 from Commerce
22 Escrow Company to them, but they were still owed approximately
23 $725,000.  NFE's attorney, on behalf of defendant Namvar,
24 attempted to negotiate a repayment agreement with them, but one
25 was ever reached.

26   Near the end of 2008, P. L. called defendant Namvar and
27 asked when he would receive the rest of the L. Family's exchange
28 proceeds.  Namvar replied that he (P. L.) was lucky he received

21

1  $500,000 back.  Defendant Namvar then accused Paul of forcing him
2  into bankruptcy and asked for the $500,000 back, promising a good
3  return on it.

4       The L. Family lost approximately $725,000.

5  **V.   LEGAL AND EVIDENTIARY ISSUES**

6       At trial, the government intends to introduce into evidence,
7  among other things, testimony from percipient witnesses, summary
8  witnesses, as well as stipulations and documents.

9       **A.   Duplicates**

10      A duplicate is admissible to the same extent as an original
11 unless (1) a genuine question is raised as to the authenticity of
12 the original, or (2) under the circumstances, it would be unfair
13 to admit the duplicate instead of the original.  Fed. R. Evid.
14 1003; see also United States v. Smith, 893 F.2d 1573, 1579 (9th
15 Cir. 1990).

16      **B.   Authentication and Identification**

17      "The requirement of authentication or identification as a
18 condition precedent to admissibility is satisfied by evidence
19 sufficient to support a finding that the matter in question is
20 what its proponent claims."  Fed. R. Evid. 901(a).  Federal Rule
21 of Evidence 901(a) only requires the government to make a prima
22 facie showing of authenticity or identification "so that a
23 reasonable juror could find in favor of authenticity or
24 identification."  United States v. Chu Kong Yin, 935 F.2d 990,
25 996 (9th Cir. 1991) (quoting United States v. Blackwood, 878 F.2d
26 1200, 1202 (9th Cir. 1989); see also United States v. Black, 767
27 F.2d 1334, 1342 (9th Cir. 1985).  Once the government meets this
28 burden, "[t]he credibility or probative force of the evidence

1  offered is, ultimately, an issue for the jury."  Black, 767 F.2d
2  at 1342.

3      **C.**   **Business Records**

4      Federal Rule of Evidence 803(6) excepts from the hearsay
5  rule:

6          A memorandum, report, record, or data
        compilation, in any form, of acts, events,
7          conditions, opinions, or diagnoses, made at
        or near the time by, or from information
8          transmitted by, a person with knowledge, if
        kept in the course of a regularly conducted
9          business activity, and if it was the regular
        practice of that business activity to make the
10         memorandum, report, record, or data compilation,
        all as shown by the testimony of the custodian
11         or other qualified witness . . . unless the source of
        information or the method or circumstances of
12         preparation indicate lack of trustworthiness.

13     Under Rule 803(6), a document is admissible if two
14 foundational facts are established: (1) the document was made or
15 transmitted by a person with knowledge at or near the time of the
16 incident recorded, and (2) the document was kept in the course of
17 a regularly conducted business activity.  United States v. Ray,
18 930 F.2d 1368, 1370 (9th Cir. 1990); Kennedy v. Los Angeles
19 Police Dep't, 901 F.2d 702, 717 (9th Cir. 1990), overruled on
20 other grounds by Hunter v. Bryant, 502 U.S. 224, 112 S. Ct. 534,
21 116 L. Ed. 2d 589 (1991).  In determining if these foundational
22 facts have been established, the court may consider hearsay and
23 other evidence not admissible at trial.  See Fed. R. Evid.
24 104(a), 1101(d)(1); Bourjaily v. United States, 483 U.S. 171,
25 178-79 (1987).

26     The foundation may be established either through a custodian
27 of records or "other qualified witness."  Fed. R. Evid. 803(6).
28 "The phrase 'other qualified witness' is broadly interpreted to

require only that the witness understand the record keeping system." United States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993); Ray, 930 F.2d at 1370.  The government does not need to establish when and by whom the document was prepared. Ray, 930 F.2d at 1370.

That said, Rule 803(6) requires that the document be made "at or near the time" of the act or event it purports to record. Id. ; United States v. Huber, 772 F.2d 585, 591 (9th Cir. 1985).

Challenges to the accuracy or completeness of the business records ordinarily goes to the weight of the evidence and not its admissibility.  See, e.g., La Porte v. United States, 300 F.2d 878, 880 (9th Cir. 1962).  Because Rule 803(6) represents a firmly rooted hearsay exception, if non-testimonial evidence meets the requirements for admission under the Rule, no further showing of reliability is necessary for admission under the Confrontation Clause.  See Ohio v. Roberts, 448 U.S. 56, 66 n.8 (1980), overruled on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); Ray, 930 F.2d at 1371; United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989); United States v. Baker, 855 F.2d 1353, 1360 (8th Cir. 1988).

### D.    Certified Public Records

The government will seek to introduce certain public records in the form of domestic public documents under seal, or certified copies of public records, which do not require extrinsic evidence of authenticity as a condition precedent to admissibility.  Fed. R. Evid. 902(1) and 902(4).  Such records are self-authenticating, Fed. R. Evid. 902(4), and not hearsay, Fed. R.

Evid. 803(8).  In this case, these records include California
Department of Motor Vehicle Records of defendants Namvar and
Tabatabai, as well as certified federal bankruptcy court records.

**E.   Admissibility of Electronic Communications**

The government will seek to introduce into evidence emails.
As with other types of communication, the admissibility of email
is governed by a collection of evidentiary rules.  <u>Lorraine v.
Markel Am. Ins. Co.</u>, 241 F.R.D. 534, 538 (D. Md. 2007) (listing
rules).  Each email must be relevant and authentic.  Fed. R.
Evid. 401 and 901(a).  If an email is hearsay, then it must be
covered by an applicable exception.  <u>See</u> Fed. R. Evid. 801, 803,
804, and 807.  Email may be offered as a duplicate of the
original, or have its contents proved by the testimony or
deposition of the party against whom it is offered.  <u>See</u> Fed. R.
Evid. 1003 and 1007.

To authenticate an email message, the proponent must produce
"evidence sufficient to support a finding that the matter in
question is what its proponent claims."  Fed. R. Evid. 901(a);
<u>see also</u> <u>Lorraine</u>, 241 F.R.D. at 538 ("can the proponent show
that the [email] is what it purports to be").  This can be
accomplished by testimony of a witness with knowledge, and/or by
distinctive characteristics in the email.  Fed. R. Evid.
901(b)(1) and 901(b)(4); <u>see</u> <u>United States v. Siddiqui</u>, 235 F.3d
1318, 1322-23 (11th Cir. 2000) (authentication of email by
testimony that message bore defendant's email address; described
defendant's conduct in intimate detail; referred to author using
defendant's nickname; and was followed by telephone call from
defendant regarding content of email); <u>United States v. Bansal</u>,

1  2006 WL 2246203, *13 (E.D. Pa. 2006) (authentication of email

2  demonstrated by defendant's ownership of the email account, the

3  messages contained distinctive information, emails were stored on

4  defendant's computer; and defendant testified that he authored

5  some of the emails in question).

6  **F.   Victim Testimony**

7       The testimony of a fraud victim about statements made to the

8  victim by the defendant's employees or agents is admissible to

9  establish the existence of the scheme to defraud and the

10 fraudulent nature of the statements.  Such testimony is not

11 hearsay because it is not offered for the truth of the matter

12 asserted, but only to prove the fact of the utterance.  See

13 United States v. Gibson, 690 F.2d 697, 700-701 (9th cir. 1982);

14 United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir.).  Further,

15 the testimony of a fraud victim about statements made to the

16 victim by a defendant are admissions of the party-opponent.  Fed.

17 R. Evid. 801(d)(2)(A); United States v. Burreson, 643 F.2d 1344,

18 1349 (9th Cir. 1981).

19      A victim's testimony regarding what the victim understood

20 the statements meant and how he or she was deceived by them is

21 admissible to prove the capacity of the statements to mislead.

22 See Phillips v. United States, 356 F.2d 297, 307-309 (9th Cir.

23 Cir. 1965); United States v. Wilson, 487 F.2d 510, 511 (5th Cir.

24 1973); Shale v. United States, 388 F.2d 616, 618-619 (5th Cir.

25 1968).

26      A fraud victim may answer hypothetical "what if" or "if you

27 had known" questions concerning whether the victim would have

28 invested if he or she had known of certain facts.  Such testimony

1  tends to prove the existence of the scheme to defraud, the effect

2  that the concealed facts would have had if they had been known,

3  and the deceptive nature of the representations or omissions.

4  See United States v. Ranney, 719 F.2d 1183, 1187-1189 (1st Cir.

5  1983); United States v. Bush, 522 F.2d 641, 649-651 (7th Cir.

6  1975); United States v. Isaacs, 493 F.2d 1124, 1162 (7th Cir.

7  1974).

8       **G.   Other Grounds for Admissibility of Victim Testimony**

9       Other theories for the admissibility of victim testimony

10  regarding statements made to them include:

11       1.   Admissibility as a statement (made to the victim) "in

12  furtherance of the scheme" pursuant to Federal Rule of Evidence

13  801(d)(2)(E) and as a statement of defendant's agent pursuant to

14  Fed. R. Evid. 801(d)(2)(D).  Bourjaily v. United States, 483 U.S.

15  171, 175 (1987); United States v. Kirk, 844 F.2d 660, 663 (9th

16  Cir. 1988); United States v. Gibson, 690 F.2d 697, 701 (9th Cir.

17  1982).

18       2.   Admissibility pursuant to the "effect on the hearer or

19  reader doctrine" of common law.  United States v. Arteaga, 117

20  F.3d 388, 397-98 (9th Cir. 1997) (noting that statements offered

21  for their effect on the hearer or as circumstantial evidence of

22  state of mind are not hearsay).  For example, a statement made by

23  one person, which becomes known to another, is not hearsay when

24  offered as a circumstance under which the latter acted and as

25  bearing upon that person's conduct.  Id.  The same doctrine

26  covers statements of victims, as to what others said to them and

27  as statements of others as to what they said to the victims, to

28  show the result of the victim having heard it.  United States v.

27

Hyde, 448 F.2d 815, 845 (5th Cir. 1971) (statements admitted to show the effect of the statements on the victims in an extortion case, where statements were not those of the defendant).

3.    Admissible under the "state of mind" exception.  Fed. R. Evid. 803(3); see United States v. Emmert, 829 F.2d 805, 809-10 (9th Cir. 1987) (an out-of-court statement admissible where three foundational inquiries are satisfied: contemporaneous, chance for reflection, and relevance).

4.    Admissible as statements that were made in the defendant's (or co-schemer's) presence and offered to show their knowledge and/or participation in a scheme, and are not hearsay. Moody v. United States, 376 F.2d 525, 530 (9th Cir. 1967).

5.    Admissible as statements being offered as impeachment under Rule 801(d)(1).

6.    Admissible as statements of what the recipient of the information -- in this case, the victims -- understood the declarant to mean.  Specifically, a witness may testify, in proving the fact of the utterance, as to what he or she understood a declarant to mean with respect to a statement made by the declarant to the witness.  United States v. Gibson, 690 F.2d 697, 700-701 (9th cir. 1982) (fact of utterance); United States v. Brooks, 473 F.2d 817, 818 (9th Cir. 1973) (per curiam) (a witness may testify to what he or she understood a declarant to mean with respect to a statement made by the declarant to the witness).

**H.    A Defendant's Prior Statements**

The government intends to have a FBI Special Agent read for the jury certain portions of bankruptcy-related deposition

1   transcripts of testimony of defendant Namvar.

2        A statement is not hearsay if the statement is offered

3   against a party and is the party's own statement in either an

4   individual or representative capacity.  Fed. R. Evid.

5   801(d)(2)(A); United States v. Burreson, 643 F.2d 1344, 1349 (9th

6   Cir. 1981).

7        When the government admits some of a defendant's prior

8   statements, the door is not thereby opened to the defendant to

9   put in all of his out-of-court statements; because when offered

10  by the defendant, the statements are hearsay.  Fed. R. Evid.

11  801(d)(2); Ortega, 203 F.3d at 682; United States v. Willis, 759

12  F.2d 1486, 1501 (11th Cir. 1985) (defendant's exculpatory

13  statements inadmissible when offered by defense).

14       The only potential limitation on this principle is the

15  "doctrine of completeness," which has been applied by some courts

16  to require that all of a particular prior statement by defendant

17  be admitted where necessary to explain the admitted portion of

18  the statement, to place it in context, or to avoid misleading the

19  jury.  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).

20  "The completeness doctrine does not, however, require

21  introduction of portions of a statement that are neither

22  explanatory of nor relevant to the admitted passages."  Marin,

23  669 F.2d at 84.[2]

24

25

26

27

28       [2]  The government reserves the right to read or refer to any
    portion of the deposition transcripts should defendant Namvar
    testify.  At the time the portions are read to the jury, the
    government  will ask that the court instruct the jury that they
    are not to speculate as to what might have been on the other part
    of the transcript.

                                    29

1   **I.   <u>Adoptive Admissions</u>**

2       A statement made by a party-opponent and offered against

3   that party is not hearsay if it is a "statement of which the

4   party has manifested an adoption or belief in its truth."  Fed.

5   R. Evid. 801(d)(2)(A).

6       The Court must find sufficient foundational facts that a

7   jury could reasonably conclude that defendant actually heard,

8   understood, and acceded to the statements.  <u>United States v.</u>

9   <u>Ospina</u>, 739 F.2d 448, 451 (9th Cir. 1984) (writings in residence

10  of defendant and acted upon by defendant are adoptive admissions

11  and therefore non-hearsay).  Possession of a written statement by

12  defendant becomes an adoption of its contents when defendant acts

13  in conformity with that document.  <u>See</u> <u>United States v. Carrillo</u>,

14  16 F.3d 1046, 1048-49 (9th Cir. 1994); <u>United States v. Ospina</u>,

15  739 F.2d 448, 451 (9th Cir. 1984).

16  **J.   <u>Co-conspirator and Co-Schemer Statements</u>**

17      A statement is not hearsay if it is "a statement by a

18  co-conspirator of a party during the course and in furtherance of

19  the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  For Federal Rule

20  of Evidence 801(d)(2)(E) to apply, it is not necessary that the

21  declarant be charged with the crime of conspiracy; any "concert

22  of action creates a conspiracy for purposes of the evidence

23  rule."  <u>United States v. Portac. Inc.</u>, 869 F.2d 1288, 1294 (9th

24  Cir. 1989).  "The question is merely whether there is enough of a

25  sufficient concert of action" between the declarant and the

26  defendant to show a joint venture.  <u>United States v. Everidge</u>,

27  488 F.2d 1, 3 (9th Cir. 1973).  When this occurs, any statement

28  made in furtherance of this joint venture or common enterprise is

admissible even if the indictment does not contain a conspiracy count.  United States v. Layton, 855 F.2d 1388, 1398 (9th Cir. 1988), overruled on other grounds by United States v. George, 960 F.2d 97 (9th Cir. 1992).  Statements made during a fraud scheme are similarly admissible.  United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants.").

For a statement to be admissible under Rule 801(d)(2)(E), the offering party must establish that: (a) the statement was in furtherance of the conspiracy; (b) it was made during the life of the conspiracy; and (c) the defendant and declarant were members of the conspiracy.  Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Smith, 893 F.2d 1573, 1578 (9th Cir. 1990).

The offering party has the burden of proving these foundational facts by a preponderance of the evidence. Bourjaily, 483 U.S. at 176; United States v. Schmit, 881 F.2d 608, 610 (9th Cir. 1989); United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir. 1988).  Whether the offering party has met its burden is to be determined by the trial judge, and not the jury. United States v. Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988) (citing Bourjaily, 483 U.S. at 175).

The term "in furtherance of the conspiracy" is construed broadly to include statements made to "induce enlistment or further participation in the group's activities," to "prompt further action on the part of conspirators," to "reassure members

of a conspiracy's continued existence," to "allay a coconspirator's fears," and to "keep coconspirators abreast of an ongoing conspiracy's activities."  United States v. Yarbrough, 852 F.2d 1522, 1535-36 (9th Cir. 1988) (citing cases).  A co-conspirator declaration need not have been made exclusively, or even primarily, to further the conspiracy.
Garlington, 879. F.2d at 277.  Moreover, a statement can be a co-conspirator declaration even if it is subject to alternative interpretations.  Garlington v. O'Leary, 879 F.2d 277, 284 (7th Cir. 1989).

Statements made with the intent of furthering the conspiracy are admissible whether or not they actually result in any benefit to the conspiracy.  See United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993); Schmit, 881 F.2d at 612; Zavala-Serra, 853 F.2d at 1516.  It is not necessary that the defendant was present at the time the statement was made.  Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970).

Co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E).
Zavala-Serra, 853 F.2d at 1516.

Once the existence of the conspiracy is established, only "slight evidence" is needed to connect the defendant and declarant to it.  United States v. Crespo De Llano, 838 F.2d 1006, 1017 (9th Cir. 1987); United States v. Dixon, 562 F.2d 1138, 1141 (9th Cir. 1977).  The declaration itself, together with independent evidence, may constitute sufficient proof of the existence of the conspiracy and the involvement of the defendant and declarant in it.  Bourjaily, 483 U.S. at 181; Zavala-Serra,

1  853 F.2d at 1515.

2      Co-conspirator statements fall within a "firmly rooted

3  hearsay exception." <u>Bourjaily</u>, 483 U.S. at 183-84.  Therefore,

4  if a statement is properly admissible under Rule 801(d)(2)(E), no

5  additional showing of reliability is necessary to satisfy the

6  requirements of the Confrontation Clause.  <u>Id.</u>; <u>Yarbrough</u>, 852

7  F.2d at 1536; <u>United States v. Knigge</u>, 832 F.2d 1100, 1107 (9th

8  Cir. 1987), <u>amended</u>, 846 F.2d 591 (9th Cir. 1988).  In

9  determining if these foundational facts have been established,

10  the court may consider hearsay and other evidence not admissible

11  at trial.  <u>See</u> Fed. R. Evid. 104(a) and 1101(d)(1); <u>Bourjaily</u>,

12  483 U.S. at 178-79.  Moreover, co-conspirators statements are not

13  testimonial and do not violate the confrontation clause.  <u>United</u>

14  <u>States v. Allen</u>, 425 F.3d 1231, 1235 (9th Cir. 2005).

15      The foundation for the admission of a co-conspirator

16  statement may be established before or after the admission of the

17  statement.  If a proper foundation has not yet been laid, the

18  trial court may nevertheless admit the statement, but with an

19  admonition that the testimony will be stricken should the

20  conspiracy not be proved.  <u>See United States v. Arbelaez</u>, 719

21  F.2d 1453, 1460 (9th Cir. 1983); <u>United States v. Spawr Optical</u>

22  <u>Research, Inc.</u>, 685 F.2d 1076, 1083 (9th Cir. 1982); <u>United</u>

23  <u>States v. Kenny</u>, 645 F.2d 1323, 1333-34 (9th Cir. 1981).

24      The trial court has discretion to determine whether the

25  government may introduce co-conspirator declarations before

26  establishing the conspiracy and the defendant's connection to it.

27  <u>United States v. Loya</u>, 807 F.2d 1483, 1490 (9th Cir. 1987).  In

28  makings its determination, the district court may find that

33

statements were made in furtherance of the conspiracy, provided
that its factual findings are not clearly erroneous. See United
States v. Bowman, 215 F.3d 951, 960-61 (9th Cir. 2000) (citations
omitted).

### K.   Proof of Agency Relationship

A statement is not hearsay if the statement is offered
against a party and is a statement by the party's agent
concerning a matter within the scope of the agency or employment,
made during the existence of the relationship.  Fed. R. Evid.
801(d)(2)(D).  The existence of an agency relationship is a
question for the judge under Rule 104(a) and must be proved by
substantial evidence, but not by a preponderance of the evidence.
Hilao v. Estate of Marcos, 103 F.3d 767, 775 (9th Cir. 1996).

The fact of agency can be proved by the alleged agent's
extrajudicial statements.  That is, the trial court may consider
an out of court statement in making its Federal Rule of Evidence
104(a) determination of the admissibility of a statement under
Rule 801(d)(2)(D).  Hilao, 103 F.3d at 775.

### L.   Charts and Summary Witnesses

To streamline the presentation of evidence for the jury, the
government intends to call three summary witnesses during its
case-in-chief, two of whom will use summary charts, and whose
expected testimony is discussed below in part 3.

#### 1.   Summary Chart Admissible under Federal Rule of Evidence 1006

Charts and summaries of evidence are governed by Federal
Rule of Evidence 1006, which permits the introduction of charts,
summaries, or calculations of voluminous writings, recordings, or

photographs which cannot conveniently be examined in court.   See
Fed. R. Evid. 1006.   The purpose of Rule 1006 is to allow the use
of summaries when the volume of documents being summarized is so
large as to make their use impractical or impossible; summaries
may also prove more meaningful to the judge and jury.   United
States v. Johnson, 594 F.2d 1253, 1255 (9th Cir. 1979).

Accordingly, a summary chart may be admitted as substantive
evidence when the proponent establishes that the underlying
documents upon which the summary is based are voluminous,
admissible, and available for inspection.   Id.; see also United
States v. Meyers, 847 F.2d 1408, 1412 (9th Cir. 1988).   Although
the materials underlying the summary must be "admissible," they
need not themselves be "admitted" into evidence.   Meyers, 847
F.2d at 1412.   In addition, the summary chart must be accurate,
authentic, and properly introduced.   United States v. Scales, 594
F.2d 558, 562 (6th Cir. 1979) (affirming introduction of summary
charts; "with 161 exhibits, involving facts relevant to sixteen
counts and twenty-one overt acts, comprehension of the exhibits
would have been difficult, and certainly would have been
inconvenient, without the charts utilized by the Government").

There is no requirement in Rule 1006 that it be literally
impossible to examine the underlying records before a summary or
a chart may be utilized.   All that is required for the rule to
apply is that the underlying writings be voluminous and that
in-court examination not be convenient.   Scales, 594 F.2d at 562.

Size alone does not render inadmissible a summary chart
containing otherwise unobjectionable objective evidence.   Where a
chart does not contain complicated calculations that would

35

require an expert for accuracy, authentication of the chart requires only that the witness (1) have properly catalogued the exhibits and records upon which the chart is based; and (2) have knowledge of the analysis of the records referred to in the chart. Neither of these requirements necessitates any special expertise. The person who supervises the compilation of the summary chart is the proper person to attest to its authenticity and accuracy. <u>Scales</u>, 594 F.2d at 563.

It is well-established that the nature of a summary witness' testimony requires that he draw conclusions from the evidence presented at trial. When a summary witness simply testifies as to what the government's evidence shows, he does not testify as an expert witness. <u>United States v. Pree</u>, 408 F.3d 855, 869 (7th Cir. 2005).

Summary charts need not contain the defendant's version of the evidence and may be given to the jury while a government witness testifies concerning them. <u>United States v. Radseck</u>, 718 F.2d 233, 239 (7th Cir. 1983) (version of evidence); <u>Barsky v. United States</u>, 339 F.2d 180, 181 (9th Cir. 1964) (rejecting defendant's argument that summary did not contain his version of the case; accepting that argument "would be to hold that if a defendant had an alibi, no matter how improbable, then no expert could prepare a summary of the evidence tending to prove guilt").

A summary witness may rely on the analysis of others where they have sufficient experience to judge another person's work and incorporate as their own, the fact of its expertise. The use of other persons in the preparation of summary evidence goes to its weight, not its admissibility. <u>United States v. Soulard</u>, 730

F.2d 1292, 1299 (9th Cir. 1984); see also Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co., 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original records or the summaries be brought to the witness stand.").

In addition, summary charts may be used by the government in its opening statement.  Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove."  United States v. De Peri, 778 F.2d 963, 979 (3d Cir. 1985) (approving government's use of chart); United States v. Rubino, 431 F.2d 284, 290 (6th Cir. 1970) (same).

Moreover, a chart summarizing unavailable documents is admissible under Rule 1004 if the underlying materials are "lost or destroyed" or "not obtainable."  Fed. R. Evid. 1004(1) and 1004(2).

        2.    Summary Chart Admissible under Federal Rule of Evidence 611(a)

Summary charts are also admissible under Rule 611(a), which requires a court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time . . ."  Fed. R. Evid. 611(a); see also United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (in tax case, use of chart summarizing defendant's assets, liabilities, and expenditures "contributed to the clarity of the presentation to the jury, avoided needless consumption of time, and was a reasonable method of presenting the evidence").

1    Entirely aside from Rule 1006, there is an established

2    tradition, both within the Ninth Circuit and in other circuits,

3    that permits a summary of evidence to be put before the jury with

4    proper limiting instructions.   The purpose of the summaries in

5    these cases is simply to aid the jury in its examination of the

6    evidence already admitted.   Authority for such summaries would

7    certainly exist under Rule 611(a).   Scales, 594 F.2d at 563-64

8    (citing cases).

9                 3.   Overview of Summary Witness Testimony

10    The three expected summary witnesses are: (1) Stephen

11   Loveman, Forensic Auditor at the United States Attorney's Office

12   for the Central District of California; (2) David Judd, Director

13   at the Berkeley Research Group; and (3) Liliana Rizardo, Revenue

14   Agent at Internal Revenue Service.   Loveman and Judd will use

15   summary charts.

16    The government will call Loveman as a summary witness to

17   testify regarding (1) the flow of money into and out of the bank

18   accounts of NFE and NCG; and (2) the on-line bank activity of NFE

19   employees, particularly defendant Tabatabai, pertaining to NFE

20   and NCG accounts held at Security Pacific Bank.   Loveman's

21   testimony will be based on his review of bank records, which

22   defendants Namvar and Tabatabai have stipulated to as being

23   admissible.

24    Judd, as a Director at the Berkeley Research Group, has

25   assisted the Trustees for NCG and defendant Namvar in their

26   forensic accounting.   The government will call Judd as a summary

27   witness to testify regarding: (1) defendant Tabatabai's

28   compensation for the last five years (as well as interests in

38

LLCs in the case of defendant Tabatabai) and defendant Namvar's (as well as his immediate family members) compensation for the last five years; (2) there were not loan/promissory type agreements between NCG and NFE (including in connection with the Four Victim Clients' 1031 exchange funds; (3) and the identity of certain entities and individuals who are NCG and/or Ezri Namvar bankruptcy creditors; (4) NFE did not have any accounts at any financial institutions other than Wells Fargo, Bank of America, and Security Pacific Bank (Pacific Western Bank), as well as no accounts under any other names; (5) Namco Fininical, Inc. previously did 1031 exchanges, but when NFE was incorporated and set up in 2005, it stopped doing them and NFE took over the business; (6) defendant Namvar, NCG, and NFE are in bankruptcy (the government intends to offer certain certified bankrupcty filings into evidence (specifically, the petitions and orders/consents to relief)); and (7) defendant Namvar's personal residence during 2008.  Judd's testimony regarding points (1), (2), (4), and (7) will be based on his review of records in the custody and control of the Trustees.  His testimony concerning certain points (3) and (5) will be based on a review of certified court records.  All of the underlying records have been produced or otherwise made available to defendants Namvar and Tabatabai, pursuant to Rule 1006, with the exception of a few certified bankruptcy filings that the government is waiting to receive and the records relating to defendant Namvar's compensation and home (all of which the government is still waiting to receive).[3]

---

[3]   The government notes that with regard to Judd's testimony concerning the lack of any loan/promissory agreements or NFE banking anywhere other than the banks named above, there is nothing to be made available to the defense because there are no such records.

1    Rizardo is expected to testify as a summary witness
2    regarding Internal Revenue Code Section 1031, as it stood in
3    2008, including, among other things, how Section 1031 permits
4    owners of investment property to defer capital gains tax that
5    would otherwise be due and owing upon the sale of an investment
6    property and the role of a "qualified intermediary" (like NFE)
7    under Section 1031.  Section 1031, as well as the connected
8    regulation and publication, have all been provided to defendants
9    Namvar and Tabatabai in compliance with Rule 1006

10   The government does not intend to ask any of the summary
11   witnesses hypothetical questions or ask them to draw conclusions
12   based on inadmissible evidence.  See Fed. R. Evid. 703.  As such,
13   the government does not consider his anticipated testimony to
14   constitute expert testimony within the meaning of Federal Rule of
15   Evidence 702.[4]  See United States v. Pree, 408 F.3d 855, 869 (7th
16   Cir. 2005); Goldberg v. United States, 789 F.2d 1341, 1343 (9th
17   Cir. 1986).

18   **M.   Cross-Examination**

19   The scope of a cross-examination is within the discretion of
20   the trial court.  Fed. R. Evid. 611(b).  It should be limited to
21   the subject matter of the direct examination and matters
22   affecting the credibility of the witness.  The trial court may,
23   in the exercise of its discretion, permit inquiry into additional
24   matters as if on direct examination.  Fed. R. Evid. 611(b).

25   A defendant who testifies at trial may be cross-examined as
26   to all matters reasonably related to the issues he puts in

27   _____

28        [4]  Even if any of the witnesses are considered "experts,"
     the government notes that neither defendant has requested
     "expert" notice, pursuant to Federal Rule of Criminal Procedure
     Rule 16(a)(1)(G), and thus, they are not entitled to any such
     notice.

dispute during cross-examination.  <u>United States v.</u>
<u>Miranda-Uriarte</u>, 649 F.2d 1345, 1353-54 (9th Cir. 1981).   A
defendant has no right to avoid cross-examination on matters
which call into question his claim of innocence.  <u>Id.</u>  Moreover,
a defendant who testifies at trial waives his Fifth Amendment
privilege and may be cross-examined on matters made relevant by
his direct testimony.  <u>Black</u>, 767 F.2d at 1341.

The scope of the defendant's waiver is co-extensive with the
scope of relevant cross-examination.  <u>United States v. Hearst</u>,
563 F.2d 1331, 1340 (9th Cir. 1977).  The extent of the waiver is
determined by whether the question reasonably relates to subjects
covered by defendant's direct testimony.  <u>Id.</u>  Federal Rule of
Evidence 608(b) provides that:

> Specific instances of the conduct of a witness, for the
> purpose of attacking or supporting the witness'
> credibility . . . may not be proved by extrinsic
> evidence.  They may, however, in the discretion of the
> court, if probative or truthfulness or untruthfulness,
> be inquired into on cross-examination of a witness (1)
> concerning the witness' character for truthfulness or
> untruthfulness, or (2) concerning the character for
> truthfulness or untruthfulness of another witness as to
> which character the witness being cross-examined has
> testified . . . .

Defendant Namvar's and Tabatabai's credibility will be
crucial if they choose to testify.  Accordingly, cross-
examination of them about other possible fraudulent conduct in
which he may have engaged is necessary for the jury to weigh
whether their denial of knowledge and intent to defraud is
credible given their other actions.  As the Ninth Circuit has
held, Rule 608(b): "specifically contemplates inquiries into
prior behavior in order to challenge a witness's credibility.
Evidence of prior frauds is considered probative of the witness's

character for truthfulness or untruthfulness." <u>United States v. Gay</u>, 967 F.2d 322, 328 (9th Cir. 1992).

Moreover, the prejudicial effect of such evidence, if any, can be addressed by a limiting instruction. <u>United States v. Hadley</u>, 918 F.2d 848, 852 (9th Cir. 1990). It is well-settled that the fact that the admission of such evidence might harm the defendant's case does not constitute unfair prejudice. <u>United States v. Bailleux</u>, 685 F.2d 1105, 1111 (9th Cir. 1982). Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory comm. nn. Thus, admission of evidence regarding the defendant's other fraudulent acts might constitute unfair prejudice if the jury in this case considered the evidence to establish defendant's propensity to commit the charged crime. However, this potential unfair prejudice can be cured by a limiting instruction that the jury should consider the evidence only for the purpose for which it is introduced. <u>Hadley</u>, 918 F.2d at 852; <u>United States v. Boise</u>, 916 F.2d 497, 501 (9th Cir. 1990).

As a general rule, character witnesses called by the defendant may not testify about specific acts demonstrating a particular trait or other information acquired only by personal observation and interaction with the defendant; the witness must be limited to summarizing the reputation of the defendant as known in the community. <u>Michelson v. United States</u>, 335 U.S. 469, 477 (1948). On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of defendant's past conduct relevant to the character

1   trait at issue.  Fed. R. Evid. 405(a).  In particular, a

2   defendant's character witnesses may be cross-examined about their

3   knowledge of the defendant's past crimes, wrongful acts, and

4   arrests.  <u>Michelson</u>, 335 U.S. at 482-83.

5          **N.    Reciprocal Discovery**

6          Despite repeated requests by the government, defendants

7   Namvar and Tabatabai have not produced to the government any

8   reciprocal discovery to which the government may be entitled

9   under Federal Rules of Criminal Procedure 16(b) and 26.2.

10  Further, the government has requested notice of any intention by

11  defendants to rely on a defense involving mental condition or

12  duress, or any other affirmative defense.  Defendants Namvar and

13  Tabatabai have also failed to provide the government with notice

14  of any affirmative defense.

15         Accordingly, to the extent defendants Namvar and Tabatabai

16  attempt to introduce or use any documents at trial that they have

17  not produced, or seeks to rely on an undisclosed affirmative

18  defense, the government reserves the right to object and to

19  request that the Court exclude any undisclosed documents or

20  affirmative defense.  The Ninth Circuit has held that a

21  defendant's failure to comply with his or her discovery

22  obligations under Rule 16(b)(1)(A) can result in exclusion of

23  evidence at trial.  <u>See</u> <u>United States v. Scholl</u>, 166 F.3d 964

24  (9th Cir. 1999) (upholding district court's decision to exclude

25  defense evidence due to defendant's strategic decision to

26  withhold discovery until the last minute); <u>United States v.</u>

27  <u>Aceves-Rosales</u>, 832 F.2d 1155, 1156-57 (9th Cir. 1987) (holding

28  that district court did not abuse discretion in precluding

medical report that the defense wished to introduce in
case-in-chief but which it disclosed for the first time after the
government had rested); <u>United States v. Moore</u>, 208 F.3d 577, 578
(7th Cir. 2000) ("courts are entitled to exclude evidence that
should have been produced during reciprocal discovery in criminal
cases."); <u>see also</u> <u>United States v. Hsia</u>, 2000 WL 195067, at *2
(D.D.C. Jan. 21, 2000) (defining government "evidence in chief"
as including non-impeachment evidence introduced during
cross-examination of government witnesses").  The government
notified the defense on April 7, 2011, that it would object to
the introduction of any evidence that should have been produced
earlier during pretrial discovery.

### O.   <u>Character Witnesses</u>

Defendants Namvar and Tabatabai may intend to call character
witnesses to testify on their behalf.  The Supreme Court has
recognized that character evidence —- particularly cumulative
character evidence -— has weak probative value and great
potential to confuse the issues and prejudice the jury.  <u>See</u>
<u>Michelson v. United States</u>, 335 U.S. 469, 480, 486 (1948).  The
Court has thus given trial courts wide discretion to limit the
presentation of character evidence.  <u>Id.</u>

In addition, the form of the proffered evidence must be
proper.  Federal Rule of Evidence 405(a) sets forth the sole
methods for which character evidence may be introduced.  It
specifically states that where evidence of a character trait is
admissible, proof may be made in two ways: (1) by testimony as to
reputation and (2) by testimony as to opinion.  Thus, defendant
may not introduce specific instances of his good conduct through

the testimony of others.  <u>See</u> <u>Michelson</u>, 335 U.S. at 477 ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental or moral traits.").

On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue.  <u>See</u> Fed. R. Evid. 405(a).  In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests.  <u>See</u> <u>Michelson</u>, 335 U.S. at 481.  The only prerequisite is that there must be a good faith basis that the incidents inquired about are relevant to the character trait at issue.  <u>See</u> <u>United States v. McCollom</u>, 664 F.2d 56, 58 (5th Cir. 1981).

**VI.   <u>CONCLUSION</u>**

The government requests leave to file such additional memoranda as may become appropriate during the course of the trial.