**EXHIBIT 1**

FILED

2010 SEP 21  PM 4: 36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 10 GR 10 01055 |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act To Be Done] |
| EZRI NAMVAR, aka "Ezri Namvar Moghadam," and HAMID TABATABAI, aka "Hamid Taba," | |
| Defendants. | |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1343, 2]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    Defendant EZRI NAMVAR, also known as ("aka") "Ezri Namvar Moghadam" ("NAMVAR"), operated and controlled Namco Financial Exchange Corp. ("NFE") and Namco Capital Group, Inc. ("NCG"), which were run out of offices located in the same building in Los Angeles, California.  Defendant NAMVAR resided in

1   Los Angeles County, California.

2        2.   Defendant HAMID TABATABAI, aka "Hamid Taba"

3   ("TABATABAI"), was the controller and a vice president of NFE and

4   held similar positions at NCG.  Defendant TABATABAI resided in

5   Los Angeles County, California.

6        3.   Section 1031 of the Internal Revenue Code permitted

7   owners of investment property to defer the capital gains tax that

8   would otherwise be due and owing upon the sale of the investment

9   property by applying, within a set time frame, the sale proceeds

10  to the purchase of an identified replacement investment property

11  or properties.  These transactions were commonly referred to as

12  "like-kind exchanges," "tax-free exchanges," or "1031 exchanges."

13       4.   In a typical 1031 exchange, the owner of an investment

14  property would assign the owner's interest in the investment

15  property to a "qualified intermediary," before the planned sale

16  of the investment property.  The qualified intermediary would

17  then convey the investment property to the buyer, who would

18  deposit the sale proceeds (the "exchange proceeds") into a bank

19  account of the qualified intermediary.  The owner of the

20  investment property that was sold would have 45 days from the

21  date of the sale to identify for the qualified intermediary a

22  like-kind replacement property or properties and 180 days from

23  the date of the sale to close on the purchase of the replacement

24  property or properties.  The qualified intermediary would use the

25  exchange proceeds to fund the purchase of the replacement

26  property or properties, returning any unused funds to the owner.

27       5.   A qualified intermediary had responsibilities and

28  obligations to the owner regarding the safekeeping and use of

2

exchange proceeds. These responsibilities and obligations were typically set forth in a contract referred to as an "exchange agreement."

6. NFE held itself out to owners of investment properties as a qualified intermediary from in or about April 2005, when it was incorporated, to in or about April 2009, when it was forced into bankruptcy proceedings. Before its bankruptcy, NFE entered into exchange agreements with owners selling investment properties to hold the exchange proceeds in safekeeping and then use the exchange proceeds to effectuate 1031 exchanges.

7. NFE was a member of the Federation of Exchange Accomodators ("FEA"), the only national trade association organized to represent professionals who conducted 1031 exchanges, including qualified intermediaries. As part of its FEA membership, defendant NAMVAR, on behalf of NFE, agreed to, among other things:

a. Not loan or otherwise transfer exchange proceeds to any person or entity affiliated with or related to NFE with the exception of a transfer or loan made to a financial institution which was the parent of or related to NFE; and

b. Not invest exchange proceeds in a manner that did not provide sufficient liquidity to meet NFE's contractual obligations to its clients and did not preserve the principal of the exchange proceeds.

B. THE SCHEME TO DEFRAUD EXCHANGE CLIENTS

8. Beginning in or about March 2008, and continuing until at least in or about December 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendants

3

1  NAMVAR and TABATABAI, aided and abetted by others known and
2  unknown to the Grand Jury, knowingly and with intent to defraud,
3  devised, participated in, and executed a scheme to defraud
4  certain of NFE's clients (the "Victim Clients") as to material
5  matters, and to obtain money and property from the Victim Clients
6  by means of material false and fraudulent pretenses,
7  representations, and promises, and the concealment of material
8  facts.

9      9.   The fraudulent scheme operated, in substance, in the
10  following manner.

11      a.   Defendant NAMVAR, defendant TABATABAI, and others
12  held NFE out to the Victim Clients as a qualified intermediary
13  that would hold and use their exchange proceeds pursuant to an
14  exchange agreement.  Per its exchange agreements with the Victim
15  Clients, NFE was paid a fixed fee by the Victim Clients in return
16  for its services.

17      b.   Defendant NAMVAR recruited the Victim Clients,
18  among other ways, by obtaining referrals from accountants and
19  real estate investors.

20      c.   Defendant TABATABAI, on behalf of NFE, signed and
21  entered into exchange agreements with the Victim Clients, who
22  understood at the time they entered in the exchange agreements
23  that NFE would hold their exchange proceeds in a secure account
24  or accounts, where the exchange proceeds would be available upon
25  demand to effectuate 1031 exchanges.  Those exchange agreements
26  are more particularly described as follows:

27      i.   The exchange agreement entered into on or
28  about March 24, 2008, between NFE and "E.M.V. and S.V." (the "V.

4

Exchange");

      ii.  The exchange agreement entered into on or about May 16, 2008, between NFE and La Crescenta Foothill Investments, LLC (the "La Crescenta Exchange");

      iii. The exchange agreement entered into on or about June 17, 2008, between NFE and "L. and I. K. Trust No. 2" (the "K. Trust Exchange");

      iv.  The exchange agreement entered into on or about August 19, 2008, between NFE and Sunnylane Partners, LLC (the "Sunnylane Exchange"); and

      v.  The exchange agreement entered into on or about August 28, 2008, between NFE and "P. and J.L. Family Trust U/D/T Dated October 9, 1987" (the "L. Trust Exchange").

    d.  Instead of holding the Victim Clients' exchange proceeds in a secure account or accounts (where the exchange proceeds would be available upon demand to effectuate 1031 exchanges), defendant NAMVAR, with the knowing assistance of defendant TABATABAI and others, used those exchange proceeds for a variety of purposes unrelated to the Victim Clients' 1031 exchanges, which purposes were not disclosed to the Victim Clients before they entered into the exchange agreements and which the Victims Clients did not authorize.

    e.  Defendant TABATABAI, through NFE's bookkeeper, sent some of the Victim Clients a letter confirming that their exchange proceeds were available for withdrawal upon demand when, in truth and fact as defendant TABATABAI then well knew, they were not.

10. In carrying out the scheme to commit the above-described defraud, defendants NAMVAR and TABATABAI made and caused to be made to the Victim Clients one or more of the following underlined false and fraudulent representations and promises, among others:

a. <u>All of the exchange proceeds were available upon demand pursuant to the terms of the exchange agreement</u>. In truth and fact, as defendants NAMVAR and TABATABAI then well knew, most if not all of the Victim Clients' exchange proceeds were not available upon demand pursuant to the terms of the exchange agreement because they had been used for a variety of purposes unrelated to Victim Clients' 1031 exchanges, such as paying back NCG's creditors and investors.

b. <u>The exchange proceeds would be held in accounts at various banks</u>. In truth and fact, as defendants NAMVAR and TABATABAI then well knew, the exchange proceeds were not going to be held in accounts at various banks.

11. In carrying out this scheme to defraud, defendants NAMVAR and TABATABAI knowingly concealed and caused others to conceal from the Victim Clients the following material facts, among others:

a. NFE did not continuously hold the Victim Clients' exchange proceeds in a secure account or accounts, where the exchange proceeds would be available upon demand to effectuate 1031 exchanges.

b. NFE did not continuously maintain a reservoir of funds sufficient to meet the obligations it had to the Victim Clients under the exchange agreements.

c.  After receiving the Victim Clients' exchange proceeds, NFE transferred by wire and check the exchange proceeds to a variety of individuals and entities, such as:

i.  An NCG bank account, from which the exchange proceeds were used to pay the expenses and liabilities of NCG; and

ii.  Individuals and entities other than NCG to whom defendant NAMVAR and/or NCG owed money.

12.  As part of the above-described scheme to defraud, defendants NAMVAR and TABATABAI caused the Victim Clients to provide NFE with approximately $27 million in exchange proceeds, of which only approximately $4 million was returned to or used on behalf of the Victim Clients pursuant to the exchange agreements.

C.  THE USE OF THE WIRES

13.  On or about the dates set forth below, within the Central District of California, and elsewhere, defendants NAMVAR and TABATABAI, for the purpose of executing the above-described scheme to defraud, transmitted, willfully caused the transmission, and aided and abetted the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

//
//
//
//
//
//
//

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| ONE | 4/2/08 | Wire transfer of $742,955.33 from Land Title Guarantee's Alpine Bank account #XXXXXX2755 in Denver, Colorado, through the Federal Reserve Bank processing center in New Jersey to NFE's Security Pacific Bank business checking account #XXXXX4918 in Ontario, California (in connection with the V. Exchange) |
| TWO | 5/23/08 | Wire transfer of $2,110,318.18 from Glen Oaks Escrow's Comerica Bank Scotts Valley account #XXXXXX0907 in Glendale, California, through the Federal Reserve Bank processing center in New Jersey to NFE's Security Pacific Bank business checking account #XXXXX4918 in Ontario, California (in connection with the La Crescenta Exchange) |
| THREE | 7/30/08 | Wire transfer of $20,324,530.33 from Fidelity National Title Company's City National Bank account #XXXXX8666 in Stockton, California, through the Federal Reserve Bank processing center in New Jersey to NFE's Security Pacific Bank business checking account #XXXXX4918 in Ontario, California (in connection with the K. Trust Exchange) |
| FOUR | 8/20/08 | Wire transfer of $1,999,501.96 from First American Title & Trust, Co.'s First American Trust Co. account #XXXXXX0000 in Oklahoma City, Oklahoma, through the Federal Reserve Bank processing center in New Jersey to NFE's Security Pacific Bank business checking account #XXXXX4918 in Ontario, California (in connection with the Sunnylane Exchange) |

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| FIVE | 9/5/08 | Wire transfer of $1,845,297.92 from Southland Title Corporation's Union Bank, NA, aka Union Bank of California, account #XXXXXX9431 in Glen Allen, Virginia, through the Federal Reserve Bank processing center in New Jersey to NFE's Security Pacific Bank business checking account #XXXXX4918 in Ontario, California (in connection with the L. Trust Exchange) |

A True Bill

_____/s/_____

FOREPERSON

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

BEONG-SOO KIM
Assistant United States Attorney
Chief, Major Frauds Section

JILL T. FEENEY
Assistant United States Attorney
Deputy Chief, Major Frauds Section

BRIAN E. KLEIN
Assistant United States Attorney
Major Frauds Section