SCHEPER KIM & HARRIS LLP
MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
AMOS A. LOWDER (State Bar No. 269362)
alowder@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Attorneys for Defendant Ezri Namvar**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>EZRI NAMVAR, aka Ezri Namvar Maghadam, and HAMID TABATABAI, aka Hamid Taba,<br><br>   Defendants. | CASE NO. CR 10-1055-PA<br><br>**DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT** |

Defendant Ezri Namvar, by and through his counsel of record, hereby respectfully submits his objections to the Presentence Report ("PSR") disclosed on July 15, 2011.  This filing is based on the evidence adduced at trial and the facts set forth below.  Mr. Namvar will file a detailed sentencing position before his sentencing hearing scheduled for September 26, 2011 at 8:30 a.m.

**The Offense Conduct (pages 6-10)**

The "offense conduct" in the presentence report "was obtained from the Indictment and the [government's] trial memorandum." PSR, p. 6, par. 4. As such, the description of the conduct is presented with pejorative characterizations and adversarial motivated allegations, rather than a neutral statement of the conduct that constituted the offense. For example, paragraph 15 states Mr. Namvar "recruited the

1

1  victim clients," but the evidence at trial proved this government allegation to be
2  false -- there was no evidence introduced that any of the victims spoke with Mr.
3  Namvar prior to opening the subject exchanges.  The evidence presented at the trial,
4  and not the grand jury's allegations nor the government's trial memorandum, should
5  be the source of any description of the offense conduct. Mr. Namvar objects to the
6  adoption of the government's adversarial characterizations in what is supposed to be
7  a neutral presentation of the facts, and further objects to the extent the description of
8  the offense conduct in the PSR is not supported by the trial evidence.

9  **Offense Level Computation (page 12)**

10  <u>Specific Offense Characteristics</u> (page 12, par. 45)

11  Mr. Namvar objects to the PSR's 22-level adjustment in the offense level
12  based on the Probation Officer's determination that the amount of the loss for
13  purposes of the Guidelines is at least $20 million and not more than $50 million.
14  PSR, p. 12, par. 45, *citing* U.S.S.G. § 2B1.1(b)(1)(L).
15  The Guideline loss amount "is the greater of actual loss or intended loss."
16  U.S.S.G. § 2B1.1. "Actual loss" for purposes of the Guidelines, "means the
17  reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G.
18  § B1.1, Appl. Note (3)(A)(i).  The PSR failed to apply this standard in determining
19  actual loss.
20  The PSR deems the Guideline "actual loss" to be the difference between the
21  funds the four victims transferred to Namco Financial Exchange ("NFE"), and the
22  funds returned to them. See PSR p. 12, par. 45 (supporting 22-level adjustment by
23  stating, "the Government has provided evidence of losses of $20,940,456."). As
24  noted above, however, "actual loss," for purposes of the Guidelines, is "the
25  *reasonably foreseeable* pecuniary harm that resulted from the offense." U.S.S.G.
26  § 2B1.1, Appl. Note (3)(A)(i) (emphasis added).
27  Accepting for present purposes that the offense consisted of transferring the
28  exchange funds out of an NFE account (as alleged by the government), the relevant

2
DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT

question for loss purposes is whether it was "reasonably foreseeable" that as a result of each of the transfers, NFE would be unable to complete the 1031 exchange transactions. Reasonably foreseeable pecuniary harm is defined by Application Note 3(A)(iv) "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Thus, in order to establish an actual loss amount, the government must prove that Mr. Namvar knew, or reasonably should have known, at the time he transferred the funds, that a potential result would be the inability to complete the exchanges.

The evidence is decidedly to the contrary. The relevant facts the Probation Office must consider in assessing whether it was reasonably foreseeable at the time the subject funds were transferred that the exchange transactions would not be completed include: (1) the assets and resources available to Mr. Namvar at the time of the transfers; (2) the evidence indicating his intent to complete the transactions; (3) the post-transfer efforts he undertook to see that the funds would be returned in full; and (4) the unforeseen and unforeseeable circumstances that resulted in the pecuniary harm. This is precisely the evidence that the government successfully convinced the Court the jury should not hear at the trial. Docket ("Dkt.") 63 ("Government's Motion In Limine to Preclude Introduction of Two Impermissible Defenses . . .").

Notwithstanding the government's efforts, there is evidence in the record that it was not reasonably foreseeable at the time the subject funds were transferred that any of the victims would suffer pecuniary harm. The evidence of Mr. Namvar's ability and intent to complete the exchanges includes his established record and course of conduct in completing all of the exchanges he engaged in over many years, his productive use of the funds once transferred, and his substantial assets and resources. *See, e.g.*, 5/12/11 RT 116:6-12 (in 2008, Mr. Namvar's interests included dozens of limited liability companies worth several hundred million dollars); 5/13/11 RT 41:11-20, 189:23-190:1; 5/17/11 RT 92:18-93:1 (money regularly was

3
DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT

transferred between NFE and Namvar Capital Group ("NCG") for purposes of completing exchanges, and this was the regular practice); 5/17/11 RT 122:6-8 (since its incorporation in 2005, NFE had completed exchanges with a total value of $2 billion); 5/17/11 RT 122:17-21 (in 2008 alone, NFE completed exchanges of $160 million); 5/13/11 RT 199:4-8; 5/17/11 RT 91:17-20 (NFE had always had the funds to complete its exchanges).[1] Further critical evidence of Mr. Namvar's ability to complete the exchanges, and proof it was not reasonably foreseeable that any of the victims would suffer pecuniary harm was successfully excluded by the government. This further evidence included the proffered testimony of other NFE exchange customers, whose exchanges were successfully completed during the time period covered by the alleged scheme to defraud.

This evidence alone is sufficient to establish that it was not reasonably foreseeable that the pecuniary harm on which the PSR's loss amount is based would be a potential result of the transfers. *Compare United States v. Warr*, 530 F.3d 1152, 1155 (9th Cir. 2008) (costs resulting from arson were reasonably foreseeable, where the defendant "was a trained firefighter and a Montana resident who, given his statements, knew the risks of starting fires while forest restrictions were in place [and] knew or should have known costs associated with fires").

Mr. Namvar's post-transfer efforts both corroborate and provide independent proof that it was not reasonably foreseeable he would be unable to complete the four exchanges in question. There was testimony at trial that Mr. Namvar was in the process of selling assets sufficient to complete the four exchanges. 5/17/11 RT 90:16-19. The defense also proffered to the Court formal assignments executed by Mr. Namvar in the Fall of 2008 that pledged the assets from these real estate sales to

---

[1] Mr. Namvar requests that the "Offense Level Computation" section of the PSR be amended to include reference to these uncontroverted facts developed during the trial.

4
**DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT**

NFE. 5/13/11 RT 6:21-25. The assets from any of these pending real estate sales would have been sufficient to complete all of the subject exchanges, but the government successfully excluded the evidence from the trial. 5/17/11 RT 131:23-132:17.

Further proof that it was not reasonably foreseeable Mr. Namvar would be unable to complete the four exchanges is provided by the evidence showing that the inability to do so was the result of an unforeseen and unforeseeable circumstance, and not the result of the transfer of the funds which constituted the offense. This evidence is provided by the proffered testimony of Nicholas Klein. Mr. Klein, an established, experienced and well-respected real estate professional who worked with Mr. Namvar for over 25 years, would have explained in his testimony that the inability to complete the four exchanges was the result of the unprecedented freeze in the commercial real estate market in the fall of 2008. 5/13/11 RT 118:4-120:8.[2] Given the above evidence, it was incorrect for the Probation Office to conclude that there was an actual loss for purposes of the Guideline calculation as to any of the exchanges. That is especially true because the government has the burden of proving the pecuniary harm was a reasonably foreseeable result of the transfers. The government cannot prove by a preponderance, much less by the applicable clear and convincing evidence standard, that it was reasonably foreseeable Mr. Namvar would be unable to complete the exchanges. *See, United States v. Dare*, 425 F.3d 634, 642 (9th Cir.2005) (clear and convincing standard of proof applies "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction."). The government must both show both "but-for" and

---

[2] Mr. Namvar requests that the facts regarding the proffered testimony of Nicholas Klein and the anticipated sale of the Cal-Neva Hotel, Wilshire/Bundy office building, Marriott Hotel and Angeleno Hotel be included in the "Offense Level Computation" section of the PSR.

"proximate" causation in establishing loss. This is required by the provision of U.S.S.G. § 1B1.3(a)(3) that a sentence be based on the harm that "resulted from" the acts or omission of the defendant.

There should be no adjustment in the offense level based on loss. Alternatively, any adjustment must correspond to the reasonably foreseeable pecuniary harm, if any, the government is able to prove with respect to each of the exchanges, taking into account the time and amount of the transfer and the economic circumstances of Mr. Namvar at the time.

**Adjustments for Role in the Offense** (page 13, pars. 47-49)

Mr. Namvar objects to the PSR's four-level adjustment in the offense level based on his role in the offense under U.S.S.G. § 3B1.1. A four-level adjustment under Section 3B1.1 is authorized only where two separate and distinct elements exist: (1) The defendant was an organizer or leader of criminal activity; *and* (2) the criminal activity involved five or more participants or was otherwise extensive. *United States v. Rose*, 20 F. 3d 367, 373 (9th Cir. 1994). The purported basis for the adjustment recommended by the Probation Office is that the offense of conviction was "otherwise extensive." PSR, p. 13, pars. 48 & 49.

The PSR points to no facts in support of a finding that the conduct of conviction was "otherwise extensive."[3] "Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders [citation omitted]; (ii) the number of victims [citation omitted]; and (iii) the amount of money fraudulently obtained." *Rose*, 20 F. 3d at 374.

---

[3] Based on the format of the PSR, it appears that paragraph 49 is intended to provide the justification for the aggravating role enhancement. However, other than the first sentence of that paragraph (discussed further below), the paragraph deals entirely with whether Mr. Namvar was an organizer or leader, not whether the criminal conduct was "extensive."

1    Here, the PSR identifies only two additional individuals, Val Muraoka and
2 Sasha Ettehadieh, who participated in NFE's activities. However, there is no
3 allegation that either of them significantly facilitated or furthered the scheme to
4 defraud. The scheme to defraud, as indicted and articulated to this Court by the
5 government, is limited to the four victims named in the indictment and the act of
6 moving money out of NFE bank accounts. As the government has argued to this
7 Court on more than one occasion, "the scheme to defraud here isn't what happened
8 after the money came in. It's what they represented to the victims when their money
9 came in and how their money was going to be held." 5/13/11 RT 9:3-6; *see also*
10 5/13/11 RT 121:24-122:2 ("What happened subsequent to the money getting
11 transferred over to Namco Capital Group – Defendant Namvar's efforts to repay the
12 money -- are completely irrelevant to the fraud in this case that the Government's
13 alleging."). The government contends that Hamid Tabatabai transferred funds out
14 of NFE accounts at Mr. Namvar's direction. Thus, no one, not even Muraoka or
15 Ettihadieh were involved. Moreover, even if these two NFE employees were
16 intimately involved in the criminal conduct, that would not render the conduct
17 "extensive." *Compare Rose*, 20 F. 3d at 374 (finding that the fraud was "otherwise
18 extensive" where among other factors there were "60 knowing or unwitting
19 employees or outside accountants" and "an untold but no doubt considerable
20 number of bank employees and other outsiders" as well as "scores of duped
21 investors").
22    The number of victims in this case, like the participants, is small and well-
23 defined, particularly as compared to the hundreds of "non-victim" customers of
24 NFE. The government has gone to great lengths to repeatedly emphasize the limited
25 nature of the charged fraud. On numerous occasions the government has stated that
26 the scheme to defraud as alleged in the indictment, and thus the basis for the
27 conviction, "exclusively encompassed the Victims named in the indictment rather
28 that an 'established course of dealing' regarding a broader base of customers."

7

DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT

Dkt. 175, at 61.[4] Thus, the fraud in this case is limited to only four victims, and cannot be considered "extensive" on that basis. *Compare United States v. Stouffer*, 986 F. 2d 916, 927 (5th Cir. 1993) (upholding a finding of "otherwise extensive" where the fraudulent activity involved over 2,000 investors).

Nor does "the amount of money fraudulently obtained" justify application of the sentencing enhancement under § 3B1.1. First, while there is no denying that the overall amount that was lost by these four NFE clients, over $20 million, is large, as argued herein, the loss suffered by these four clients was neither intended nor was it reasonably foreseeable. From March 2008 through December 2008, the period of time set forth in the indictment for the scheme to defraud, numerous other clients of NFE operating under the same exact agreements and under the same circumstances successfully and without incident used the services of NFE as an intermediary for 1031 exchanges. Approximately $160 million in 1031 exchange monies, not part of the scheme to defraud, were handled by NFE without incident. Looking at the totality of the circumstances, the monies while substantial, overstate the breadth, scope and complexity of the fraud scheme as set forth in the indictment.

Moreover, it is wholly improper for the Probation Office to suggest that a four-level enhancement is appropriate based solely on the amount of loss in this case. The PSR recommends a 22-level increase in the offense level based on the amount of loss. It would be impermissible double counting to further increase the offense level based on this exact same factor. The double counting is particularly inappropriate where, as here, the alleged loss is at the low-end of the applicable loss range ($20 million to $50 million). In other words, the PSR already suggests (without the § 3B1.1 enhancement) the same total offense level that would apply in a case where a defendant outright steals $50 million. Under these circumstances, it

---

[4] The government also stresses this point in its recently filed objections to the PSR.

is simply absurd to argue that the offense level should be increased another four levels because the alleged loss was $20 million, even if the Court were to find that the entire loss amount was reasonably foreseeable.  Consequently, the four-level upward adjustment for role should not be applied.

**Offender Characteristics**

Mr. Namvar objects to the following errors in this section of the PSR:

Paragraph 78:  Mr. Namvar did not last use marijuana at age 37 or 38.  He told the Probation Officer that he had not used marijuana in 37 or 38 years (referring to his time in college).

Paragraph 80:  It is not correct that Mr. Namvar was a semester short of receiving his degree from the University of Kansas.  Mr. Namvar completed all required studies at University of Kansas and received his bachelors degree in 1974.

Paragraph 84:  Mr. Namvar never operated a company called "Ran Namco Group of Companies."  The companies he operated were generally referred to as the Namco group of companies.

Paragraph 89:  As discussed with the Probation Officer previously, Mr. Namvar does not have the present ability to provide complete financial data to the Probation Office due to the fact that the bankruptcy trustees have taken control of all of his financial records, as well as records relating to more than 100 LLCs in his control that Mr. Namvar voluntarily turned over to the trustees in early 2009.  Although the basis for the "unsecured debts" figure is not entirely clear, it appears that the figure includes loans or obligations that are part of the Namvar bankruptcies, including contingent liabilities.  If pre-bankruptcy obligations are to be included in this figure, the amount is many, many times the $5,140,714 amount included in the PSR.  If the PSR is meant to include only post-bankruptcy obligations, the proper amount is approximately $500,000.  The loans comprising this post-bankruptcy debt were discussed with the Probation Office during Mr. Namvar's interview.

1       Paragraph 91: This paragraph suggests that Mr. Namvar still owns certain real property. This is incorrect. He does not presently own any real property.

      Paragraph 92: The obligations referenced in this paragraph appear to be pre-bankruptcy obligations. See response to paragraph 89, above.

      Paragraph 95: The Probation Officer's conclusion that Mr. Namvar has not established an inability to pay monetary sanctions is patently absurd. The PSR notes that Mr. Namvar has no meaningful assets, owes millions of dollars in unsecured debts, has a negative monthly cash flow of $14-16,000, and has not worked in 2½ years. During his interview with the Probation Office, Mr. Namvar told the Probation Officer that he has relied exclusively on loans from family and friends to pay his bills. The Probation Office is also aware that the Court has precluded Mr. Namvar from working during his period of home incarceration.

      Paragraph 96: There is no basis for the statement in the PSR that Mr. Namvar has paid counsel $100,000. This assertion is incorrect and should be removed from the PSR.

**Restitution (page 21)**

      Mr.Namvar objects to the PSR's statement that the applicable restitution is $20,940,456. PSR, p. 21, par. 117. The statutory source of authority for restitution here is 18 U.S.C. § 3663A. Section 3663A(a)(2) contains an explicit requirement of both direct and proximate causation. Restitution can only be ordered for a loss which directly results from the defendant's offense and which is proximately caused by it. The required causation must be established to the amount of the loss, and not merely the existence of a loss. The government has the burden of proving the "amount of the loss" by a preponderance of the evidence. 18 U.S.C. § 3664(e).

      The losses that stemmed from the inability to complete the exchanges resulted from and were proximately caused by the intervening and unforeseeable circumstances discussed above, and not the transfer of the funds. The government has not and cannot meet its burden of show direct and proximate causation.

| | | |
|---|---|---|
| 1 | DATED: July 29, 2011 | Respectfully submitted, |
| 2 | | |
| 3 | | SCHEPER KIM & HARRIS LLP<br>MARC S. HARRIS |
| 4 | | AMOS A. LOWDER |
| 5 | | |
| 6 | | |
| 7 | | By: /S/ Marc S. Harris<br>    Marc S. Harris |
| 8 | | Attorneys for Defendant Ezri Namvar |

11

DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENCE REPORT

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 601 West Fifth Street, 12th Floor, Los Angeles, California 90071-2025.

On July 29, 2011, I served true copies of the following document(s) described as

**DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT**

on the interested parties in this action as follows:

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed below and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Scheper Kim & Harris LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY FAX TRANSMISSION:** I faxed a copy of the document(s) to the persons at the fax numbers listed below. The telephone number of the sending facsimile machine was (213) 613-4656. No error was reported by the fax machine that I used.

Jill Hatfield
United States Probation Officer
U.S. District Court – Central District of California
Probation Office
11827 Ventura Boulevard
Studio City, CA 91604-2816
Facsimile: (818) 755-8053

I declare under penalty of perjury that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 29, 2011, at Los Angeles, California.

/S/ Vicki Kirkland
Vicki Kirkland

DEFENDANT EZRI NAMVAR'S OBJECTIONS TO THE PRESENTENCE REPORT