1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   BRIAN E. KLEIN (Cal. State Bar No.: 258486)
4  MONICA D. MANGE (Cal. State Bar No.: 234950)
   Assistant United States Attorneys
5  Major Frauds Section
       1100 United States Courthouse
6      312 North Spring Street
       Los Angeles, California 90012
7      Telephone: (213) 894-6920/6529
       Facsimile: (213) 894-6269
8      E-mail: brian.klein@usdoj.gov
              monica.mange@usdoj.gov
9
   Attorneys for Plaintiff
10 United States of America

11              UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,      ) NO. CR 10-1055-PA
                                  )
14          Plaintiff,            ) GOVERNMENT'S CONSOLIDATED
                                  ) SENTENCING POSITION FOR
15          v.                    ) DEFENDANTS EZRI NAMVAR AND
                                  ) HAMID TABATABAI; EXHIBITS 1-4
16 EZRI NAMVAR,                   )
      aka "Ezri Namvar           )
17    Moghadam,"                  )
   and HAMID TABATABAI,           ) SENTENCING DATE: 10/11/11
18    aka "Hamid Taba,"           ) SENTENCING TIME: 8:30 a.m.
                                  )
19          Defendants.           )
                                  )
20                                )

21

22      Plaintiff United States of America, by and through its

23 counsel of record, the United States Attorney for the Central

24 District of California, hereby respectfully submits its

25 consolidated sentencing position for defendants Ezri Namvar and

26 Hamid Tabatabai.

27      The government's sentencing position is based on the

28 attached memorandum of points and authorities, the files and

1  records in this case (which include the trial evidence), the

2  United States Probation Office's Presentence Reports and related

3  filings, the attached exhibits, and any other evidence or

4  argument that the Court may wish to consider at the time of

5  sentencing.

6  DATED: September 26, 2011        Respectfully submitted,

7                                  ANDRÉ BIROTTE JR.
                                    United States Attorney
8
                                    ROBERT E. DUGDALE
9                                   Assistant United States Attorney
                                    Chief, Criminal Division
10

11                                  _____/s/_____
                                    BRIAN E. KLEIN
12                                  MONICA D. MANGE
                                    Assistant United States Attorneys
13
                                    Attorneys for Plaintiff
14                                  United States of America

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . 1

III.  THE SENTENCING GUIDELINES CALCULATIONS . . . . . . . . 4

      A.   Defendant Ezri Namvar's Calculation . . . . . . . 4

      B.   Defendant Hamid Tabatabai's Calculation . . . . . 6

      C.   Loss And Restitution Calculations . . . . . . . . 10

           1.   The Loss Suffered By The Victims As A Result
                Of The Scheme To Defraud Was Reasonably
                Foreseeable . . . . . . . . . . . . . . . . 12

           2.   The Factors Defendants Cite In Their Objections
                To Their Presentence Reports Do Not Otherwise
                Render The Financial Harm Suffered By The
                Victims Reasonably Unforeseeable . . . . . . 14

           3.   Defendants Jointly Should Be Required To Pay
                Full Restitution Of The Victims' Collective
                Actual Loss Of Almost $21 Million . . . . . 17

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATIONS PURSUANT TO
      THE 18 U.S.C. § 3553(a) FACTORS . . . . . . . . . . . 18

      A.   Recommended Sentence For Defendant Ezri Namvar . . 18

      B.   Recommended Sentence For Defendant Hamid
           Tabatabai . . . . . . . . . . . . . . . . . . . . 21

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

PAGE

**FEDERAL CASES**

United States v. Cantrell,
        433 F.3d 1269 (9th Cir. 2006) ............................. 9

United States v. Cicconi,
        219 F.3d 1078 (9th Cir. 2000) ........................... 16

United States v. Galliano,
        977 F.2d 1350 (9th Cir. 1992) ........................... 16

United States v. Hackett,
        311 F.3d 989 (9th Cir. 2002) ............................ 17

United States v. Hutchison,
        22 F.3d 846 (9th Cir. 1993) ............................. 16

United States v. Kennedy,
        643 F.3d 1251 (9th Cir. 2011) ........................... 18

United States v. McCormac,
        309 F.3d 623 (9th Cir. 2002) ............................ 16

United States v. Meksian,
        170 F.3d 1260 (9th Cir. 1999) ....................... 17, 18

United States v. Patterson,
        538 F.3d 1064 (9th Cir. 2008) ........................... 17

United States v. Rodrigues,
        229 F.3d 842 (9th Cir. 2000) ............................ 17

United States v. Sholwalter,
        569 F.3d 1150 (9th Cir. 2001) ........................... 11

United States v. Treadwell,
        593 F.3d 990 (9th Cir. 2010) ........................ 10, 11

United States v. Weiland,
        420 F.3d 1062 (9th Cir. 2005) ........................... 7

**DOCKETED CASES**

Neilson v. Paul and Judith Laska Family Trust,
        Case No. 2:11AP-1392-BR (C.D. Cal. Bankruptcy Court) .... 19

**FEDERAL STATUTES**

18 U.S.C. § 1343 ............................................ 1

18 U.S.C. § 2259 ........................................... 18

18 U.S.C. § 3363A .......................................... 18

ii

18 U.S.C. § 3553(a) ...................................... 10, 18

USSG § 2B1.1 ........................................... passim

USSG § 2B1.1(a)(1) ..................................... passim

USSG § 3B1.1 ............................................... 5

USSG § 3B1.1(a) ........................................... 5

USSG § 3B1.1(c) ......................................... 5, 6

USSG § 3B1.2 ........................................ 7, 9, 10

USSG § 3B1.2(a) ........................................... 8

USSG § 3E1.1 .............................................. 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Defendants Ezri Namvar and Hamid Tabatabai await sentencing after a jury convicted them each of four counts of wire fraud, in violation of 18 U.S.C. § 1343.  The government recommends that the Court sentence defendant Namvar to a 120-month term of imprisonment, which is within the government's calculation of his Sentencing Guidelines range, and sentence defendant Tabatabai to a 57-month term of imprisonment, which is the low-end of the government's calculation of his Sentencing Guidelines range, taking into account a four-level downward variance.  The government also recommends that the Court sentence each of them to three years of supervised release and order them to pay a $400 mandatory special assessment and joint restitution in the amount of $20,930,648.

Defendants deserve their respective substantial sentences. After all, as the jury found, they participated in a scheme to defraud four former clients (the "Victims") of one of defendant Namvar's companies, Namco Financial Exchange Corp. ("NFE"), out of approximately $25 million that the Victims had collectively entrusted to NFE.  A significant prison sentence will appropriately punish defendants -- both of whom are unrepentant -- for their crimes.

**II. BACKGROUND**

On May 19, 2011, defendants were convicted at a jury trial of four counts of wire fraud, in violation of 18 U.S.C. § 1343. The government emphasizes for the Court the following information adduced from the trial testimony and evidence, which the

1 government believes is relevant to the Court's sentencing

2 decisions.[1]

3     In 2008, defendants carried out a scheme to defraud the

4 Victims.  To execute the scheme, they held NFE out to the Victims

5 as a qualified intermediary whose sole purpose was to hold the

6 Victims' money safely in an NFE bank or savings account(s) until

7 they needed it to effectuate their 1031 exchanges.  At the time

8 the Victims entered into their respective exchange agreements

9 with NFE, however, defendants knew that the Victims' exchange

10 proceeds would not remain the entire time in NFE accounts. (See,

11 e.g., 5/17/11 RT 85:22-86:3, 86:5-13, 87:11-15.)  Instead,

12 defendants used those funds for a variety of undisclosed and

13 unauthorized purposes, such as to pay off other clients of NFE

14 and the creditors of another company defendant Namvar ran and

15 controlled called Namco Capital Group, Inc. ("NCG"), a "hard

16 money" lending and real estate development business.  (GX 1-3, 8-

17 13; 5/17/11 RT 71:1-7, 14-16, 151:21-152:3, 153:12-15.)

18     In total, the Victims entrusted NFE collectively with

19 approximately $25 million in exchange proceeds via interstate

20 wire transfer.  (GX 3-6, 8-11, 76.)  Of that $25 million, only

21 approximately $4 million was returned to or used on behalf of the

22 Victims.  (5/6/11 RT 67-23-68:13, 5/10/11 RT 17:12-14, 99:24-

23

24 _____

25     [1] This sentencing memorandum incorporates by reference the Factual Background section of the Government's Consolidated Opposition to Defendants Ezri Namvar's and Hamid Tabatabai's Rule

26 29 and 33 Motions.  (CR 175 at 2-9.)  "CR" refers to the Criminal Docket.  "RT" refers to the Reporter's Transcript of Proceedings,

27 preceded by the date and followed by the applicable page reference.  "GX" refers to government's admitted trial exhibits.

28 The government is only attaching GX 8-14 as an exhibit.  The government will file the remaining GX referenced in this filing, at the Court's request.

1   100:3, 5/11/11 RT 173:8-11.)

2          The centerpieces of the fraud scheme were the 1031 exchange

3   agreements that defendant Tabatabai signed and entered into, on

4   behalf of NFE, with each of the Victims. (GX 101, 301, 401,

5   501.)  At the time each of the Victims signed their respective

6   exchange agreements, they understood that the agreements required

7   NFE to hold their money in an NFE account the entire time (not

8   transferred to another unaffiliated company or used to pay

9   expenses unrelated to them). (5/4/11 RT 245:6-10, 248:16-20,

10  253:22-254:2; 5/4/11 (afternoon)[2] RT 22:24-23:5, 13-16, 21-25;

11  5/6/11 RT 196:9-15, 198: 2-9; 5/10/11 RT 39:24-40:10, 63:8-10;

12  5/11/11 RT 153:3-13, 175:23-176:10, 206:22-207:2; 5/12/11 RT

13  18:2-12.)  The four identical exchange agreements did not mention

14  NCG, or reference the fact that defendants could and would use

15  the Victims' money for expenses unrelated to their 1031

16  exchanges. (GX 101, 301, 401, 501; 5/10/11 RT 67:4-9, 100:4-12;

17  5/11/11 RT 131:7-8, 147:8-25, 148:1-4.)

18         Based on the documentation the Victims received, their

19  general understanding of a 1031 exchange, prior 1031 exchanges

20  some of the Victims had done with NFE, and conversations or e-

21  mail exchanges some of them had with NFE employees or defendants

22  themselves, each Victim believed and understood that their money

23  would be held in safekeeping for them in an NFE account, so that

24  it would be readily available to them when they needed it.

25  (5/4/11 RT 248:6-11, 16-20, 253:19-254:12, 257:5-23; 5/6/11 RT

26  196:2-15, 197:21-198:1; 5/10/11 RT 63:13-24, 66:1-4, 67:4-9,

27

28         [2]  A portion of the afternoon proceedings on May 4, 2011 was
    reported by Mark Schweitzer.  Accordingly, this citation and
    others to that afternoon come from the second transcript of that
    date.

                                    3

132:14-21, 152:16-153:3; 5/11/11 RT 135:12-20, 136:7-24, 143:2-144:5, 145:4-9, 147:8-12, 153:3-16; 5/13/11 RT 86:6-11, 89:15-90:4, 90:15-18.)

At trial, each Victim testified that the only reason they decided to use NFE was to keep their money safe and ready for their use when they identified a replacement property, which could have been at any time within the 45-day period.  (5/4/11 RT 248:6-11, 257:5-23; 5/6/11 RT 197:21-23, 206:15-19; 5/10/11 RT 63:15-18, 68:3-6; 5/11/11 RT 143:2-144:5, 149:17-22, 150:12-23.) Each Victim also testified that they would have never entrusted their money to NFE if they had known that their money would be transferred over to another company (i.e., NCG), used to pay bills, loaned out to others, used to pay another company's creditors, used for another company's investments, or used for defendant Namvar's own investments.  (5/4/11 (afternoon) RT 22:24-23:25; 5/10/11 RT 18:1-24, 100:4-22; 5/11/11 RT 147:8-148:4, 173:21-23, 174:17-20, 175:19-176:16.)

### III. THE SENTENCING GUIDELINES CALCULATIONS

### A.   Defendant Ezri Namvar's Calculation

The Probation Office's Presentence Report ("PSR") for defendant Namvar was disclosed on July 15, 2011, and it calculated his total offense level as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [USSG § 2B1.1(a)(1)] |
| Loss of more than $20 million: | +22 | [USSG § 2B1.1(b)(1)(L)] |
| Organizer/Leader | +4 | [USSG § 3B1.1(a)] |
| **Total Offense Level:** | **33** | |

(PSR ¶¶ 41-56.)  The PSR also calculated a criminal history

category of I, due to zero criminal history points.  (<u>Id.</u> ¶¶ 58-61.)  Based on a total offense level of 33 and a criminal history category of I, the PSR calculated the following for defendant Namvar: 1) a Sentencing Guidelines range of 135 to 168 months imprisonment; 2) a term of supervised release of two to three years; 3) a fine between $17,500 and $175,000; 4) a $400 mandatory special assessment; and 5) restitution in the amount of $20,940,456.  (<u>Id.</u> ¶¶ 99, 102, 110, 112, 117.)

The government agrees with the PSR's factual findings to the extent noted in the Government's Objections to the Presentence Reports of Defendants Ezri Namvar and Hamid Tabatabai.[3]  (<u>See</u> CR 184).  Further, the government supports the PSR's Sentencing Guidelines calculations, with one exception.  The government is revising its position regarding the adjustment for role in the offense, pursuant to USSG § 3B1.1.  Although there is evidence to support a four-level enhancement under 3B1.1(a), the government believes that a two-level enhancement under 3B1.1(c) is appropriate.  There can be no doubt that defendant Namvar was the organizer and leader of the charged scheme to defraud.  He was the Chairman of the Board of Directors, President/CEO, and CFO of NFE, as well as the controlling shareholder along with his immediate family.  (GX 72.)  He was also the person who set up NFE, laying the framework for the fraud, and was the person who made defendant Tabatabai NFE's Vice President.  (GX 63, 72.)  Moreover, defendant Namvar was the Chairman of the Board of Directors, President, and sole shareholder of NCG, where a large

---

[3]  At approximately 12:45 p.m. today, the Probation Office filed a first addendum to defendant Namvar's PSR.  The government will respond, if necessary, in a filing later this week.

1   portion of Victim money ended up and was subsequently spent (all

2   without the Victims' authorization).  (GX 12, 72; 5/12/11 RT

3   145:5-9.)  Indeed, he was in charge of determining how much

4   Victim money left NFE's accounts and how that money would

5   ultimately be used.  (See, e.g., 5/17/11 RT 207:4-208:8.)  Thus,

6   defendant Namvar should receive a two-level enhancement for his

7   role in the offense under 3B1.1(c), and as a result, his revised

8   total offense level is 31 (108 to 135 months imprisonment).

9        The government offers its support of the loss and

10  restitution calculations, which are contested,[4] in a separate

11  section below.

12  **B.   Defendant Hamid Tabatabai's Calculation**

13       The Probation Office's Revised Presentence Report ("RPSR")

14  for defendant Tabatabai was disclosed on August 22, 2011,[5] and it

15  calculated his total offense level as follows:

16  Base Offense Level:      7    [USSG § 2B1.1(a)(1)]

17  Loss of more than
     $20 million:          +22    [USSG § 2B1.1(b)(1)(L)]
18
     Minimal Role          -4    [USSG § 3B1.2(a)]
19
20  **Total Offense Level:      25**

21  (RPSR ¶¶ 42-57.)  The RPSR also calculated a criminal history

    category of I, due to zero criminal history points.  (Id. ¶¶ 59-
22
    62.)  Based on a total offense level of 25 and a criminal history
23
    category of I, the RPSR calculated the following for defendant
24
    Tabatabai: 1) a Sentencing Guidelines range of 57 to 71 months
25

26  _____

27       [4]  See Defendant Hamid Tabatabai's Objections to the
    Presentence Report (CR 185 at 9-11) and Defendant Ezri Namvar's
    Objections to the Presentence Report (CR 186 at 2-6, 10).
28
         [5]  The RPSR takes into account the parties objections to the
    original PSR and includes information defendant Tabatabai
    provided when interviewed.

                                    6

imprisonment; 2) a term of supervised release of two to three years; 3) a fine between $10,000 and $100,000; 4) a $400 mandatory special assessment; and 5) restitution in the amount of $20,930,648. (Id. ¶¶ 102, 105, 113, 115, 120.)

The government agrees with the RPSR's factual findings[6] and Sentencing Guidelines calculations[7] with respect to defendant Tabatabai, with one exception. For the reasons noted in the Government's Objections to the Presentence Reports of Defendants Ezri Namvar and Hamid Tabatabai (CR 184 at 5-7), defendant Tabatabai does not qualify for a "minimal role" downward adjustment (as the RPSR contends in Paragraphs 49-50), or even a "minor role" adjustment, pursuant to USSG § 3B1.2. For the Court's convenience, the government restates its argument.

3B1.2 provides:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a)  If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

---

[6]  The third to last sentence of paragraph 14 of the RPSR begins with "According to Tabatabai . . . ." It is the government's understanding that the next two sentences are also assertions of defendant Tabatabai. The government does not agree with any of defendant Tabatabai's assertions found in the RPSR's Offense Conduct section.

[7]  Even though defendant Tabatabai denied his guilt before trial, during trial, and to this day, he argues that he is entitled to a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1. (CR 185 at 8.) This is erroneous and neither the Sentencing Guidelines nor case law support defendant Tabatbai's argument. (See USSG § 3E1.1 cmt. n. 2; see, e.g., United States v. Weiland, 420 F.3d 1062, 1080 (9th Cir. 2005) ("Appropriate downward adjustment for acceptance of responsibility after trial might include when a defendant challenges the constitutionality of a criminal statute, or other like circumstances.").

7

1                      In cases falling between (a) and (b), decrease

2                      by 3 levels.

3 The commentary states that 3B1.2 "provides a range of adjustments

4 for a defendant who plays a part in committing the offense that

5 makes him substantially less culpable than the average

6 participant." Id., app. n. 3(A).  A "minimal participant" is

7 defined as follows:

8              Minimal Participant.–– Subsection (a) applies to

9              a defendant . . . who plays a minimal role in
             concerted activity.  It is intended to cover

10              defendants who are plainly among the least
             culpable of those involved in the conduct of

11              a group. Under this provision, the defendant's
             lack of knowledge or understanding of the scope

12              and structure of the enterprise and of the
             activities of others is indicative of a role

13              as minimal participant.  It is intended that the
             downward adjustment for a minimal participant
             will be used infrequently.

14 Id., cmt. n. 4.  The RPSR contends that defendant Tabatabai

15 qualifies for such a role reduction because his "role is seen as

16 minimal in comparison to [defendant] Namvar."  (RPSR ¶ 50.)  The

17 RPSR goes on to state in support of its position that defendant

18 Tabatabai: is "substantially less culpable;" was defendant

19 Namvar's employee; "there is no indication that he was

20 responsible for moving client money, or making unauthorized

21 transactions with client money; and defendant Namvar "authorized

22 most of the transfers," with the money used for his benefit.

23 (Id.)  The RPSR does note that defendant Tabatabai signed all the

24 1031 exchange agreements and had online access to bank accounts.

25 (Id.)

26      The facts of this case do not support a four-level decrease

27 in defendant Tabatabai's total offense level for minimal

28 participation, or even minor participation, pursuant to 3B1.2(a).

To qualify for a minimal or minor role reduction under 3B1.2, a defendant must be significantly less culpable than co-participants. See United States v. Cantrell, 433 F.3d 1269, 1283 (9th Cir. 2006); USSG § 3B1.2, cmt. n. 3(A).

Although the government concedes that defendant Tabatabai was not the fraud scheme's mastermind (the evidence shows that defendant Namvar was its organizer and leader), he had a detailed understanding and thorough knowledge of the scheme, and he played a significant role in it, not a minimal or even minor one. The evidence at trial established these facts. Defendant Tabatabai was the controller of NFE and NCG, and he was NFE's Vice President. (GX 63; 5/17/11 RT 82:24-25.) He was the only person who checked the bank accounts of both NFE and NCG online on an almost daily basis to see the different account balances and to see how much money was moving in and out of NFE's and NCG's bank accounts. (GX 32-34, 36; 5/12/11 RT 39:15-17, 40:3-4.) And NFE's and NCG's bookkeepers only moved money out of those companies, respectively, at his direction. (5/6/11 RT 168:12-19, 187:16-18; 5/11/11 RT 21:24-22:3, 70:18-20.) Further, when NFE needed the money that had been transferred to NCG, NFE's bookkeeper would make a request to defendant Tabatabai who would, in turn, instruct NCG's bookkeeper to transfer money from NCG back to NFE. (5/11/11 RT 99:22-100:22, 101:6-21.) Moreover, defendant Tabatabai knew that the exchange agreements with the Victims were deceptive because, at the time he signed them, he knew that their money would not stay in an NFE account but would be, for example, transferred over to NCG to use for things unrelated to the Victims. (5/17/11 RT 85:22-86:3, 86:5-13,

9

87:11-15.)  In addition, the importance of his entering into the exchange agreements, with whose terms and provisions he was familiar, on behalf of NFE should not be discounted.  (GX 101, 301, 401, 501; (5/17/11 RT 202:16-19, 203:10-13.)  After all, entering into the agreements with the Victims was integral to putting the fraud scheme in motion.  For these reasons, among others, there can be no doubt that defendant Tabatabai was a substantial participant in the scheme to defraud the Victims,[8] and therefore the Court should reject any role reduction pursuant to 3B1.2.

Accordingly, defendant Tabatabai's total offense level should be 29, resulting in a Sentencing Guidelines range of 87 to 108 months imprisonment.  That said, the government believes that a four-level downward variance is warranted in the case of defendant Tabatabai, which has a Sentencing Guidelines range of 57 to 71 months imprisonment.  The reasons for this variance will be discussed below in the government's discussion of the 18 U.S.C. § 3553(a) factors.

## C.  Loss And Restitution Calculations

USSG § 2B1.1 requires the district court to calculate the amount of loss attributable to an individual defendant's conduct in perpetrating the fraud.  United States v. Treadwell, 593 F.3d 990, 1003 (9th Cir. 2010).  "'Actual loss' is defined as the 'reasonably foreseeable pecuniary harm that resulted from the offense,' meaning monetary harm 'that the defendant knew or, under the circumstances, reasonably should have known was a

---

[8]  Additional discussion of defendant Tabatabai's significant role in the fraud scheme is found on pages 26-36 of the Government's Consolidated Opposition to Defendants Ezri Namvar's and Hamid Tabatabai's Rule 29 and 33 Motions.  (CR 175.)

potential result of the offense.'"  <u>Id.</u> (citing USSG § 2B1.1,
cmt. n.3(A)(I), (iv)).  "In making this estimate, the district
court is required to consider 'available information ... as
appropriate and practicable under the circumstances' including
'general factors such as the scope and duration of the offense
....'"  <u>Id.</u> (citing USSG § 2B1.1, cmt n.3(C)).  District courts
have broad discretion to consider information relevant to the
sentencing determination provided that the information has
sufficient indicia of reliability to support its probable
accuracy.  <u>United States v. Sholwalter</u>, 569 F.3d 1150, 1159-60
(9th Cir. 2001) (quotations and citations omitted).

        In this case, defendants' PSRs calculated a loss amount of
$20,940,456, with the RPSR for defendant Tabatabai lowering the
loss amount to $20,930,648.  This minor downward revision was
based on certain facts presented in the Government's Objections
to the Presentence Reports of Defendants Ezri Namvar and Hamid
Tabatabai.  (CR 184 at 3-4.)  The Victims' actual loss amounts
are as follows: (1) Vasquez Trust - $742,955; (2) Karsin Trust
(Getlin) - $17,491,919; (3) Sunnylane - $1,972,003; and (4) Laska
Trust - $723,771.  (<u>See</u> Exhibit 1, NFE QuickBook Reports for
Victims; <u>see also</u> GX 3-6 (bank records), 8-14 (charts).)  These
actual, out-of-pocket loss numbers do not include interest
purportedly earned or the exchange fees paid by the Victims.
(<u>See</u> Exhibit 1.)  The loss numbers are based on the amount of
money each Victim provided to NFE via interstate wire transfer
that they did not receive back.  Adding up the individual loss
amounts suffered by each of the Victims results in a collective
actual loss of $20,930,648.

Defendants argue in their objections to their PSRs that a 22-level adjustment in offense level pursuant to USSG § 2B1.1(b)(1)(L) is not warranted in this instance because the actual loss to the Victims of almost $21 million was not foreseeable to them.  (CR 185 at 9; CR 186 at 3.)  They argue that the Victims' losses were not foreseeable based on several factors including: that the assets and resources were available to defendant Namvar at the time of the transfers; that defendant Namvar intended to repay the Victims as evidenced by failed attempts to sell some of the properties he owned; and that the market crash in 2008 was unforeseeable.  (CR 185 at 10; CR 186 at 3.)  As discussed in greater details below, their arguments fail on multiple grounds.  The pecuniary harm the Victims suffered from defendants' fraudulent scheme was reasonably foreseeable. After all, defendants were entrusted with money to hold in safekeeping, but instead, without authorization, used the Victims' money for other purposes.  Accordingly, it is proper to calculate the loss amount pursuant to the "actual loss" standard articulated in 2B1.1(b), cmt. n. 3(A)(i).

### 1. The Losses Suffered By The Victims As A Result Of The Scheme To Defraud Were Reasonably Foreseeable

There can be no doubt that defendants were aware or, under the circumstances, reasonably should have been aware, that the Victims could have suffered financial harm as a result of their fraudulent scheme.  As was noted above, defendant Namvar ran and controlled NFE and NCG and defendant Tabatabai was his right-hand man, who oversaw the movement of money, at defendant Namvar's direction, and had intimate knowledge of both companies' finances and practices.

1    In this case, defendants used the Victims' approximately $25
2    million to cover other 1031 exchanges or transferred the money
3    over to NCG, where it was used by NCG for its (defendant
4    Namvar's) own purposes, such as to pay "loans" and "interest" to
5    NCG clients. (Exhibit 2 (GX 8-13).)  For the money that was used
6    to pay other NFE clients, like the Vasquez's money (id. (GX 8 at
7    1)), that specific money was not spent not for the Victim's
8    benefit and thus its loss to the Victim was reasonably
9    foreseeable.  For the money that went to NCG, loss was equally
10   reasonably foreseeable.  As the attached February 26, 2010 report
11   of the bankruptcy trustees of defendant Namvar and NCG (Trustees'
12   Report") explained, from April 2006 onward, NCG was incurring
13   significant losses and had begun a "perilous financial slide."
14   (Exhibit 3 at 6-7.)  "Namco was descending into a monthly spiral
15   of increasing expenses and decreasing income." (Id. at 7.)  Due
16   to their respective positions at NFE and NCG, both defendants
17   would have been aware of NCG's precarious position.  Further, the
18   evidence at trial showed that defendants used Victim money to try
19   to keep NCG afloat.  For example, within days of the
20   approximately $20.3 million of the Karsin Trust money being wired
21   into a NFE account, over $8 million of it had been transferred
22   out of the NFE account over to NCG, where it was spent without
23   authorization in the span of four days on things such as loan
24   repayments and interest payments to NCG investors, payroll, and
25   transferred over to a limited liability company in defendant
26   Namvar's childrens' names. (See Exhibit 2 (GX 11-12).)
27   When defendants used the Victims' money without their
28   authority or consent, it was therefore reasonably foreseeable (or

13

at a minimum should have been reasonably foreseeable in light of the circumstances) to them that there was an inherent risk that the Victims' money would not be there when the Victims needed it. See 2B1.1, cmt. n. 3(A)(iv).  After all, the defendants were not doing what they were supposed to do with the funds and NCG was in precarious financial shape.

The fact that Victim money was at serious risk once it went to NCG is even more egregious in light of the fact that each Victim was led to believe that their money would stay in an NFE bank or savings account until they were ready to complete their 1031 exchanges.  (See GX 101, 301, 401, 501.)  The Victims were therefore entirely unaware of this risk and did not intend to assume any of the risk to which defendants subjected their money.

Accordingly, even if defendants truly believed that they could have paid the Victims back somehow at a later point in time, they knew (or in light of the circumstances, at a minimum, reasonably should have known) that what they did with the Victims' money could result in financial losses to the Victims.

**2.    The Factors Defendants Cite In Their Objections
To Their Presentence Reports Do Not Otherwise Render
The Financial Harm Suffered By The Victims Reasonably
Unforeseeable**

The four factors defendants cite as evidence that the pecuniary harm the Victims' suffered was unforeseeable are without merit.  Defendants begin by arguing that the financial harm was unforeseeable because defendant Namvar had enough resources at the time of the transfers to pay the Victims back and intended to do so (factors one and two).  (CR 185 at 10-11; CR 186 at 3-5.)  In doing so, they attempt to focus the Court's attention on NFE's previous "track record."  This is irrelevant,

however, in light of the financial analysis presented at trial and NCG's financial position as outlined in the Trustees' Report. (See Exhibits 2 (GX 8-14) and 3 (Trustees' Report).)  After all, the Victims entrusted their money to NFE in 2008, which was well after NCG began experiencing severe financial difficulty in April 2006.  Further, by September 23, 2008,[9] although exchange money (including Victim money) continued to pour out of NFE, there was never enough money coming back from NCG to any of NFE's six bank accounts to cover all of the Victims' exchanges.  (Exhibit 2 (GX 14 at 6); 5/12/11 RT 170:3-172:12.)  From the end of September 2008 to the end of October 2008, tens of millions of dollars were funneled out of NFE by defendants on a daily basis, notwithstanding their knowledge that NCG did not have sufficient funds to cover the transfers, as evidenced by their repeated failure to transfer any substantial portion of that money back to NFE.  (See Exhibit 2 (GX 14 at 6-8).)[10]  By the end of December 2008, NFE had only $72,828 in all of its NFE bank accounts combined.  (Id. (GX at 8).)  This evidence undermines defendants' assertion that, at the time the Victims' money was transferred and used, they believed there was a sufficient amount of assets and resources to pay the Victims back.

Likewise, the failed efforts to allegedly pay the Victims back by selling real estate cannot factor into the foreseeability analysis (factor three).  Alleged attempts to sell property both

---

[9]  Less than a month before NFE agreed to hold in safekeeping Sunnylane's and Laska Trust's money.  (See Exhibit 2 (GX 9-10).)

[10]  Defendant Tabatabai had knowledge of all of the account balances.  (GX 32, 33.)  He also testified that he would only transfer money back and forth between NCG and NFE at defendant Namvar's direction.  (5/17/11 RT 120:8-10.)

contemporaneously and after the fact, do not render the loss to
the Victims any less foreseeable especially, as defendants
contend, because these failed attempts occurred at the same time
defendants assert the real estate market was collapsing.  In any
event, whether defendants had an intent to repay the Victims is
only determinative of whether a district court should use
intended or actual loss in calculating a defendant's sentence,
not whether the loss was foreseeable.  Cf., United States v.
McCormac, 309 F.3d 623, 629 (9th Cir. 2002) ("intended loss
should not be an inquiry into intent to repay but rather should
focus on the intended financial harm"); cf. also United States v.
Cicconi, 219 F.3d 1078 (9th Cir. 2000) (court need not deduct the
cost of refunds and recoveries from the total amount taken where
such services permitted the fraudulent scheme to continue).
Hence, even if it was established that defendants did intend to
repay the Victims and had successfully paid off some or all of
the Victims (only the latter of which happened in part for
certain Victims in this case), this fact would have only
potentially altered the actual loss calculation amount -- it
would have not rendered that loss unforeseeable, as defendants
contend.  See, e.g., United States v. Hutchison, 22 F.3d 846, 855
(9th Cir. 1993) (intended loss rather than actual loss applies
when defendant did not intend to repay loans under 2F1.1)[11];
United States v. Galliano, 977 F.2d 1350, 1353 (9th Cir. 1992)
(if defendant intended to make good on all or part of the loan
then the actual loss incurred by the victim is used to calculate

---

[11]   2B1.1 replaced 2F1.1 in 2001.   Pursuant to 2B1.1, cmt.
n. 3, loss is the greater of actual loss or intended loss subject
to certain exclusions, which the government factored in when
determining the actual overall actual loss amount in this case.

1   the amount of loss if it is greater than the intended loss).

2       Defendants' assertion that the market crash in 2008 created

3   an unforeseeable situation is also without merit (factor four).

4   As was noted above, NCG was already headed towards financial

5   collapse.  Moreover, it should not be forgotten that if

6   defendants had kept the Victims' money in an NFE account as

7   promised, instead of using it as they saw fit, the Victims would

8   have suffered no losses.  Because defendants used/spent the

9   Victims' money instead of holding it in safekeeping as promised,

10  it was reasonably foreseeable that they would not have the money

11  to pay the Victims back, particularly because NCG was on the road

12  to bankruptcy and defendants were using Victim money in a failed

13  attempt to keep it afloat.

14          **3.  Defendants Jointly Should Be Required To Pay Full**
            **Restitution Of The Victims' Collective Actual Loss Of**
15          **Almost $21 Million**

16      Restitution pursuant to 18 U.S.C. § 3363A (Mandatory

17  Restitution to Victims of Certain Crimes) may be awarded only for

18  losses in which a defendant's conduct was the "actual and

19  proximate cause."  United States v. Patterson, 538 F.3d 1064,

20  1068 (9th Cir. 2008); see also United States v. Hackett, 311 F.3d

21  989, 993 (9th Cir. 2002).  If there is an intervening cause of

22  the loss or if the loss is too remote, restitution has been found

23  to be inappropriate.  See United States v. Meksian, 170 F.3d

24  1260, 1263 (9th Cir. 1999) (intervening cause); United States v.

25  Rodriques, 229 F.3d 842, 845 (9th Cir. 2000) (holding no

26  restitution for consequential losses or other losses that are too

27  remote).  That said, losses that are even "one step removed" have

28  been found appropriate, as long as the intervening cause was tied

directly to the crime.  <u>Meksian</u>, 170 F.3d at 1263.  Importantly, the Ninth Circuit recently explained:

> . . . [e]ven when factors other than the defendant's conduct contributed to a specific loss, a defendant may be held liable for restitution so long as the defendant's conduct was a "material and proximate cause" of the loss.

<u>United States v. Kennedy</u>, 643 F.3d 1251, 1262 (9th Cir. 2011) (upholding restitution under 18 U.S.C. § 2259 within context of discussion of 18 U.S.C. § 3363A).  Here, defendants' conduct directly caused the Victims' actual losses -- as noted above, they are the ones who did not keep the Victims' money in safekeeping as promised.  Their criminal conduct was the actual and proximate cause of the Victims' losses.  Those losses were not due to intervening or unforeseen circumstances, as defendant Namvar suggests.  (<u>See</u> CR 186 at 10.)  The Court therefore should require that defendants jointly pay full restitution of the Victims' actual collective loss of $20,930,648.

### IV. THE GOVERNMENT'S SENTENCING RECOMMENDATIONS PURSUANT TO THE 18 U.S.C. § 3553(a) FACTORS

**A.    Recommended Sentence For Defendant Ezri Namvar**

As noted at the outset, the government recommends a 120-month term of imprisonment for defendant Namvar.  This sentence is within the government's calculation of the Sentencing Guidelines range of 108 to 135 months imprisonment for defendant Namvar.  The government also recommends that the Court sentence defendant Namvar to three years of supervised release and order him to pay a $400 mandatory special assessment and restitution in the amount of $20,930,648 jointly with defendant Tabatabai.

With respect to the factors set forth in Section 3553(a)(1), the nature and circumstances of the offense and the history and

characteristics of defendant, the government's recommended sentence is appropriate.  Defendant Namvar was the leader of a massive scheme to defraud, one that took in approximately $25 million under false pretenses from the unwitting Victims and caused real and severe harm.  For example, as a result of this offense, one of the Victims' hard-earned retirement and ability to take care of their handicapped daughter has been ruined. (Exhibit 4 at 6 (Victim Impact Statement of Laskas).)  For another Victim, in addition to the significant monetary loss suffered (over $17 million), defendants' crime destroyed family ties and a father's legacy.  (<u>Id.</u> at 27 (Victim Impact Statement of Getlin).)

This is not the story of a businessman who on one isolated occasion chose the wrong path.  Defendant Namvar engaged in a large-scale scheme to defraud and got his loyal right-hand man, defendant Tabatabai, to help him carry out the scheme.  That a small portion of certain Victims' money was returned or used as originally intended does not alter these facts.[12]  Moreover, it should be remembered just how defendants used Victim money.  They paid off other clients of NFE and transferred it to NCG, where it was used to pay bills, loaned out to others, used to pay NCG creditors, used for another company's investments, or used for defendant Namvar's own investments.  (Exhibit 2 (GX 8-13); 5/17/11 RT 71:1-7, 14-16, 151:21-152:3, 153:12-15.)  In fact, NCG

---

[12]  It is worth noting that one of the Victims, the Laskas, are actually being sued by the bankruptcy trustees for defendant Namvar and NCG for the $500,000 that NFE paid the Laskas on November 5, 2008 (after Mr. Laska repeatedly went to defendant Namvar and begged him for their money back) because it is an alleged "preference."  <u>See</u> <u>Neilson v. Laska Family Trust</u>, Case No. 2:11AP-1392-BR (C.D. Cal. Bankruptcy Court).

1  sent $500,000 to one of defendant Namvar's own brothers.
2  (Exhibit 2 (GX 12 at 7).)

3      Defendant Namvar chose to engage in a massive fraud scheme,
4  despite having every opportunity to participate in lucrative and
5  law-abiding ways of making money and providing for himself and
6  his family.  Defendant Namvar appears to have a loving and stable
7  family life, and he is well educated, having received an MBA from
8  UCLA.  (PSR ¶¶ 67-68, 70, 79 (Defendant Namvar).)  As the Court
9  is well aware, defendant Namvar has had the types of advantages
10 most offenders who appear before this Court could never even
11 dream of having.  Although it is true that he had no prior
12 criminal record (Id. ¶ 60), the nature and circumstances of the
13 offense and the history and characteristics of defendant Namvar
14 weigh heavily in favor of the government's recommended sentence
15 of 120 months imprisonment.

16     The government's recommended sentence also serves all of the
17 remaining Section 3553(a) factors.  It reflects the seriousness
18 of the offense, will promote respect for the law, and provide
19 just punishment for defendant Namvar's criminal conduct.  The
20 recommended term of 120 months imprisonment will also afford
21 adequate deterrence to criminal conduct and protect the public
22 from further crimes of defendant Namvar.  It is important that
23 word gets out to people who are entrusted with money, including
24 those in the 1031 exchange community, that not doing what was
25 promised with the money (particularly when it results in
26 significant financial losses and other types of harm) leads to a
27 substantial prison sentence.  A lengthy prison sentence for
28 defendant Namvar is a step in that direction.  Further, defendant

Namvar's extensive involvement in the scheme to defraud (spanning not just last days but months upon months) and lack of any acknowledgment of guilt indicate that he may do this again, if he is not held fully accountable now.  All things considered, a 120 month term of imprisonment provides adequate deterrence to criminal conduct and protects the public from further crimes of defendant Namvar.

**B.** **Recommended Sentence For Defendant Hamid Tabatabai**

The government's recommended 57-month sentence for defendant Tabatabai is the low-end of the government's calculation of the Sentencing Guidelines range (57 to 71 months), when factoring in a four-level downward variance.  The government also recommends that the Court sentence defendant Tabatabai to three years of supervised release and order him to pay a $400 mandatory special assessment and restitution in the amount of $20,930,648 jointly with defendant Namvar.

The Section 3553(a) factors support the government's recommended sentence for defendant Tabatabai.  With respect to the factors set forth in Section 3553(a)(1), the nature and circumstances of the offense and the history and characteristics of defendant Tabatabai, the government's recommended sentence of 57 months in prison is appropriate for a number of reasons. First, defendant Tabatabai was an integral part of a multimillion dollar scheme to defraud.  He entered into all the exchange agreements with the Victims and was familiar with the identical exchange agreements' terms and conditions.  (GX 101, 301, 401, 501; 5/17/11 RT 202:16-19, 203:10-13.)  Then, defendant Tabatabai directed the flow of money as it left NFE for a variety of

undisclosed and unauthorized purposes. (5/6/11 RT 168:12-19, 187:16-18; 5/11/11 RT 21:24-22:3, 70:18-20.) The scheme was not limited to just a single or small series of transfers of the Victims' money. Rather, it involved numerous transfers of mostly large sums of the Victims' money over the course of many months. Second, as a highly trained accountant and NFE's and NCG's controller, defendant Tabatabai was all too aware of what was going on with the Victims' money (i.e., being transferred from NFE to NCG and how it was subsequently used). Yet, he proceeded anyway, without giving it a second thought, as his own testimony revealed at trial.[13] His actions demonstrated an utter lack of concern for the Victims.

For the same reasons noted above in the discussion of defendant Namvar, a 57 month sentence for defendant Tabatabai is needed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. His trial testimony revealed a complete lack of acknowledgment of any wrongdoing. For example, he testified that he never tried to cheat or deceive any NFE clients, which flies in the face of the evidence and the jury's verdict. (See 5/17/11 RT 124:11-13.) His testimony suggests that he could be tempted to engage in financial chicanery again if not appropriately punished at this time with a lengthy prison term.

The government's recommended sentence for defendant Tabatabai represents a downward variance. The government

---

[13] Defendant Tabatabai testified that he believed the exchange agreements allowed for NFE to transfer funds to NCG, which NFE did on a regular basis throughout its existence for 1031 exchange funds. (5/17/11 RT 85:22-87:15.)

believes that a four-level downward variance is warranted in his case, moving his Sentencing Guidelines calculation range from 87 to 108 months to 57 to 71 months imprisonment.  A four-level variance recognizes a number of factors regarding defendant Tabatabai that merit a reduced sentence: that it is unlikely that he would have engaged in a massive scheme to defraud if he did not work for defendant Namvar; and that he was not the primary beneficiary of the fraud scheme (unlike defendant Namvar, who ran and controlled both NFE and NCG).  That said, the government believes that it is important that defendant Tabatabai be given a significant sentence, rather than a sentence that would be appropriate for a low-level offender who participated in a much smaller fraud scheme.

## V. CONCLUSION

For all of the foregoing reasons, the government respectfully requests that the Court impose the above requested sentences for defendants.

DATED: September 26, 2011          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


                                   _____/s/_____
                                   BRIAN E. KLEIN
                                   MONICA D. MANGE
                                   Assistant United States Attorneys

                                   Attorneys for Plaintiff
                                   United States of America

23