MARC S. HARRIS (State Bar No. 136647)
mharris@scheperkim.com
AMOS A. LOWDER (State Bar No. 269362)
alowder@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone:  (213) 613-4655
Facsimile:   (213) 613-4656

Attorneys for Ezri Namvar

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| UNITED STATES OF AMERICA, | CASE NO. CR 10-1055-PA |
|---|---|
| Plaintiff, | **SENTENCING MEMORANDUM ON BEHALF OF EZRI NAMVAR** |
| v. | |
| EZRI NAMVAR, | Date:     October 11, 2011<br>Time:     8:30 a.m.<br>Place:    Courtroom # 15 |
| Defendant. | |

Defendant Ezri Namvar, by and through his counsel of record, respectfully submits the following memorandum and accompanying materials to set forth his position regarding the sentencing factors in his case, and to provide the Court with information not previously part of the record to aid it in determining an appropriate sentence.

DATED: September 26, 2011          Respectfully submitted,
                                   SCHEPER KIM & HARRIS LLP


                                   By:   /S/  Marc S. Harris
                                         Marc S. Harris
                                         Attorneys for Defendant Ezri Namvar

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................... 2

II.  FACTUAL BACKGROUND RELEVANT TO SENTENCING ............................ 4

    A.  Mr. Namvar's Business Background ................................................. 4

    B.  The Exchange Business ..................................................................... 5

    C.  The Inability to Complete the Four Exchanges ............................... 7

III.  ARGUMENT ........................................................................................ 10

    A.  Governing Legal Principles ............................................................ 10

    B.  The Advisory Guideline Range ...................................................... 11

        1.  The Loss Was Not Reasonably Foreseeable ....................... 11

        2.  There Is No Basis for a Role Enhancement ........................ 14

    C.  The Section 3553(a) Factors Support a Sentence Within the Advisory Range ........................................................................................... 18

        1.  Personal History and Characteristics .................................. 18

        2.  Nature and Circumstances of the Offense .......................... 20

        3.  Restitution ............................................................................ 21

    D.  If The Government's Proposed Advisory Guideline Range Were Adopted, the Section 3553(a) Factors and the Parsimony Principle Would Require a Substantial Variance ............................................ 22

IV.  CONCLUSION ..................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

Cases

*Gall v. United States*,
  128 S.Ct 586 (2007).................................................................. 10

*Kimbrough v. United States*,
  128 S.Ct 558 (2007).................................................................. 10

*Nelson v. United States*,
  555 U.S. 350 (per curiam) (2009) ........................................... 18

*United States v. Booker*,
  543 U.S. 220 (2005) ................................................................ 10

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) ...................................... 10, 11, 23

*United States v. Rose*,
  20 F. 3d 367 (9th Cir. 1994) ............................................. 15, 16

*United States v. Stouffer*,
  986 F. 2d 916 (5th Cir. 1993) ................................................. 17

*United States v. Treadwell*,
  592 F.3d 990 (9th Cir. 2010) .................................................. 12

*United States v. Warr*,
  530 F.3d 1152 (9th Cir. 2008) ................................................ 13

*United States v. Whitehead*,
  532 F.3d 991 (9th Cir. 2008) .................................................. 10

Statutes

18 U.S.C. §3553(a) ........................................................ 3, 10, 19, 22

18 U.S.C.A. § 3572 ............................................................................ 21

28 U.S.C. § 991(b) ............................................................................ 22

U.S.S.G. § 2B1.1 ............................................................................... 11

U.S.S.G. § 3B1.1 ........................................................................ 14, 15

I.      INTRODUCTION

Ezri Namvar, a 60 year old first offender appears before the Court for sentencing following his conviction after a jury trial of four counts of wire fraud. This is the unusual case where, despite there having been a trial, the evidence presented at the trial does not provide meaningful guidance with respect to the Court's sentencing decision. Instead, the facts most relevant to sentencing were excluded from the trial based on the narrow theory of the government's case.

The government's theory was that the crime consisted of not keeping the exchange funds in the account in they were originally deposited. The government did not contend nor prove that Mr. Namvar intended to steal the victims' money or cause them to lose it, and in fact it expressly disavowed such a theory. The government's evidence thus did not prove the losses were "reasonably foreseeable," and without proof the losses were reasonably foreseeable they do not constitute a loss for purposes of the guidelines. Moreover, the evidence that is relevant to whether the loss was reasonably foreseeable, *i.e.*, the defense evidence that the losses were the result of an unprecedented freeze in the commercial real estate market and Mr. Namvar's good faith and extraordinary efforts to complete the exchanges in the face of that freeze, was excluded from the trial. A review of that evidence affirmatively establishes the loss was *not* reasonably foreseeable.

The government's case theory and trial evidence similarly fails to support the role adjustment that the Presentence Report ("PSR") proposes. The PSR suggests a role adjustment is warranted because the criminal conduct was "otherwise extensive." The government's theory and its evidence was the exact opposite. The government maintained that the criminal conduct was narrow and limited in scope, and concerned only four exchanges. As with the loss amount, the evidence that indisputably confirms the conduct charged was not extensive – *i.e.*, the defense evidence as to the hundreds of exchanges that were completed and the customers' understanding of the exchange agreement in those instances – was excluded from trial based on the government's repeated profession of the narrow theory of its case.

1    Thus, even accepting the government's theory and the jury's verdict, a lengthy

2  prison sentence is not warranted and cannot be justified. In fact, given that the losses were

3  not reasonably foreseeable and that there is no basis for a role adjustment, the advisory

4  guideline range is zero to six months.

5    There were losses, however, and Mr. Namvar accepts ultimate responsibility for

6  those losses. The letters submitted to the Court prove beyond dispute that from the outset,

7  Mr. Namvar has viewed making full restitution as a moral duty, and as a personal

8  commitment to honor his father's name.  The facts adduced at trial, including that Mr.

9  Namvar immediately gave non-dischargeable, stipulated judgments and offered properties

10  to each of the customers whose exchanges could not be completed, bolster this

11  indisputable point. He has no objection to full restitution being imposed, as he concedes it

12  must, as a legal obligation as well. This fervent desire to provide restitution must also be

13  considered by the Court in determining the length of any prison sentence.  *See* 18 U.S.C.

14  §3553(a)(7). As the letters written to the Court also demonstrate, Mr. Namvar still enjoys

15  the support and respect of many people in the business community, and has employment

16  opportunities that would provide him with a realistic chance of making full restitution.

17  That support and those opportunities, however, cannot be expected to endure through a

18  lengthy prison term.

19    An appropriate sentence in this case must also take into account Mr. Namvar's

20  history of extraordinary good works, which are referenced in many of the letters and which

21  are discussed in Kent Costley's report of Mr. Namvar's personal history that accompanies

22  this memorandum. Once a celebrated financier and leading philanthropist in the greater

23  Los Angeles area, in particular the Persian-Jewish community, he has been professionally

24  destroyed, personally degraded and publically vilified by the press and on the internet, not

25  only due to the allegations in the Indictment, but at least equally so by events related to the

26  involuntary bankruptcy brought against Namco, his business entity of almost 30 years,

27  from which investors enjoyed robust returns until the real estate market crash in 2007-

28  2008.

1   Derogatory terms such as "swindle," and "Bernie Madoff" have been recklessly and

2   capriciously applied to this defendant by misinformed and malevolent detractors who

3   continue to allege, among other untruths, the existence of vast wealth squirreled away by

4   Mr. Namvar in hidden accounts; this, despite repeated assurances by forensic accountants

5   that such monies are purely phantom. In truth and fact, Mr. Namvar has donated millions

6   of dollars to numerous charities, schools and medical research centers, locally and

7   internationally, as well as to countless other individuals and families whose suffering has

8   been eased by his helping hand. That Mr. Namvar was – and, in the eyes of many, remains

9   -- an astute businessman is an undeniable fact, but it is his abundant generosity,

10   selflessness, and incredible kindness to others which accurately gauge the true measure of

11   the man.

12   In sum, the advisory guideline range is zero to six months, and the other factors

13   relevant to sentencing -- in particular the need for the sentence to be imposed to take into

14   account the need to provide restitution to the victims, and Mr. Namvar's history of good

15   works -- confirm the appropriateness of that sentence.

16   In contrast, the advisory guideline range proposed by the government and the PSR

17   is not only without factual support, but even if the Court were to find the loss was

18   reasonably foreseeable, these same considerations would call for a substantial variance.

19   Given the narrow scope of the government's case, a sentence within the guideline range

20   the government contends applies would violate the principle of parsimony, undermine the

21   primacy to be given restitution as a form of punishment, and disserve the interests of the

22   victims.

23   II.   FACTUAL BACKGROUND RELEVANT TO SENTENCING

24   A.   Mr. Namvar's Business Background

25   As related by Mr. Costley's report, Ezri Namvar learned from a young age the

26   principles that would guide him in his personal as well as business life as an adult. After

27   graduating from the Anderson School at UCLA, Mr. Namvar began working as a loan

28   broker. In 1980, he started his own company, Namco Financial, Inc. ("NFI"), where he

1  continued to operate as a loan broker. Due to Mr. Namvar's business acumen, hard work

2  and growing reputation, the business flourished. NFI went from brokering loans to making

3  loans and accepting loans for purposes of real estate investment. Investors were paid

4  monthly interest, and could obtain their principal at any time. The properties that were

5  purchased by NFI with the funds were held in the name of individual LLCs, as is

6  customary in the real estate business.

7      In approximately 1988, Mr. Namvar started Namco Capital Group ("NCG"), which

8  took over the real estate part of NFI's operation. As before, NCG would use investors'

9  money to make loans, and purchase real estate in the name of LLC's that were controlled

10  by Mr. Namvar, and use the income generated by the property and profits from sales to pay

11  NCG investors monthly interest. The entities purchased large commercial properties,

12  including the Marriott hotel downtown, the Cal-Neva Hotel in Lake Tahoe, a premier high-

13  rise office building at the corner of Wilshire and Bundy in West Los Angeles, and the

14  Angelino Hotel on Sunset Boulevard where it crosses the 405 Freeway.

15          B.    The Exchange Business

16      Mr. Namvar's first experience with what are referred to as "tax-deferred exchanges"

17  was in conjunction with his sale and purchase of properties, pursuant to an amendment to

18  Section 1031 of the Internal Revenue Code which made such exchanges increasingly

19  common. Initially, the exchange business was conducted almost exclusively by title

20  companies and banks, who took control of the funds. The banks and title companies

21  charged a fee and paid little or no interest. To take advantage of the growing exchange

22  industry, Mr. Namvar established NFI as a qualified intermediary. The NFI model was to

23  pay higher than market interest to entice exchange customers to use its services. In 2005,

24  Mr. Namvar established Namco Financial Exchange ("NFE"), which was devoted

25  exclusively to section 1031 exchanges, and which took over NFI's exchange business.

26      Between 2001 and 2008, NFI and later NFE completed well over a thousand

27  exchanges, involving literally billions of dollars.  Throughout that period, it was standard

28  practice for NFI and NFE to transfer funds being held in connection with pending

exchanges to NCG to be used by NCG during the exchange period.[1]  When NFI/NFE needed funds to complete exchanges, NCG would transfer the necessary funds back to NFI/NFE on a priority basis.  At all times, the practice and expectation was that funds would go from NFI/NFE to NCG, and then come back again when needed.  Indeed, there was no reason for those involved in the companies (including Mr. Namvar) to believe otherwise: Over a thousand exchanges had been completed in this manner, and, at all times, NCG had more than sufficient assets to cover any transfers from the exchange companies.

The growth of NFI's and later NFE's exchange business was driven by the interest NFI/NFE paid to exchange customers, and by Mr. Namvar's long standing track record and stellar reputation in the commercial real estate business community for being an astute businessman and honoring his agreements. As with other aspects of Mr. Namvar's business, the interest payments on exchange funds were, for the most part, the subject of oral agreements, secured by the trust Mr. Namvar had developed and earned over many years.

Throughout this same period of time, NCG continued to operate as it had before, accepting investors funds which it would use to make real estate investments, and paying monthly interest to the investors. For 28 or 29 years, between 1980 and 2008, NFI and later NCG borrowed literally billions of dollars and never missed a monthly interest payment and always repaid the full principal upon request. All of the money Mr. Namvar made from the operation of the business was poured back into NCG.  As of 2008, NCG, the LLCs, and Mr. Namvar, owned over a hundred properties worth billions of dollars.

---

[1] The fact that funds were routinely transferred from NFI/NFE to NCG was not hidden. The employees of NFE testified that this was the standard practice, and they were never told to keep it secret.  Although each of the victims testified that they were not properly advised of this fact, the agent for two of the victims was certainly told, and the defense proffered the fact that other customers of NFE would also testify that they knew their exchange funds were being used by Mr. Namvar.

C.      The Inability to Complete the Four Exchanges

The four exchanges that were charged as a scheme to defraud were initiated between March 28 and September 5, 2008. They were (1) the Vasquez exchange; (2) the Karsin Trust exchange (referred to during the trial as the "Getlin" exchange, based on the last name of the executor of the Karsin Trust); (3) the Sunnylane Partners exchange; and (4) the Laska exchange.[2]

The principals of three of the four exchanges  – Getlin,  Sunnylane partners and Laska –  had used NFE for prior exchanges. In fact, the Sunnylane partners had used NFE twice before, most recently for an exchange that was completed in April, 2008, for which they received 4% interest. The same standard agreement was used in all four exchanges, and it was the same agreement that had been used in the prior exchanges with the subject customers, and with hundreds of other exchanges NFE had completed.

Mr. Namvar did not recruit any of the four exchanges and he did not speak to any of them in advance. The principals of two of the exchanges, Vasquez and Laska, dealt with NFE through an agent, Joseph Mandelbaum, a CPA who had his own firm. Mandelbaum had acted as the agent for dozens of prior exchanges with NFE, earning his clients substantial sums for the use of the funds, with the interest on one exchange alone totaling approximately $500,000. Mr. Mandelbaum knew full well that the reason NFE was able to pay interest on the funds was because they were being used for productive purposes, a fact that was disclosed to him by Mr. Namvar and Mr. Tabatabai.

Notably, none of the principals testified or claimed that their understanding

---

[2]   The Vasquez exchange agreement was signed on March 28 and the exchange funds of $742,955.33 were wired into NFE's account on April 2 (count 1). The Getlin exchange agreement was signed June 17, 2008, and the exchange funds $20,324,530.33 were wire transferred to NFE on July 30 (count 2). The Sunnylane exchange was signed on August 19, 2008, and the exchange funds of $1,999,501.96 were wire transferred to NFE on August 20 (count 3).  The Laska exchange agreement was signed on August 28, 2008, and the exchange funds of $1,845,297.92 were wire transferred to NFE on September 9 (count 4).

7

regarding the exchange transaction was based on anything Mr. Namvar said or did. Other exchange customers knew and understood that during the exchange period the funds that had been transferred to NFE (which as a matter of law were owned and controlled by NFE), were being used for productive purposes and did not simply remain in a bank account. Indeed, had they been allowed, any number of NFE exchange customers would have testified that this was their understanding, and that it was self-evident the funds were not remaining in account given the interest they were paid by NFE.

Until the Fall of 2008, NFE operated as it had for years, successfully completing every exchange that it opened – over $160 million in exchanges in 2008 alone.  However, in the Fall, when an historically unprecedented freeze hit the commercial real estate and credit markets, NCG was confronted with a substantial liquidity problem.  Although NCG controlled hundreds of millions of dollars of assets, those assets became temporarily unavailable at precisely the time funds were needed to complete the subject exchanges. Properties that should have sold for hundreds of millions of dollars could not be sold at any price. The proffered testimony of Nicholas Klein, an experienced and well-respected real estate professional, would have established that well before there was a request to complete any of the four exchanges here Mr. Namvar had contracts to sell extremely valuable properties that would have been sufficient to complete all of the exchanges. 5/13/11 RT 119:18-120:8; 5/17/11 RT 90:16-19. However, as Mr. Klein also would have explained in his testimony, the sales were repeatedly delayed as the freeze in the market took hold. See, 5/13/11 RT 118:4-120:8. Despite these delays and difficulties, NCG was able to transfer funds to purchase replacement properties for two of the victims.[3] However, the liquidity crisis encountered by NCG prevented the return to NFE of the bulk of the

---

[3] In October, $2.5 million was used to purchase a replacement property in connection with the Getlin exchange, and that same month $500,000 was used to purchase two replacement properties in connection with the Laska exchange. In November, $27,000 was returned to the Sunnylane partners.

victim funds, and the exchanges failed.

Mr. Namvar met personally with several of the victims and acknowledged he was unable to complete the exchanges at that time and sought more time to do so. He similarly sought to negotiate terms with the customers that would allow him to complete the exchanges, and in furtherance of his good faith efforts, he made a payment of $500,000 to Mr. Laska,[4] and was close to working out terms with the Sunnylane partners.  In an effort to see that the exchanges would be completed, Mr. Namvar executed formal assignments that pledged the assets from his anticipated real estate sales to NFE.  5/13/11 RT 6:21-25. He also immediately gave two of the customers (Getlin and Sunnylane) stipulated judgments for the full amount of their losses, and agreed that the judgments should not be dischargeable in bankruptcy.

NCG was facing similar liquidity problems, and corresponding demands from its creditors. In late Fall, Mr. Namvar addressed a meeting of the creditors of NCG and NFE. He acknowledged the creditors' claims and proposed a plan that would allow him to repay all of them over time, as the market improved. His proposal was favorably received by the vast majority of creditors, many of whom had known and worked with Mr. Namvar for years. In fact, many of them have written the Court on behalf of Mr. Namvar. A small number of creditors, however, resisted the proposal, and successfully petitioned to have NCG put into involuntary bankruptcy. Later, six creditors put Mr. Namvar into involuntary bankruptcy and three creditors of NFE put it into involuntary bankruptcy.[5]

Mr. Namvar has cooperated fully with the trustees. In fact, he transferred to the trustees the assets of all of the LLCs even though they were not owned by any of the

---

[4] Apparently, the Bankruptcy Trustees are now suing Mr. Laska for the return of the funds Mr. Namvar provided to him, claiming that this was a preferential transfer.

[5] The resulting losses according to the government, were $742,955 (Vasquez); $17,491,919 (Getlin); $1,972,003 (Sunnylane); and $723,771 (Laska), for a total of $20,930,648. Dkt. 184, pp. 3-4 (Government's Objections to Presentence Report).

entities placed into bankruptcy. The bankruptcy trustees have liquidated many of the holdings, generating millions of dollars even at the fire sale prices that allowed the properties to be disposed of quickly. Not one of the millions of dollars, however, has gone to repay any of the creditors, and instead haven been used to pay the trustees and the tens of millions in fees billed in the course of the bankruptcy.

III.   ARGUMENT

A.   Governing Legal Principles

In the wake of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S.Ct 558 (2007); and *Gall v. United States*, 128 S.Ct 586 (2007), it is abundantly clear that the United States Sentencing Guidelines "are no longer mandatory but are only advisory." *United States v. Carty*, 520 F.3d 984, 990 (9th Cir. 2008). *Booker* and its progeny "empowered district courts, not appellate courts . . . [and] breathe[d] life into authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).

The overarching statutory charge for a district court is to "impose a sentence sufficient, *but not greater than necessary*" to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with needed educational, medical, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a) (emphasis added). According to the statute, in making this determination, the Court must consider

a)   the nature and circumstances of the offense and the history and characteristics of the defendant;

b)   the need for the sentence imposed to achieve each of the enumerated purposes of sentencing;

c)   the kinds of sentences available;

d)   the applicable statute, guideline range and policy statements; and

e)   the need to avoid unwarranted sentence disparities among similarly situated defendants.

*Id.*

The Ninth Circuit in *Carty* recently set forth the principles that emerge from *Booker*

1   and its progeny: "All sentencing proceedings are to begin by determining the applicable

2   Guidelines range." 520 F.3d at 991. "The district court may not presume that the

3   Guidelines range is reasonable." *Id.* "Nor should the Guidelines factor be given more or

4   less weight than any other. *Id.* "While the Guidelines are to be respectfully considered,

5   they are one factor among the § 3553(a) factors that are to be taken into account in arriving

6   at an appropriate sentence." *Id.* "The district court must make an individualized

7   determination based on the facts." *Id.*

8                          B.      The Advisory Guideline Range

9            The parties agree that the base offense level is seven, and that the criminal history is

10  category one. The PSR proposes an enhancement of 22 levels for loss and an additional

11  four-level role enhancement, in which the government concurs. The PSR's proposed loss

12  enhancement is based on an erroneous application of the guidelines, and fails as a matter of

13  proof in any event, as does the proposed role enhancement. The advisory guideline range is

14  thus zero to six months.

15                          1.      The Loss Was Not Reasonably Foreseeable

16           The PSR acknowledges, and the government does not dispute, that there was no

17  intended loss and thus any adjustment would have to be based on "actual loss." An "actual

18  loss," for purposes of the Guidelines, "means the reasonably foreseeable pecuniary harm

19  that resulted from the offense." U.S.S.G. § 2B1.1, Appl. Note (3)(A)(i). The PSR

20  proposed loss enhancement is incorrect as a matter of law, as it fails to consider or apply

21  the required "reasonably foreseeable standard."[6]

22  _____

23  [6] The PSR failed to apply the reasonably foreseeable standard and simply deemed the

24  Guideline "actual loss" to be the difference between the funds the four trusts transferred to
    NFE, and the funds returned. See PSR p. 12, par. 45 (supporting 22-level adjustment by

25  stating, "the Government has provided evidence of losses of $20,940,456."). Mr. Namvar
    noted this in his previously filed objections to the PSR which were filed July 29. Dkt. 186,

26  p. 2. The response to this objection, which was filed September 26, the same day this

27  memorandum is due, mischaracterizes Mr. Namvar's position as being that "loss should be
    determined on what the defendant subjectively believed the victims would ultimately be

28  (footnote continued)

1   Further, as noted above, the fact of the conviction does not provide any meaningful

2   guidance or factual support for a loss adjustment, and the most relevant evidence on this

3   point was excluded from the trial.  However, the evidence that was introduced at trial that

4   bears on this issue, as well as the evidence proffered by the defense, affirmatively

5   establishes the loss was not reasonably foreseeable.

6   Reasonably foreseeable pecuniary harm is defined by Application Note 3(A)(iv) as

7   "pecuniary harm that the defendant knew or, under the circumstances, reasonably should

8   have known, was a potential result of the offense." Thus, in order to establish an actual

9   loss amount, the government must prove that Mr. Namvar knew, or reasonably should

10   have known, at the time he transferred the funds, that a potential result would be the

11   inability to complete the exchanges. As a matter of due process, the government must

12   prove these facts by clear and evidence, both because of the extremely disproportionate

13   impact the enhancement would have, and because the Court may not rely on "the evidence

14   presented at trial" to find the loss was reasonably foreseeable, as the evidence on that point

15   was excluded. *United States v. Treadwell*, 592 F.3d 990, 1000-01 (9th Cir. 2010) (listing

16   considerations that determine whether standard is preponderance or clear and convincing,

17   including, *inter alia,* whether enhancement would have disproportionate effect and

18   whether the finding "was based on the evidence presented at the trial . . .").

19   Evidence already before the Court establishes Mr. Namvar never intended there to

20   be any loss and that he could not have reasonably foreseen there would be. Affirmative

21   proof that the pecuniary harm was not reasonably foreseeable is provided by Mr. Namvar's

22   ability and intent to complete the exchanges, as evidenced by his established record and

23   course of conduct in completing all of the exchanges he engaged in over many years, his

24   productive use of the funds once transferred, and his substantial assets and resources. *See,*

25

26

27   deprived of." Dkt. 196, p. 1. The reasonably foreseeability standard is an objective one,
and objectively applied, it fully sustains Mr. Namvar's position. .

28

*e.g.*, 5/12/11 RT 116:6-12 (in 2008, Mr. Namvar's interests included dozens of limited liability companies worth several hundred million dollars); 5/13/11 RT 41:11-20, 189:23-190:1; 5/17/11 RT 92:18-93:1 (money regularly was transferred between NFE and NCG for purposes of completing exchanges, and this was the regular practice); 5/17/11 RT 122:6-8 (since its incorporation in 2005, NFE had completed exchanges with a total value of $2 billion);  5/17/11 RT 122:17-21 (in 2008 alone, NFE completed exchanges of $160 million); 5/13/11 RT 199:4-8; 5/17/11 RT 91:17-20 (NFE had always had the funds to complete its exchanges).

This evidence alone is sufficient to establish that it was not reasonably foreseeable that the pecuniary harm on which the PSR's loss amount is based would be a potential result of the transfers. *Compare United States v. Warr*, 530 F.3d 1152, 1155 (9th Cir. 2008) (costs resulting from arson were reasonably foreseeable, where the defendant "was a trained firefighter and a Montana resident who, given his statements, knew the risks of starting fires while forest restrictions were in place [and] knew or should have known costs associated with fires").

Evidence of Mr. Namvar's post-transfer efforts both corroborate and provide independent proof that it was not reasonably foreseeable he would be unable to complete the four exchanges in question. The testimony established that Mr. Namvar was in the process of selling assets sufficient to complete the four exchanges. 5/17/11 RT 90:16-19. The defense also proffered to the Court formal assignments executed by Mr. Namvar in the Fall of 2008 that pledged the assets from these real estate sales to NFE.  5/13/11 RT 6:21-25.  The assets from any of these pending real estate sales would have been sufficient to complete all of the subject exchanges, but the government successfully excluded the evidence from the trial.  5/17/11 RT 131:23-132:17.

Further proof that it was not reasonably foreseeable Mr. Namvar would be unable to complete the four exchanges is provided by the evidence showing that the inability to do so was the result of an unforeseen and unforeseeable circumstance, and not the result of the transfer of the funds which constituted the offense. This evidence is provided by the

1  proffered testimony of Nicholas Klein. Mr. Klein, an established, experienced and well-
2  respected real estate professional, would have explained in his testimony that the inability
3  to complete the four exchanges was the result of the unprecedented freeze in the
4  commercial real estate market in the Summer and Fall of 2008. 5/13/11 RT 118:4-120:8.
5  The above evidence forecloses any enhancement based on loss.

6  Whatever the government wants to say about promises regarding where or how the
7  subject exchange funds were to be held, it cannot seriously dispute that the victims in this
8  case would never have lost money but for the economic downturn in 2007-2008 and the
9  severe liquidity crisis that ensued in the Fall of 2008.  Putting aside whether the victims'
10 exchange funds were handled as promised, there is no doubt that each of their exchange
11 transactions would have been completed had any of Mr. Namvar's significant real estate
12 holdings which he had under contract for sale in the Summer and Fall of 2008 been able to
13 close.  While the government might argue that Mr. Namvar should never have put himself
14 (and his customers' money) in this position, it cannot reasonably dispute that the inability
15 to sell these extremely valuable properties caused the subject exchanges to fail and that the
16 real estate transactions were not completed due to an unprecedented freezing of the real
17 estate and credit markets in the Fall of 2008.  It has not and cannot produce any evidence
18 to support an argument that, at the time NFE accepted the client funds at issue, it was
19 reasonably foreseeable to Mr. Namvar that the exchange transactions would not be
20 completed, and these victims would suffer a loss.

21 2.    There Is No Basis for a Role Enhancement

22 The PSR's proposed four-level role adjustment, which the government endorses, is
23 similarly without support and affirmatively undermined by the relevant evidence. *See*,
24 Dkt.184, p. 8 (Government's Objections To The Presentence Reports of Defendants Ezri
25 Namvar And Hamid Tabatabai"). A four-level adjustment under U.S.S.G. § 3B1.1 is
26 authorized only where two separate and distinct elements are established by the
27 government:  (1) The defendant was an organizer or leader of criminal activity; *and* (2) the
28 criminal activity involved five or more participants or was otherwise extensive. *United*

*States v. Rose*, 20 F. 3d 367, 373 (9th Cir. 1994).  Neither the PSR nor the government contend that the criminal activity involved five or more participants within the meaning of U.S.S.G. § 3B1.1. The PSR instead concedes that "in order for Namvar to be considered an organizer or leader, the offense must have been 'otherwise extensive.'" PSR, p. 13, pars. 48.

"Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount of money fraudulently obtained." *Rose*, 20 F. 3d at 374 (citations omitted). The PSR does not identify any facts that support a finding the criminal activity was "otherwise extensive" based on these criteria.[7]

The PSR first errs in suggesting that the question here is whether the "organization" was "'otherwise extensive.'" PSR, p. 13, par. 48. While examining whether an "organization" is "otherwise extensive" may be appropriate where, as in *Rose*, the organization was a wholly criminal enterprise, there is absolutely no contention that is the case here. In fact, the government repeatedly asserted the criminal scheme involved only the victims named in the indictment. Moreover, the defense evidence excluded from the trial regarding the other exchange customers affirmatively establishes the NFE and NCG were established, reputable and successful companies.

This error permeates the PSR analysis and its conclusion, which it seeks to support by considering the entire operation of NFE and NCG, rather than the four exchanges that the government repeatedly asserted was the extent of the criminal activity. See PSR, p. 13, par. 49 (as support for role adjustment, PSR notes that "In addition, Namvar operated and controlled [NFE] and [NCG].")

---

[7] Mr. Namvar objected to the PSR's proposed role adjustment in his formal objections. Dkt. 186, p. 6. The PSR's response to the objection merely restates that the basis for the PSR view that the offense was "otherwise extensive" is set forth in paragraph 49, but does not respond to or attempt to rebut the reasons stated in the objections as to why the information is paragraph 49 does not and cannot be used to support the role enhancement..

1    It is true, as the PSR states, that in deciding whether criminal activity was

2  "otherwise extensive," "all persons involved during the course of the entire offense are to

3  be considered," and "[t]hus, a fraud that involved only three participants but used the

4  unknowing services of many outsiders could be considered extensive." PSR, p. 13, par. 48.

5  In applying that consideration here, however, the PSR identifies only two individuals, Val

6  Muraoka and Sasha Ettehadieh. Moreover, the PSR's suggestion that they should be

7  considered in determining whether a role enhancement is warranted, is based on the PSR's

8  mistaken assumption that their role in the operation of NFE is the relevant question, rather

9  their involvement in the criminal activity, *i.e.*, the four exchanges that the government

10  maintained constituted the criminal scheme. There is no allegation that Muraoka or

11  Ettehadieh significantly facilitated or furthered the scheme to defraud. The government

12  contends that Hamid Tabatabai transferred funds out of NFE accounts at Mr. Namvar's

13  direction.  Thus, no others, not even Muraoka or Ettihadieh, were involved in the conduct

14  giving rise to the conviction.

15    In any event, even if there was such an allegation and evidence that proved it, the

16  involvement of two unknowing participates would not render the criminal activity

17  "otherwise extensive." *Compare Rose*, 20 F. 3d at 374 (finding that the fraud was

18  "otherwise extensive" where among other factors were "60 knowing or unwitting

19  employees or outside accountants" and "an untold but no doubt considerable number of

20  bank employees and other outsiders" as well as "scores of duped investors").

21    The PSR does not discuss, examine or rely on the other factors *Rose* says are

22  relevant to determining whether criminal activity is "otherwise extensive" under U.S.S.G.

23  § 3B1.1. Instead, the PSR seeks to support its proposed "otherwise extensive" role

24  adjustment by considerations that are relevant to whether an individual is an organizer or

25  leader, not whether the criminal conduct was "extensive." See, PSR, p. 13, pars. 48 & 49.

26  In fact, the PSR asserts in conclusion the adjustment should be imposed because in the

27  Probation Officer's assessment, "Namvar was an organizer and leader of the fraud

28  scheme," but never actually finds that the criminal activity is "otherwise extensive" and

1  ultimately does not rely on it to support the adjustment, even though it concedes at the

2  outset that without such a finding, there is no basis for the adjustment.

3       The PSR's failure to consider the other two factors is unsurprising (but troubling),

4  as neither provide any support for the finding the criminal activity is "otherwise

5  extensive." The number of victims in this case, like the participants, is small and well-

6  defined. The government repeatedly stated that the scheme to defraud "exclusively

7  encompassed the Victims named in the indictment rather that an 'established course of

8  dealing' regarding a broader base of customers." Dkt. 175, at 61. Thus, the fraud in this

9  case is limited to only four victims, and cannot be considered "extensive" on that basis.

10  *Compare United States v. Stouffer*, 986 F. 2d 916, 927 (5th Cir. 1993) (upholding a finding

11  of "otherwise extensive" where the fraudulent activity involved over 2,000 investors).

12       Nor does the third factor identified by *Rose*, "the amount of money fraudulently

13  obtained" support or justify a finding that the conduct was "otherwise extensive." As an

14  initial matter, *Rose* does not suggest that this factor could by itself support a finding the

15  criminal activity was "otherwise extensive" without regard to the other two factors. Nor

16  could it do so as a matter of logic and language. Otherwise, you could have a single

17  instance of narrowly circumscribed conduct involving a large sum of money that would be

18  deemed to make the criminal conduct "otherwise extensive." Indeed, that is the situation

19  here where a single exchange comprises nearly 85% of the loss. Whether conduct is

20  "extensive" has to do with its reach and scope, not its amount.

21       In addition, reliance on the amount of the loss to support a role adjustment would

22  punish Mr. Namvar twice based on the same facts, as it proposes a separate adjustment

23  based on the loss amount.  To then increase the offense level again based solely on the

24  amount of money at issue would be classic double-counting. Such double counting is

25  particularly inappropriate where, as here, the alleged loss is at the low-end of the

26  applicable loss range ($20 million to $50 million).

27       In sum, the scheme to defraud, as indicted and articulated to this Court by the

28  government, is limited to the four exchanges and the act of moving money out of NFE

SENTENCING MEMORANDUM ON BEHALF OF EZRI NAMVAR

bank accounts after the customers had been led to believe that their money was not going to be transferred.  As the government has argued to this Court on more than one occasion, "the scheme to defraud here isn't what happened after the money came in. It's what they represented to the victims when their money came in and how their money was going to be held." 5/13/11 RT 9:3-6;  *see also* 5/13/11 RT 121:24-122:2 ("What happened subsequent to the money getting transferred over to Namco Capital Group – Defendant Namvar's efforts to repay the money -- are completely irrelevant to the fraud in this case that the Government's alleging.").  Nothing about the scheme, as so articulated, could be considered "extensive."

Given that there is no basis for a role adjustment, and that the evidence establishes the loss was not reasonably foreseeable, the offense level is seven, and the resulting advisory guideline range is zero to six months.

C.     The Section 3553(a) Factors Support a Sentence Within the Advisory Range

With the advisory guideline range in mind, the Court is to "consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the . . . [advisory guideline range] with reference to the . . . [sentencing factors]."  *Nelson v. United States*, 555 U.S. 350, 129 S. Ct. 890, 891-92 (per curiam) (2009). Moreover, in making that determination, the sentence the Court imposes must be sufficient, but not greater than necessary to comply with the purposes of sentencing set forth in paragraph (2) of § 3553(a).

1.     Personal History and Characteristics

As noted above, accompanying this memorandum is a comprehensive report prepared by Kent Costley detailing Mr. Namvar's personal history, beginning with his childhood in Iran and continuing to the life he made for himself and his family in his much loved adopted country. It chronicles how from early childhood his family and his father in particular taught him by example the value and importance of honoring one's commitments to others, treating everyone with dignity and respect, and helping others in

1  need. The report makes clear that the criminal accusations are at profound variance with

2  Mr. Namvar's history, his character and his upbringing. In a family which places

3  tremendous pride in its reputation for honesty, community consciousness, and religious

4  principles, the besmirching of his family name strikes at the very core of Mr. Namvar's

5  soul.

6       Importantly, the report presents Mr. Namvar's life beyond the thin slice that has

7  been presented in this proceeding previously. The Court is respectfully referred to Mr.

8  Costley's report to obtain a full picture of Ezri Namvar the person, and the family that

9  defines him. Equally important to gaining an understanding of Mr. Namvar's history and

10  characteristics are the dozens and dozens of letters that people have written to the Court on

11  his behalf.  The letters corroborate and confirm Mr. Namvar's history of good works, his

12  hard-earned and well deserved standing in the community, and his many other outstanding

13  character traits that are recounted by Mr. Costley's report.  The letters are especially

14  powerful because they do so not with adjectives but with facts, recounting instances where

15  Mr. Namvar's character has manifested itself through deeds and actions.

16       The force of the letters cannot be conveyed adequately by a summary, and no

17  attempt is made here to do so, as it would necessarily fall short.  That said, several themes

18  emerge from the letters as constants in Mr. Namvar's life. Mr. Namvar is deeply spiritual

19  and his faith guides his life in all respects. Second, Mr. Namvar is a man of unparalleled

20  humility, integrity and selfless generosity. The people who have taken the time to write the

21  Court are from all walks and stations of life, from royalty to the most common and

22  ordinary among us. They have been treated equally by Mr. Namvar, with the same respect,

23  concern and generosity of spirit. Third, Mr. Namvar views making full restitution to those

24  who entrusted their money with him at NFE and NCG as a moral imperative, and has been

25  committed to doing so even before the losses were tallied.

26       In sum, Mr. Namvar's "history and characteristics," provide no reason or basis to

27  vary from the zero to six month range. 18 U.S.C. § 3553(a)(1). As detailed in Mr.

28  Costley's report, Mr. Namvar's history and characteristics substantially mitigate the need

1  for punishment. Indeed, the many lives he has touched for the better through his selfless

2  acts of charity, as well as his devout and principled life weigh heavily in favor of lesser

3  punishment.[8]

4                    2.        Nature and Circumstances of the Offense

5        Similarly, the "nature and circumstances of the offense," the other half of the first

6  factor, provide no reason or basis to vary from the zero to six months range. The offense,

7  as recounted above, was about as benign as conduct that constitutes wire fraud could be.

8  As the government argued, it did not require proof of any fraudulent misrepresentation and

9  could instead rest on an omission. In fact there was no evidence Mr. Namvar ever made

10 any fraudulent misrepresentation in the commission of the offense. As charged and

11 prosecuted, the offense did not require proof that Mr. Namvar intended to steal the funds.

12 The fraud required only that the funds not be kept in the NFE account in which they were

13 initially deposited.

14        During trial, the government introduced no evidence that there was any attempt to

15 conceal, hide or cover-up the transfers, which were instead conducted as ordinary business

16 transactions, with a corresponding complete account record. Mr. Namvar did not use the

17 funds to acquire extravagant or personal assets.  In fact, the evidence introduced at trial

18 _____

19 [8]  Counsel is aware that a letter attacking Mr. Namvar's character has apparently been

20 submitted to the Court, not by one of the victims in this case, but by an individual who has

   a longstanding and continuing personal animus against Mr. Namvar and his family, and

21 that this same individual may have recruited others to write similar letters to the Court. The

22 letter consists of viciously false allegations, and is a blatant attempt by this non-victim to

   use this proceeding for personal advantage. Counsel is prepared to discredit each and every

23 one of the allegations. However, because that effort would itself advance the writer's

24 personal agenda, counsel requests the Court disregard and give no consideration to the

   letter.

25        Counsel respectfully requests that the defense be provided with a copy of any letters

26 that have been received by the Court directly, and which have not been formally submitted

27 by the government or defense, unless the Court is going to disregard and not give them any

   consideration.

28

1   showed that Mr. Namvar was pouring every cent he had back into his businesses when the

2   crisis hit.  Clearly, there was never any intent to cause any loss to any of the NFE

3   customers. Moreover, the evidence supports the conclusion that there would have been no

4   loss but for the circumstances in which the offense unfolded.  Each of these factors is

5   critical in assessing the nature of the offense, and each militate in favor of a reduced

6   sentence. Put differently, the circumstances of the offense simply do not compare to the

7   typical fraud scheme, in which the intent is to steal from unwitting victims for personal

8   gain, and the scheme involves efforts to conceal the criminal conduct.  This profound

9   difference must be accounted for in determining the appropriate sentence.

10               3.    Restitution

11          Of particular note and importance in a case such as this one is the primacy given

12   restitution, both as a form of punishment and an explicit objective of sentencing. The

13   primacy of restitution in the cases where it is applicable is reflected not only by its listing

14   as a separate factor, but by the directive that a criminal fine not be imposed that will

15   impede a defendant's ability to make restitution. 18 U.S.C.A. § 3572  ("If, as a result of a

16   conviction, the defendant has the obligation to make restitution to a victim of the offense,

17   other than the United States, the court shall impose a fine or other monetary penalty only

18   to the extent that such fine or penalty will not impair the ability of the defendant to make

19   restitution.").   The guidelines acknowledged the primacy of restitution as a sentencing

20   objective from the outset, as they mandated  restitution even before it was made mandatory

21   by statute. The belief that the guidelines were mandatory, however, prevented courts from

22   giving restitution as a sentencing objective the primacy it was intended to have. The post-

23   *Booker* sentencing regime now allows restitution to be given the primacy it was always

24   intended to have.

25          The need to provide restitution must be considered not just as a factor on its own,

26   but as a factor that impacts the determination as to the appropriate type and length of

27   sentence to be imposed. A custodial sentence would not only delay payment of restitution,

28   but depending on its length, it could substantially affect Mr. Namvar's employment

1   opportunities upon release and thus his ability to make restitution at all.

2        Mr. Namvar's conviction has not caused him to lose all prospects of employment.

3   In fact, as the Court knows, he was offered a position of employment following his

4   conviction. Dkt. 153 ("Defendant Ezri Namvar's Ex Parte Application For Permission To

5   Accept Employment"). The letters submitted on behalf of Mr. Namvar demonstrate that he

6   still enjoys the support, respect and trust of many people in the business community, which

7   speaks favorably to his ability to obtain employment and to be able to earn the sums

8   needed to make meaningful restitution. As a practical matter, however, the longer he is

9   separated from that community, the more difficult it will be for him to return. The interest

10   of the victims in receiving restitution would be best served by a sentence within the

11   advisory guideline range of zero to six months.

12        D.    <u>If The Government's Proposed Advisory Guideline Range Were</u>

13             <u>Adopted, the Section 3553(a) Factors and the Parsimony Principle</u>

14             <u>Would Require a Substantial Variance</u>

15        If the Court were to conclude that the loss was reasonably foreseeable, which would

16   result in an advisory guideline range of 87 to 108 months, the same § 3553(a) factors

17   discussed above would require a substantial variance below that range.

18        A variance would be dictated by the personal history and characteristics of the

19   defendant, the nature and circumstances of the offense, and by the "need to avoid

20   unwarranted sentence disparities." 18 U.S.C. §3553(a)(6). Unwarranted sentencing

21   disparity must be assessed in the context of the facts of the specific case, rather than the

22   category of offense. Congress' directive was not simply to avoid sentencing disparity, but

23   rather to "avoid[] unwarranted sentencing disparities among defendants with similar

24   records who have been found guilty of *similar criminal conduct* while maintaining

25   sufficient flexibility to permit individualized sentences when warranted . . ." 28 U.S.C. §

26   991(b), (b)(1)(B).

27        Even without the role enhancement urged by the PSR and the government, the

28   proposed offense level would be 29, resulting in a sentencing range of 87-108 months. A

1    sentence within the 87-108 month range would apply to an offender who creates a

2    fraudulent scheme out of whole cloth, steals up to $50 million from others by personal

3    fraudulent representations, and uses the money to spend lavishly on himself. The offense

4    here is different, not by a matter of degree, but as a wholly different type.  There is no

5    evidence that Mr. Namvar ever set out to steal money from anyone or to enrich himself at

6    the expense of others. To reiterate the point made above, the circumstances of the offense

7    simply do not compare to the typical fraud scheme, in which the intent is to steal from

8    unwitting victims, and the scheme involves efforts to conceal the criminal conduct.  This

9    difference must be accounted for and thus requires a variance below the guideline range

10    applicable that would apply to such offenders.

11        The need to provide restitution would itself warrant and justify a variance from such

12    an advisory range. Imprisonment for seven years would likely make full restitution illusory

13    as a practical matter. A variance based on the need to provide restitution to the victims

14    would not have been possible prior to *Booker*, when the guidelines were viewed as

15    mandatory. *Booker* and the governing legal principles discussed above now provides the

16    Court with the discretion and flexibility to fashion a sentence that gives restitution the

17    importance it should have, both as a form of punishment and as means of making the

18    victims whole.

19        A variance is also mandated by the overarching principle of parsimony, as a

20    sentence even at the low end of a range of 87 to 108 months would be far greater in all

21    respects than what is necessary to comply with the purposes of §3553(a)(2). *Carty*, 520

22    F.3d at 991 ("The overarching statutory charge for a district court is to 'impose a sentence

23    sufficient, but not greater than necessary,'" to comply with the purposes of sentencing set

24    forth in §3553(a)(2)).  The devastating consequences that conviction has had in all areas

25    and aspects of Mr. Namvar's life, together with an order a full restitution and the effect

26    such an order will have until it is satisfied, is sufficient for general deterrence, without the

27    need for a lengthy prison term. Those same considerations make a sentence of seven years

28    greater than what is necessary for the sentence to reflect the seriousness of the offense, to

1 promote respect for the law, and to provide just punishment for the offense. Finally, a

2 sentence of incarceration is greater than necessary to protect the public from further crimes

3 of Mr. Namvar. That need, to the extent it exists, can be adequately met by the supervisory

4 conditions proposed by the Court, without undermining the victims' interest in restitution.

5 IV.    CONCLUSION

6        Mr. Namvar acknowledges the victims in this case suffered significant losses, and

7 recognizes that he is to be held accountable for those losses, a responsibility he voluntarily

8 assumed even before they became fixed. Mr. Namvar's criminal punishment, however,

9 should not be enhanced based on the amount of those losses because the government never

10 attempted to prove, did not prove and cannot prove that Mr. Namvar intended to cause

11 those losses or that the possible loss of the funds was objectively reasonably foreseeable.

12       That critical distinction causes Mr. Namvar's criminal culpability to be vastly

13 different than one who intentionally steals money, and that difference in culpability must

14 be taken into account in determining the appropriate sentence. For that reason alone, a

15 sentence that uses the restitution amount to determine the guideline range would violate

16 the parsimony principle. The Court should instead fashion a sentence that includes

17 restitution, and also allows for full restitution to be made, by imposing a sentence that

18 takes into account that difference in culpability.

19 DATED: September 26, 2011          Respectfully submitted,

20                                    SCHEPER KIM & HARRIS LLP
21                                    MARC S. HARRIS
                                      AMOS A. LOWDER
22

23

24                                   By:   /S/  Marc S. Harris
                                          Marc S. Harris
25                                        Attorneys for Defendant Ezri Namvar

26

27

28

SENTENCING MEMORANDUM ON BEHALF OF EZRI NAMVAR