1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   BRIAN E. KLEIN (Cal. State Bar No.: 258486)
4  MONICA D. MANGE (Cal. State Bar No.: 234950)
   Assistant United States Attorneys
5  Major Frauds Section
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-6920/6529
        Facsimile: (213) 894-6269
8       E-mail: brian.klein@usdoj.gov
               monica.mange@usdoj.gov
9
   Attorneys for Plaintiff
10 United States of America

11              UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,      ) NO. CR 10-1055-PA
                                  )
14          Plaintiff,            ) GOVERNMENT'S CONSOLIDATED
                                  ) RESPONSE TO THE ADDENDA TO THE
15          v.                    ) PRESENTENCE REPORTS AND THE
                                  ) SENTENCING POSITIONS OF
16 EZRI NAMVAR,                   ) DEFENDANTS EZRI NAMVAR AND
       aka "Ezri Namvar          ) HAMID TABATABAI; EXHIBITS 5-7
17     Moghadam,"                 )
   and HAMID TABATABAI,           )
18     aka "Hamid Taba,"          )
                                  )
19          Defendants.           ) SENTENCING DATE: 10/11/11
                                  ) SENTENCING TIME: 8:30 a.m.
20 _____    )
                                  )
21

22      Plaintiff United States of America, by and through its

23 counsel of record, the United States Attorney for the Central

24 District of California, hereby respectfully submits the

25 Government's Consolidated Response to the Addenda to the

26 Presentence Reports and the Sentencing Positions of Defendants

27 Ezri Namvar and Hamid Tabatabai.

28 //

1    The government's response is based on the attached

2   memorandum of points and authorities and exhibits, the

3   government's consolidated sentencing position for defendants, the

4   files and records in this case (which include the trial

5   evidence), the United States Probation Office's Presentence

6   Reports and related filings, including Addenda, and any other

7   evidence or argument that the Court may wish to consider at the

8   time of sentencing.

9   DATED: October 5, 2011          Respectfully submitted,

10                                  ANDRÉ BIROTTE JR.
                                    United States Attorney
11
                                    ROBERT E. DUGDALE
12                                  Assistant United States Attorney
                                    Chief, Criminal Division
13

14                                  _____/s/_____
                                    BRIAN E. KLEIN
15                                  MONICA D. MANGE
                                    Assistant United States Attorneys
16
                                    Attorneys for Plaintiff
17                                  United States of America

18

19

20

21

22

23

24

25

26

27

28
                                      2

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

II.   RESPONSES . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Defendant Ezri Namvar . . . . . . . . . . . . . . . 2

           1.   A Number Of Defendant Namvar's Sentencing
                Position's Factual Assertions Are Misleading,
                Unsupported By The Evidence, And/Or Irrelevant . 2

           2.   The Actual Loss Amount Of Almost $21 million
                Was Reasonably Foreseeable . . . . . . . . . . 6

           3.   Defendant Namvar Qualifies For A Role
                Enhancement . . . . . . . . . . . . . . . . . . 7

           4.   Defendant Namvar Should Not Receive A Lesser
                Sentence Based On His Recent Alleged Desire To
                Pay Restitution . . . . . . . . . . . . . . . . 7

           5.   The Letters . . . . . . . . . . . . . . . . . . 9

      B.   Defendant Hamid Tabatabai . . . . . . . . . . . . 10

           1.   A 22-Level Loss Amount Increase Is Warranted
                And Does Not Overstate Defendant Tabatabai's
                Culpability . . . . . . . . . . . . . . . . . 10

           2.   Defendant Tabatabai Played A Significant Role
                In The Scheme To Defraud For Which He Has Been
                Convicted . . . . . . . . . . . . . . . . . . 12

           3.   Defendant Tabatabai Has Not Accepted
                Responsibility For His Criminal Conduct . . . 14

           4.   Defendant Tabatabai Does Not Deserve A Downward
                Departure For Aberrant Behavior Pursuant To
                USSG § 5K2.20 . . . . . . . . . . . . . . . . 17

      C.   Addenda to the Presentence Reports . . . . . . . 19

           1.   Defendant Namvar's Addendum . . . . . . . . . 19

           2.   Defendant Tabatabai's Addendum . . . . . . . . 20

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 20

i

**TABLE OF AUTHORITIES**

**PAGE**

**FEDERAL CASES**

United States v. Burrows,
   36 F.3d 875 (9th Cir. 1994) ........................... 17

United States v. Fairless,
   975 F.2d 664 (9th Cir. 1992) .......................... 18

United States v. Gauvin,
   173 F.3d 798 (10th Cir. 1999) ...................... 15, 16

United States v. Green,
   105 F.3d 1321 (9th Cir. 1997) ......................... 19

United States v. Guerrero
   333 F.3d 1078 (9th Cir. 2003) ...................... 17, 18

United States v. Lindholm,
   24 F.3d 1078, 1087 (9th Cir. 1994) .................... 17

United States v. McKinney,
   15 F.3d 849 (9th Cir. 1994) ........................ 14, 15

United States v. Mohrbacher,
   182 F.3d 1041 (9th Cir. 1999) ...................... 16, 17

United States v. Pierson,
   121 F.3d 560 (9th Cir. 1997) .......................... 19

United States v. Saffo,
   227 F.3d 1260 (10th Cir.2000) ......................... 16

United States v. Takai,
   941 F.2d 738 (9th Cir. 1991) .......................... 18

United States v. Weiland,
   420 F.3d 1062 (9th Cir. 2005) ......................... 14

United States v. Working,
   224 F.3d 1093 (9th Cir. 2000) ......................... 19

**FEDERAL STATUTES**

18 U.S.C. § 3553(a) ........................................ 1

ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

On September 26, 2011, defendants Ezri Namvar and Hamid Tabatabai ("defendants") filed their respective sentencing positions. (CR 199, 203.)[1] Defendant Namvar argues for a sentence within the range of zero to 6 months. (See, e.g., CR 199 at 4.) Defendant Tabatabai contends that he should receive a sentence of probation. (See, e.g., CR 203 at 2.) The Court should reject both defendants' recommended sentences and the arguments upon which their respective recommendations are based for the reasons stated in the Government's Consolidated Sentencing Position for Defendants Ezri Namvar and Hamid Tabatabai ("Government's Sentencing Position") (CR 198), and for the additional reasons discussed below. The government's recommended sentences for defendants, as stated in the Government's Sentencing Position, are appropriate in light of all the 18 U.S.C. § 3553(a) factors. The Court should sentence defendant Namvar to 120 months imprisonment, defendant Tabatabai to 57 months imprisonment, and adopt all of the government's other sentencing recommendations for defendants.

\* \* \*

On September 26, 2011, the Probation Office filed its Addendum to the Presentence Report for defendant Namvar. (CR 196.) On October 5, 2011, the Probation Office filed its Addendum to the Presentence Report for defendant Tabatabai. (CR 205.) The government previously articulated its positions

---

[1] "CR" refers to the Criminal Docket. "RT" refers to the Reporter's Transcript of Proceedings, preceded by the date and followed by the applicable page reference. "GX" refers to government's admitted trial exhibits. The government will file the GX referenced in this filing, at the Court's request.

1    regarding each defendant's Presentence Report ("PSR") in the

2    Government's Objections to the Presentence Reports of Defendants

3    Ezri Namvar and Hamid Tabatabai ("Government's Objections to the

4    PSRs") and the Government's Sentencing Position.  (<u>See</u> CR 184,

5    198.)  The government maintains its positions, as will be

6    discussed below.

                          **II. RESPONSES**

7

8    **A.    <u>Defendant Ezri Namvar</u>**

9            **1.    A Number Of Defendant Namvar's Sentencing Position's
                    Factual Assertions Are Misleading, Unsupported By**

10                  **The Evidence, And/Or Irrelevant**

11           In his sentencing position, defendant Namvar makes a number

12   of factual assertions that are misleading, unsupported by the

13   evidence, and/or irrelevant.  The "Professional Endeavors"

14   section of the report of Kevin Costley ("Costley Report") is

15   similarly riddled with errors and irrelevancies.  (<u>See</u> CR 200-2

16   at 21-32.)  Since the Court is so familiar with the facts of this

17   case, the government will not address all of them; however, the

18   government feels compelled to respond to a few of the more

19   egregious assertions.

20           First, in a discussion of his alleged acceptance of

21   responsibility for the Victims' losses and his view that paying

22   restitution is a "moral duty," defendant Namvar's sentencing

23   position claims that he "immediately gave non-dischargeable,

24   stipulated judgments and offered properties to each of the

25   [Victims][2]. . ."  (CR 199 at 3.)  This assertion is misleading,

26   at best, as the trial evidence showed.  To the extent he met with

27

28           [2]  The "Victims" are the four former clients of Namco
     Financial Exchange Corp. whom defendants are convicted of
     defrauding.

Victims, or in one case a Victim's attorney as well, defendant Namvar offered what turned out to be, and what he had to have known were, empty promises of repayment.  For example, in late October 2008, defendant Namvar handwrote, signed, and gave the Laska Trust a pledge to repay him in full no later than November 3, 2008 (GX 520 at 4), which never happened.  As for the stipulated judgments entered into with the Karsin Trust and Sunnylane, they were entered into well after those Victims asked for their money back.  (<u>See</u> Exhibit 5[3] (Stipulated Judgments).) The evidence shows that what defendant Namvar actually did when confronted by the Victims was offer excuses and empty promises. With the exception of a partial repayment to the Laska Trust, defendant Namvar gave the Victims nothing back of their remaining 1031 exchange proceeds, which were supposedly being held safe and secure with Namco Financial Exchange Corp. ("NFE").

Second, the sentencing position claims that "[t]he fact that funds were routinely transferred from NFI/NFE to [Namco Capital Group ("NCG")] was not hidden," and NFE employees knew this was procedure and they were not "told to keep it secret."  (CR 199 at 6 fn. 1.)  This claim is off the mark.  When defendant Namvar's counsel asked the NFE bookkeeper whether anybody at NFE had ever asked him to hide the fact that he was transferring NFE money to NCG, the bookkeeper replied: "I don't think even the customer knew the money was being transferred.  So nobody would ask that question."  (5/11/11 RT 74:1-6, 111:18-112:1.)  Per the bookkeeper's testimony, defendants did not need to tell anyone at NFE to lie to clients because none of the documentation,

---

[3]   The exhibit numbers for this filing start where the exhibits to the Government's Sentencing Position left off.

1  conversations, or e-mails provided to the Victims stated that

2  their money would be transferred and used however defendants saw

3  fit.

4      Third, the sentencing position asserts that "at all times,

5  NCG had more than sufficient assets to cover any transfers from

6  the exchange companies." (CR 199 at 6.)  This is misleading and

7  irrelevant.  NCG needed to have cash, not assets, on hand because

8  NFE clients might need their 1031 exchange proceeds at any time

9  to effectuate a 1031 exchange.[4]  Whether NCG had enough assets at

10 any given time therefore is irrelevant.  Further, it should be

11 noted that NCG used NFE like an open line of credit, among other

12 things, to pay off its creditors.  The evidence adduced at trial

13 revealed as much.  (See, e.g., GX 11, 12.)  Lastly, NCG had no

14 obligation upon the sale of any asset to transfer the sale

15 proceeds to NFE.  NCG could have used the money any way it

16 wanted, including to pay back its numerous creditors.

17     Fourth, the sentencing position claims that "[defendant]

18 Namvar met personally with several of the [V]ictims and

19 acknowledged he was unable to complete the exchanges at that time

20 and sought more time to do so." (CR 199 at 9.)  This is

---

22 [4]  Various witnesses at trial testified that Section 1031 of
   the Internal Revenue Code permits owners of investment property
23 to defer capital gains taxes after the sale of the investment
   property if the sale proceeds are used to purchase a
24 replacement investment property or properties within a specified
   time frame.  (See, e.g., 5/6/11 RT 91:7-16.)  These transactions
25 are commonly known as "1031 exchanges."  After the sale of the
   investment property, the owner has 45 days from the date of the
26 sale to identify like-kind replacement property or properties and
   180 days from the sale date to close on the purchase of the
27 replacement property or properties.  To preserve the tax
   deferral, the original sale proceeds must be deposited with a
28 "qualified intermediary," like NFE, which is supposed to hold the
   money in safekeeping until the owner requests that the qualified
   intermediary use it to acquire a replacement property or
   properties, returning any unused funds to the owner.

4

misleading.  When Paul Laska confronted defendant Namvar about
where his money had gone and begged for his money back, defendant
Namvar told Laska there had been a "mix-up," that someone had
"goofed" and sent the Laska Trust's money elsewhere, and that he
would have his money the next day.  (5/4/11 RT 266:17-267:3.)
Likewise, when the Karsin Trust's attorney, Gerald Chizever,
confronted defendant Namvar about the whereabouts of the Karsin
Trust's approximately $20 million entrusted to NFE, he admitted
to Chizever that the money was gone and that he could not trace
it.  (5/10/11 RT 178:7-16.)  Finally, when Russ and August
discovered that Sunnylane's money was missing and confronted
defendant Namvar, he admitted that he had taken the money, knew
it was wrong, and was sorry.  (5/11/11 RT 170:9-171:5; 5/13/11 RT
91:12-92:11.)

        Lastly, it should be noted that defendant Namvar's
sentencing position implicitly asserts that, but for him and NCG
being forced into bankruptcy, the Victims would have been repaid.
(See CR 199 at 9-10.)  The Court need only refer to the February
26, 2010 report of the bankruptcy trustees of defendant Namvar
and NCG (Trustees' Report"), which is attached as Exhibit 3 to
the Government's Sentencing Position, to know that this assertion
is pure speculation.  After all, NCG had been operating at a loss
well before creditors filed for NCG's and defendant Namvar's
involuntary bankruptcies on December 22, 2008.  Defendant Namvar
himself understood that all too well and eventually owned up to
it.  Soon after the involuntary bankruptcy petitions were filed,
on January 29, 2009, defendant Namvar and NCG consented to
bankruptcy.  (GX 91, 93.)

### 2. The Actual Loss Amount Of Almost $21 million Was Reasonably Foreseeable

A 22-level increase for loss under USSG § 2B1.1(b)(1)(L) is as appropriate for defendant Namvar, as it is for defendant Tabatabai.  For the reasons noted in the Government's Sentencing Position, the actual loss amount of almost $21 million was reasonably foreseeable to both defendants.

The government offers the following additional reasons the actual loss the Victims collectively suffered was reasonably foreseeable to defendants:

- Well before the Fall of 2008, there were global credit troubles and concerns about the health of the commercial real estate market, as the attached sampling of news articles from December 2007 attest. (Exhibit 6.)

- Defendant Namvar and his brothers used NCG's money as "a family piggy bank."[5]  (Exhibit 7 at 2 (Complaint for Damages); see also Trustees Report, Exhibit 3.) It was "an unrestricted source of capital to purchase property of every kind, size, and description . . ." (Exhibit 7 at 2.)  "[F]unds were systemically diverted and managed for the benefit of family members, at the expense of [NCG's] creditors." (Id. at 3.)

The government also wishes to emphasize the following portions of the Trustees Report, which is attached as Exhibit 3 to the Government's Sentencing Position:

- Beginning in late 2006, amounts owed to creditor/investors [of NCG] exceeded the total investment balance.  Between late 2006 and the Petition Date amounts due to creditor/investors exceeded investment balances by approximately $40 million to $50 million.  (Id. at 56.)

- To further compound the problems facing the Trustees trying to achieve value for the creditors was Ezri's decision prior to bankruptcy to create fictitious debt on many of the properties and numerous

---

[5]  As the controller for NCG, as well as the LLCs involved with NCG and tied to defendant Namvar, defendant Tabatabai was aware of all of this.  (5/17/11 RT 74:1-12.)

> assignments of this debt as well as voluminous
> assignments of ownership interests in the LLCs
> which own the properties.  In many instances there
> are multiple assignments of the same debt or
> ownership interests.  There are literally hundreds
> of such assignments.  (<u>Id.</u> at 49.)

Lastly, the government notes that defendant Namvar, like defendant Tabatabai, blames the financial markets for the failure to repay the Victims.  (<u>See, e.g.</u>, CR 199 at 14; CR 203 at 6.) This argument misses the point.  In determining actual loss, the question is what was reasonably foreseeable to defendants at the time the Victims entrusted their funds to NFE, not what happened later, when they claim they would have fully repaid the Victims. For the same reasons, the assignment of rights referenced in defendant Namvar's sentencing position are equally irrelevant and unpersuasive.[6]  (<u>See</u> CR 199 at 13.)

### 3.   Defendant Namvar Qualifies For A Role Enhancement

Defendant Namvar should receive a role enhancement pursuant to USSG § 3B1.1.  For the reasons stated in the Government's Sentencing Position, the government believes that a two-level enhancement under 3B1.1(c) is appropriate.

### 4.   Defendant Namvar Should Not Receive A Lesser Sentence Based On His Recent Alleged Desire To Pay Restitution

In his sentencing position, defendant Namvar claims that the Court should give him a lesser sentence so that he has the best chance to pay restitution.  (CR 199 at 21-22.)  Although the government wants both defendants to pay full restitution and hopes they will, the Court should reject this argument.

---

[6]   The government does not concede that the assignment of rights was anything more than the empty gesture it turned out to be.  These assignments were previously filed with the Court and are pages 479-485 of Docket Number 133.

1    Defendant Namvar's position represents an apparent change of
2    heart from only this summer, when he opposed restitution.  In his
3    objections to his PSR, defendant Namvar objected to paying
4    restitution of the Victims' actual losses as calculated by the
5    Probation Office.  (CR 186 at 10.)

6    Even setting that aside, it should be noted that when each
7    of the Victims attempted to withdraw all of their exchange
8    proceeds after they each separately became worried about their
9    funds, NFE bank accounts had funds that could have partially
10   repaid them to varying degrees, depending on the time frame.[7]
11   (Compare GX 14 to GX 110, 317, 518, 519; 5/11/11 RT 166:2-171:5).
12   But with the exception of the Laska Trust, which received
13   $500,000 only after Paul Laska repeatedly demanded money (GX 527
14   at 2), the Victims did not receive any funds from defendants.
15   Further, since the collapse of his business empire, defendant
16   Namvar has had years to pay back the Victims even a small portion
17   of the money that they lost as a result of his and defendant
18   Tabatabai's scheme to defraud; however, to date, not one Victim
19   has been repaid a single cent.  Although following his
20   conviction, defendant Namvar was not allowed to work, this only
21   happened in May 2011.  The Victims received no money from him in
22   all of 2009, all of 2010, up through May 2011.  Accordingly, the
23   sincerity of defendant Namvar's claimed desire to pay
24   restitution, and thus the likelihood of follow-through, is
25   doubtful, at best.

26

27        [7]  For example, when the Laskas sent a demand letter to
     defendant Tabatabai on October 28, 2008 asking for the Laska
28   Trust's approximately $1.2 million in remaining exchange
     proceeds, there was approximately $3 million in NFE's bank
     accounts.  (GX 14, 518.)

1    The government hopes defendant Namvar rehabilitates himself

2    and is able to earn an honest living after prison. (The same

3    goes for defendant Tabatabai.) But the evidence before the Court

4    unfortunately leaves no doubt that it is unlikely that the

5    Victims will ever receive full restitution from defendant Namvar,

6    let alone substantial partial restitution from him, no matter the

7    length of his prison sentence. Hence, the Court should not

8    sentence defendant Namvar to a lesser term of imprisonment in the

9    hope that he might pay the Victims back more completely.

10       **5.   The Letters**

11       The government is not in a position to comment on the

12   assertions found in the letters or the portions of the Costley

13   Report outside of the "Professional Endeavors" portion to much of

14   an extent. That said, the government wishes to note that many of

15   the letters reveal that the writer is apparently unaware of the

16   evidence elicited at trial or has chosen to ignore the trial

17   evidence and the jury's verdict. For example, a sister-in-law

18   writes: "A criminal does wrong doing with the intent and

19   knowledge of his malice. Ezri's circumstances were forced on him

20   with the involuntary bankruptcy." (CR 201-1 at 16.) The

21   evidence at trial revealed defendant Namvar did act with intent

22   to defraud the Victims, as the jury quickly found. Moreover, the

23   involuntary bankruptcy petitions for defendant Namvar and NCG

24   were not filed until December 22, 2008 (GX 90, 92), which is well

25   after the Victims started requesting their money back, and NFE

26   was not put into bankruptcy until April 2, 2009. (GX 94.)

27       Moreover, at least one letter is misleading as to its true

28   agenda as a result of pertinent information it omits. Henley

9

Saltzburg, an attorney writing on behalf of certain creditors, notes that the creditors "believe that if Mr. Namvar is allowed to work, he has the experience to make restitution . . ." (CR 201-2 at 80-81.)  Attorney Saltzburg then lists a series of creditors, all of which are entities. (Id. at 81.)  But it is what he does not say about those entity creditors that is important and reveals the letter's true agenda.  All those creditors are controlled in whole or in part by members of defendant Namvar's immediate and extended family. (See, e.g., Exhibit 2 of Trustees Report (for example, Roxy 15 LLC is controlled by defendant Namvar's brothers, children and other family members).)  Whether intentional or not, this omission may lead the Court to form the wrong impression of what unaffiliated creditors want to see happen here.  For these reasons, the government believes that the Court should read the letters with scrutiny and be cautious in its reliance on them.

With regard to the Costley Report's "Conclusions" (CR 200-2 at 40-42), the Court should reject its recommendations for the reasons discussed above and in the Government's Sentencing Position.

B.   **Defendant Hamid Tabatabai**

   1.   **A 22-Level Loss Amount Increase Is Warranted And Does Not Overstate Defendant Tabatabai's Culpability**

As noted above, a 22-level increase for loss under USSG § 2B1.1(b)(1)(L) is as appropriate for defendants.  In challenging the loss amount, defendant Tabatabai claims the loss overstates the seriousness of the offense, and therefore, a downward departure is warranted, pursuant to Application Note 19(C). (CR 203 at 3, 6-7; see also Revised Presentence Report ("RPSR")

¶ 121).)[8]   The Court should reject this argument.   Although defendants could have been more egregious criminals, as defendant Tabatabai's filing notes (CR 203 at 7), the crime for which defendants were convicted was a long-running scheme to defraud that inflicted tremendous financial losses on the Victims.   (CR 198 at 2-4.)   Further, as was discussed in the Government's Sentencing Position (CR 198 at 7-10) and will be discussed below, defendant Tabatabai played an integral role in the scheme.

Lastly, defendant Tabatabai's sentencing position claims the PSR states, and the government does not dispute, that there was no intended loss in this case.   (See CR 203 at 3.)[9]   The government does not concede this point.   In fact, there is compelling evidence that defendants did not intend to repay the Victims, much less in full.   As was noted above, when the Victims attempted to withdraw all of their exchange proceeds after they each separately became worried about the safety of their funds, NFE bank accounts had funds that could have partially repaid them to varying degrees, depending on the time frame.   (Compare GX 14 to GX 110, 317, 518, 519; 5/11/11 RT 166:2-171:5.)   But with the exception of the Laska Trust, which received only partial repayment, the Victims did not receive any funds from defendants. That said, for the purposes of the loss calculation here, defendants' alleged intent to repay is irrelevant because the

_____

[8]   RPSR refers to the Revised Presentence Report of defendant Tabatabai that the Probation Office, disclosed to the parties on August 22, 2011.

[9]   In defendant Tabatabai's sentencing position, he continuously cites to the "PSR," disclosed to the parties on July 14, 2011, when in fact counsel for the government believes counsel for defendant Tabatabai actually means to cite to the RPSR, disclosed on August 22, 2011.

government is relying on actual loss.

**2.   Defendant Tabatabai Played A Significant Role In The Scheme To Defraud For Which He Has Been Convicted**

Defendant Tabatabai continues to argue in his sentencing position that he played a minimal role in the offense, and thus, he deserves a downward departure pursuant to USSG § 3B1.2(b). (CR 203 at 8-11.)   The government provided a detailed explanation of defendant Tabatabai's role in both the Government's Objections to the PSRs (CR 184 at 5-7) and in the Government's Sentencing Position (CR 198 at 7-10).   For those reasons, the Court should reject defendant Tabatabai's argument.

It should be noted that in attempting to advance this argument, defendant Tabatabai's sentencing position frequently cites to portions of the RPSR that do not stand for the propositions that he claims they do.   For example, citing to paragraph 16 of the RPSR, defendant Tabatabai's sentencing position states: "Rather, Mr. Tabatabai's only responsibility was serving as a controller, which was nothing more than glorified title for bookkeeper." (CR 203 at 9.)   But paragraph 16 does not support that assertion, nor does any other portion of the RPSR. Paragraph 16, in fact, notes that NFE had a bookkeeper, who was Sasha Ettehadieh.   It also notes that defendant Tabatabai signed all the exchange agreements.   To the extent paragraph 16 can be argued to support defendant Tabatabai's argument, it is only because the Probation Officer decided to include certain misleading claims by defendant Tabatabai himself, such as: "According to Tabatabai, it was uncontroverted at trial that he had no decision-making authority at NFE or NCG."   The trial evidence actually showed that defendant Tabatabai did, in fact,

12

1  authorize a wire transfer on behalf of NFE at Wells Fargo and
2  that he exercised authority at NFE and NCG (e.g., NFE's and NCG's
3  bookkeepers only moved money out of those companies,
4  respectively, at his direction).[10][11]  (GX 5 at 24-27; 5/6/11 RT
5  168:12-19, 187:16-18; 5/11/11 RT 21:24-22:3, 70:18-20.)

6       It is also worth noting that to support his argument that he
7  had a minimal role, defendant Tabatabai's sentencing position
8  cites to letters from a number of people who did not work at
9  either NFE or NCG, such as investors in NFE and NCG.  They are
10 therefore not in a position to know the full scope of his once
11 considerable responsibilities at either company.  Likewise, the
12 only actual former employee cited to for support in this section,
13 the former CFO of NCG, solely discusses what happened at NCG, and
14 his statement regarding defendant Namvar making "all business
15 decisions for [NCG] and exercis[ing] all authority for [NCG]" is
16 not supported by the evidence, as was noted above and in the
17 Government's Sentencing Position.  Further, defendant Tabatabai's
18 reliance on this letter is undercut because the crime here was
19 committed through NFE, where the former CFO played no role.

20
21

22  [10]  Indeed, defendant Tabatabai admitted on cross-
    examination at trial that he would direct the bookkeepers at both
23  NFE and NCG regarding how much money needed to be moved in and
    out of each company (including who to write checks to and for how
    much) after consulting with defendant Namvar.  (5/17/11 RT 207:4-
24  208:8.)

25  [11]  Another example of a misleading citation to the RPSR is
    when the sentencing position cites to paragraph 20 to support the
26  claim that "[a]ll of the NCG and NFE employees who testified at
    trial affirmed that Mr. Tabatabai had no authority to make any
27  expenditures or dispose of any assets."  (CR 203 at 9.)  That
    paragraph does state that, but it is prefaced with the
28  acknowledgment that it is "According to Tabatabai."  Thus, the
    only support for it is defendant Tabatabai's self-serving and
    erroneous version of what transpired.

### 3. Defendant Tabatabai Has Not Accepted Responsibility For His Criminal Conduct

Defendant Tabatabai argues that he should receive credit in the form of a two-level reduction of his Sentencing Guidelines calculation pursuant to USSG § 3E1.1 for acceptance of responsibility. (CR 203 at 11-13.) As noted in the Government's Sentencing Position (CR 198 at 7 n. 7), the Court should reject this request because it is unsupported under either the Sentencing Guidelines or case law in light of the facts and circumstances of this case. (See USSG § 3E1.1 cmt. n. 2; see, e.g., United States v. Weiland, 420 F.3d 1062, 1080 (9th Cir. 2005) ("Appropriate downward adjustment for acceptance of responsibility after trial might include when a defendant challenges the constitutionality of a criminal statute, or other like circumstance.").

In his sentencing position, as he did in his objections to the PSR, defendant Tabatabai argues that he is entitled to a two-level reduction because he admitted to "each and every fact that the government argued supported findings of guilt . . .," and then lists seven cherry-picked facts.[12] (CR 203 at 11; CR 185 at 8.) This argument should be rejected for a number of reasons.

For one, defendant Tabatabai has not shown genuine acceptance of responsibility for his actions, which is a requirement of 3E1.1. See United States v. McKinney, 15 F.3d

---

[12] Defendant Tabatabai's assertion regarding the number and types of facts that the government relied on at trial is continuously shifting. In closing argument, defense counsel claimed it was 15 facts. (5/18/11 RT 95:1-8.) In defendant Tabatabai's post-trial motion for acquittal and a new trial and his objections to the PSR, it was 10 facts. (CR 135 at 4; CR 185 at 6.) Now, according to defendant's sentencing position, it is only seven. (CR 203 at 11-12.) These constantly shifting lists are misleading and thus should be rejected.

1  849, 852-53 (9th Cir. 1994).  His trial testimony was at its core
2  a defiant claim that he is innocent and did nothing wrong.  There
3  have been no signs of sincere contrition, let alone signs that
4  the Ninth Circuit has held might qualify defendant Tabatabai for
5  receiving credit for acceptance of responsibility even after
6  conviction at trial, such as a confession or attempts to plead
7  guilty.  See id. at 853 (holding defendant's "confession,
8  assistance to authorities, and attempts to plead guilty make his
9  sincere contrition clear beyond all measure.")
10      Instead, defendant Tabatabai put on a defense contesting a
11  number of key facts in this case that the government argued
12  supported finding him guilty of the charged scheme to defraud,
13  and he remains unrepentant to this day.  For example, the
14  government argued that the exchange agreements defendant
15  Tabatabai entered into with the Victims, on behalf of NFE, did
16  not allow NFE to transfer the Victims' exchange proceeds to NCG.
17  (5/18/11 RT 22:12-22; see also GX 101, 301, 401, 501.)  Defendant
18  Tabatabai, however, testified that it was his belief that the
19  agreements allowed for such transfers.  Then during closing
20  argument, his counsel asserted that because defendant Tabatabai
21  believed as much, he did not intend to defraud the Victims.
22  (See, e.g., 5/18/11 RT 94:7-25.)  The jury's verdict shows that
23  the jury rejected his self-serving testimony.
24      To support his argument, defendant Tabatabai cites to a
25  Tenth Circuit case, United States v. Gauvin, 173 F.3d 798, 806
26  (10th Cir. 1999).  (CR 203 at 12.)  But Gauvin is inapplicable to
27  defendant Tabatabai's situation.  In Gauvin, the Tenth Circuit
28  upheld a district court's finding of acceptance of responsibility

1  in a case in which the defendant was convicted of assault with a

2  deadly weapon and assault of a federal officer.  Id.  While

3  fleeing from law enforcement in his pickup truck, the defendant,

4  who was drunk, swerved his pickup truck toward law enforcement

5  vehicles in an effort to avoid arrest, and collided with an

6  officer's vehicle.  Id. at 801.  The Tenth Circuit concluded that

7  because the defense was basically a challenge to the

8  applicability of the statute to the defendant's conduct (i.e.,

9  whether his admittedly drunken state of mind met the legal

10 criteria of intent to harm or cause apprehension of harm), the

11 district court did not err in granting the defendant a two-level

12 adjustment for acceptance of responsibility.[13]  Id. at 806.  As

13 the Court knows, defendant Tabatabai did not go to trial solely

14 to dispute whether the wire fraud statute applied to his conduct.

15 He challenged his factual guilt, including what the exchange

16 agreements permitted NFE to do with the Victims' funds.

17 Accordingly, the reasoning behind Gauvin, even if the Court finds

18 it persuasive, is inapplicable to defendant Tabatabai's case.

19      Although that Tenth Circuit case is inapposite, there is a

20 Ninth Circuit case that is instructive: United States v.

21 Mohrbacher, 182 F.3d 1041 (9th Cir. 1999) (affirmed in part,

22 reversed in part).  In that case, the trial court denied the

23 defendant credit for acceptance of responsibility following his

24 conviction at trial because he refused to admit to the intent

25

26      [13]  Although it upheld the district court's finding of
    acceptance, the Tenth Circuit noted that it might not have done
27  so but for "the deference afforded to the sentencing judge."
    Id. at 806.  The Tenth Circuit later held that going to trial
28  with a non-good faith denial of intent is not consistent with
    acceptance of responsibility.  United States v. Saffo, 227 F.3d
    1260, 1272 (10th Cir.2000) (distinguishing Gauvin).

16

element of his offense.  <u>Id.</u> at 1052 (defendant, who did not testify at trial, denied realizing the images he downloaded were child pornography at his sentencing).  Although that defendant admitted his acts immediately upon arrest, cooperated with law enforcement, initially pleaded guilty, and at trial called no witnesses, presented no evidence and relied on minimal cross-examination, the Ninth Circuit found that the defendant's:

> refusal to admit one's guilt of the elements of an offense permits a district court to exercise its discretion to deny an acceptance of responsibility adjustment.

<u>Id.</u> (citing <u>United States v. Burrows</u>, 36 F.3d 875, 883 (9th Cir. 1994)); <u>United States v. Lindholm</u>, 24 F.3d 1078, 1087 (9th Cir. 1994).  In this case, not only did defendant Tabatabai contest both the scheme and intent elements of the wire fraud counts at trial, but he also took none of the other actions noted above, which the Ninth Circuit recognized "would have supported an acceptance of responsibility adjustment."  <u>Id.</u>

For all those reasons, the Court should reject defendant Tabatabai's argument that he is entitled to credit for acceptance of responsibility.

### 4.   Defendant Tabatabai Does Not Deserve A Downward Departure For Aberrant Behavior Pursuant To USSG § 5K2.20

In his sentencing position, defendant Tabatabai argues for an aberrant behavior downward departure pursuant to USSG § 5K2.20.  The Court should reject this argument because it is without merit.

In <u>United States v. Guerrero</u>, the Ninth Circuit held that in determining the applicability of 5K2.20, the sentencing court

17

1  must make two separate determinations.  333 F.3d 1078, 1081-82

2  (9th Cir. 2003) (remanded for re-sentencing).  First, the

3  sentencing court must determine whether defendant's case is

4  "extraordinary."[14]  Id.  Second, the sentencing court must

5  determine whether the defendant's behavior has met the

6  requirements of aberrant behavior under 5K2.20(b) (see id.),

7  namely, as 5K2.20(b) states:

8        [T]he defendant committed a single criminal occurrence
         or single criminal transaction that (1) was committed
9        without significant planning; (2) was of limited
         duration; and (3) represents a marked deviation by the
10       defendant from an otherwise law-abiding life.

11  In support of his argument for an aberrant behavior departure,

12  defendant Tabatabai's sentencing position cites to United States

13  v. Takai, 941 F.2d 738, 743-44 (9th Cir. 1991), and United States

14  v. Fairless, 975 F.2d 664, 667 (9th Cir. 1992). (CR 203 at 13-

15  14.)  These cases, which espouse a "totality of circumstances"

16  approach, are off the mark in light of Guerrero, which noted that

17  with the adoption of 5K2.20 in 2000, the Sentencing Commission

18  rejected the "totality of circumstances" test that the Ninth

19  Circuit had adopted with Takai.  Id. at 1081.  Even so, defendant

20  Tabatabai cannot meet his own faulty standard, and he does not

21  even attempt to satisfy the proper standard found in Guerrero.

22       Assuming for the purposes of argument that defendant

23  Tabatabai's situation is "exceptional," which the government does

24  not concede, there is no way defendant Tabatabai can meet all of

25  the second prong's requirements, which is part (b) of 5K2.20.

26

27

28  _____
        [14]  The language of 5K2.20 was amended in October 2003 to
    replace "extraordinary" with "exceptional."  USSG app. C, amend.
    651 (2007).  The accompanying commentary to the amendment does
    not indicate the reasoning behind this change, nor does current
    case law.  Id.

1  <u>See</u> 5K2.20(2)(b).  For instance, application Note 2 of 5K2.20

2  states:

> [R]epititious or significant planned, behavior does
> not meet the requirements of subsection (b) . . .
> [f]or example, a fraud scheme generally would not
> meet such requirements because such a scheme
> usually involves repetitive acts, rather than a
> single occurrence or single criminal transaction,
> and significant planning.

7  Here, too, defendants' criminal behavior involved the repeated

8  use of exchange documentation over the course of more than six

9  months and the repeated transfers of the Victims' money in

10 contravention of what the Victims had been promised.[15]

11      Considering all of the above, the Court should deny

12 defendant Tabatabai's request for a downward departure pursuant

13 to 5K2.20.

14 **C.    Addenda to the Presentence Reports**

15      **1.   Defendant Namvar's Addendum**

16      The government has two objections to defendant Namvar's

17 Addendum, which it articulated in earlier filings.  First, the

18 government's calculation of the actual loss amount is

19 $20,930,648, which is slightly less than the Addendum's

20 calculation of $20,940,456.  (<u>See</u> CR 184 at 3-4; CR 198 at 11.)

21 Second, as noted above, the government believes that a two-level

22

---

23      [15]  <u>See</u> <u>United States v. Pierson</u>, 121 F.3d 560, 564-65 (9th
   Cir. 1997) (affirming the district court's decision not to depart
24 on aberrant behavior grounds because, *inter alia*, the defendant's
   participation in a cocaine distribution scheme spanned a period
25 of at least eight months); <u>United States v. Green</u>, 105 F.3d 1321,
   1322-23 (9th Cir. 1997) (holding that the district court abused
26 its discretion in departing downward on aberrant behavior grounds
   because, *inter alia*, the defendant's criminal activity lasted for
27 at least a few months, perhaps two years); <u>see also</u> <u>United States
   v. Working</u>, 224 F.3d 1093, 1096, 1100 (9th Cir. 2000) (en banc)
28 (affirming the district court's decision that the defendant's
   behavior was aberrant where, *inter alia*, the events leading to
   the crime took place at most over the course of one week, not
   over a "long period" of time).

19

1  enhancement under 3B1.1(c) is appropriate.  (<u>Supra.</u> 7; <u>see also</u>

2  CR 198 at 5.)

3      **2.   Defendant Tabatabai's Addendum**

4      The government has one objection to defendant Tabatabai's

5  Addendum, which it set forth in previous filings, as well as

6  above.  The government does not believe defendant Tabatabai

7  qualifies for a role reduction pursuant to USSG § 3B1.2(b).

8  (<u>Supra.</u> 12-14; <u>see also</u> CR 184 5-7; CR 198 7-10.)

9                        **III. CONCLUSION**

10      For all of the foregoing reasons, the government

11  respectfully requests that the Court deny defendants' respective

12  requests for sentences and impose the sentences the government

13  requested for defendants in the Government's Sentencing Position.

14  DATED: October 5, 2011        Respectfully submitted,

15                                ANDRÉ BIROTTE JR.
                                  United States Attorney
16
17                                ROBERT E. DUGDALE
                                  Assistant United States Attorney
                                  Chief, Criminal Division
18

19                                _____/s/_____
                                  BRIAN E. KLEIN
20                                MONICA D. MANGE
                                  Assistant United States Attorneys
21
22                                Attorneys for Plaintiff
                                  United States of America
23

24

25

26

27

28

                                20