ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
MONICA D. MANGE (Cal. State Bar No.: 234950)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6529
     Facsimile: (213) 894-6269
     E-mail: monica.mange@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>EZRI NAMVAR,<br>   aka "Ezri Namvar<br>   Moghadam,"<br>and HAMID TABATABAI,<br>   aka "Hamid Taba,"<br><br>      Defendants. | NO. CR 10-1055-PA<br><br>GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT NAMVAR'S AND DEFENDANT TABATABAI'S MOTIONS FOR RELEASE ON BAIL PENDING APPEAL<br><br>HEARING DATE:  11/07/11<br>HEARING TIME:  3:00 p.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby respectfully files this consolidated opposition to defendant Ezri Namvar's and defendant Hamid Tabatabai's motions for release on bond pending appeal.

The government's opposition is based on the attached memorandum of points and authorities, the files and records in this case (including the trial evidence), and any

other evidence or argument that the Court may wish to consider.

DATED:   October 31, 2011          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MONICA D. MANGE
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

2

<u>**TABLE OF CONTENTS**</u>

PAGE

TABLE OF AUTHORITIES ........................................... ii

I.   INTRODUCTION ............................................. 1

II.  ARGUMENT ................................................. 3

    A.   <u>Bail Pending Appeal Should Be Granted Only
         In Exceptional Circumstances</u> ...................... 3

    B.   <u>Defendant Namvar And Defendant Tabatabai Fail
         To Establish By Clear And Convincing Evidence
         That They Are Not An Economic Danger To The
         Community</u> .......................................... 5

    C.   <u>Defendant Namvar Has Also Failed To Establish
         By Clear And Convincing Evidence That He Does
         Not Pose A Flight Risk</u> ............................. 9

    D.   <u>Defendant Namvar And Defendant Tabatabai Also
         Fail To Establish By Clear And Convincing Evidence
         That There Is A Substantial Question On Appeal</u> ..... 10

        1.   <u>Defendants Fail To Establish By Clear And
             Convincing Evidence That Their Rule 29
             Motions Raise A Substantial Question Of Law
             Or Fact On Appeal</u> ............................. 11

        2.   <u>Defendants Fail To Establish By Clear And
             Convincing Evidence That Their Rule 33
             Motions Raise A Substantial Question Of Law Or
             Fact On Appeal</u> ............................... 15

            a.   Evidentiary Objections ................... 16

            b.   Defendant Tabatabai's Sixth Amendment
                 Objections .............................. 21

            c.   Eliciting False Testimony And Vouching
                 Objections .............................. 23

            d.   Trial Exhibit Objection ................. 33

V.   CONCLUSION ...... ...................................... 39

i

1

# TABLE OF AUTHORITIES

PAGE(S)

2 FEDERAL CASES:

3

4
Delaware v. Van Arsdall,
475 U.S. 673 (1986) ................................. 21

5
Gideon v. Wainwright,
372 U.S. 335 (1963) ................................. 33
6

7
Hayes v. Ayers,
632 F.3d 500 (9th Cir. 2011) .................... 26, 27

8
Hayes v. Brown,
399 F.3d 972 (9th Cir. 2005) ...................... 29
9

10
Johnson v. United States,
520 U.S. 461 (1997) ................................. 33

11
McKaskle v. Wiggins,
465 U.S. 168 (1984) ................................. 34
12

13
Neder v. United States,
527 U.S. 1 (1999) ................................... 33

14
Rivera v. Illinois,
129 S. Ct. 1446 (2009) ............................. 33
15

16
Rose v. Clark,
478 U.S. 570 (1986) ................................. 33

17
Rosen v. United States,
245 U.S. 467 (1918) ................................. 28
18

19
Shayne v. United States,
255 F.2d 739 (9th Cir. 1958) ...................... 33

20
Sullivan v. Louisiana,
508 U.S. 275 (1993) ................................. 34
21

22
Tumey v. Ohio,
273 U.S. 510 (1927) ................................. 33

23
United States v. Alston,
974 F.2d 1206 (9th Cir. 1992) ..................... 16
24

25
United States v. Alvarez,
358 F.3d 1194 (9th Cir. 2004) ..................... 16

26
United States v. Atcheson,
94 F.3d 1237 (9th Cir. 1996) ...................... 24
27

28

ii

## <u>TABLE OF AUTHORITIES</u> (continued)

<u>United States v. Bagnariol</u>,
   665 F.2d 877 (9th Cir. 1981) ......................... 36

<u>United States v. Banks</u>,
   514 F.3d 959 (9th Cir. 2008) ......................... 16

<u>United States v. Bensimon</u>,
   172 F.3d 1121 (9th Cir. 1999) ........................ 21

<u>United States v. Biggs</u>,
   491 F.3d 616 (7th Cir. 2007) ......................... 33

<u>United States v. Cervantes</u>,
   542 F.2d 773 (9th Cir. 1976) ......................... 27

<u>United States v. Ciccone</u>,
   219 F.3d 1078 (9th Cir. 2000) ........................ 20

<u>United States v. Collins</u>,
   604 F.3d 481 (7th Cir. 2010) ......................... 34

<u>United States v. Croft</u>,
   124 F.3d at 1109 (9th Cir. 1997) ..................... 29

<u>United States v. Debrow</u>,
   346 U.S. 374 (1953) .................................. 25

<u>United States v. DeCoito</u>,
   764 F.2d 690 (9th Cir. 1985) ......................... 33

<u>United States v. Dunnigan</u>,
   507 U.S. 87 (1993) ................................... 25

<u>United States v. Friedland</u>,
   660 F.2d 919 (3d Cir. 1981) .......................... 34

<u>United States v. Garza</u>,
   574 F.2d 298 (5th Cir. 1978) ......................... 34

<u>United States v. Geston</u>,
   299 F.3d 1130 (9th Cir. 2002) ........................ 24

<u>United States v. Gonzalez-Lopez</u>,
   548 U.S. 140 (2006) .................................. 34

<u>United States v. Griley</u>,
   814 F.2d 967 (4th Cir. 1987) ......................... 32

<u>United States v. Handy</u>,
   761 F.2d 1279 (9th Cir. 1985) ................... passim

iii

## TABLE OF AUTHORITIES (continued)

United States v. Harber,
  53 F.3d 236 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 34, 37

United States v. Hermanek,
  289 F.3d 1076 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . 24, 25

United States v. Hernandez,
  105 F.3d 1330 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . 12

United States v. Hickey,
  2006 WL 1867708 (N.D. Cal. July 6, 2006) . . . . . . . . . 5, 20

United States v. Hofer,
  995 F.2d 746 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 34

United States v. Houston,
  648 F.3d 806 (9th Cir. 2011) . . . . . . . . . . . . . . . . 25, 27, 30

United States v. Inzunza,
  638 F.3d 1006 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . 16

United States v. Jenkins,
  884 F.2d 433 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 22

United States v. Kellington,
  217 F.3d 1084 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . 15

United States v. Krug,
  2010 WL 4054155 (M.D. Tenn. Oct. 15, 2010) . . . . . . . . . 34

United States v. Madoff,
  586 F. Supp. 2d 240 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . 5

United States v. Manning,
  56 F.3d 1188 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 21

United States v. Marcus,
  130 S. Ct. 2159 (2010)  . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Martinez,
  182 F.3d 1107 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . 22

United States v. Miller,
  753 F.2d 19 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Mills,
  280 F.3d 915 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 36

United States v. Molinaro,
  11 F.3d 853 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 17

iv

## TABLE OF AUTHORITIES (continued)

United States v. Motamedi,
    767 F.2d 1403 (9th Cir. 1985) ....................... 6

United States v. Necoechea,
    986 F.2d 1273 (9th Cir. 1993) ...................... 30

United States v. Pelisamen,
    641 F.3d 399 (9th Cir. 2011) ....................... 16

United States v. Powell,
    469 U.S. 57 (1984) ................................. 36

United States v. Prime,
    431 F.3d 1147 (9th Cir. 2005) ...................... 34

United States v. Provenzano,
    605 F.2d 85 (3d Cir. 1979) ....................... 5, 7

United States v. Reynolds,
    956 F.2d 192 (9th Cir. 1992) ..................... 5, 6

United States v. Rogers,
    321 F.3d 1226 (9th Cir. 2003) ...................... 13

United States v. Rush,
    749 F.2d 1369 (9th Cir. 1984) ...................... 15

United States v. Saadeh,
    61 F.3d 510 (7th Cir. 1995) .................... 25, 29

United States v. Sarkisian,
    197 F.3d 966 (9th Cir. 1999) ....................... 24

United States v. Shabani,
    48 F.3d 401 (9th Cir. 1995) ........................ 21

United States v. Shipsey,
    363 F.3d 962 (9th Cir. 2004) ....................... 17

United States v. Smith,
    793 F.2d 85 (3d Cir. 1986) .......................... 5

United States v. Stinson,
    647 F.3d 1196 (9th Cir. 2011) ....................... 2

United States v. Tebha,
    770 F.2d 1454 (9th Cir. 1985) ...................... 34

United States v. Thomas,
    32 F.3d 418 (9th Cir. 1994) ........................ 20

v

## TABLE OF AUTHORITIES (continued)

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010) ...................... 17

United States v. Van Griffin,
    874 F.2d 634 (9th Cir. 1989) ..................... 35

United States v. Vasquez,
    597 F.2d 192 (9th Cir. 1979) ..................... 36

United States v. Vasquez-Landaver,
    527 F.3d 798 (9th Cir. 2008) ..................... 23

United States v. Zuno-Arce,
    44 F.3d 1420 (9th Cir. 1995) ..................... 24

Vasquez v. Hillery,
    474 U.S. 254 (1986) .............................. 34

Waller v. Georgia,
    467 U.S. 39 (1984) ............................... 34

Washington v. Recuenco,
    548 U.S. 212 (2006) .............................. 33

Yeager v. United States,
    129 S. Ct. 2360 (2009) .......................... 36

Sivak v. Hardison,
    2011 WL 3907111 (9th Cir. Sept. 7, 2011) ........ 36

**FEDERAL STATUTES**

18 U.S.C. § 1343 ................................... 1

18 U.S.C. § 3142(e) ................................ 9

Fed. R. Crim. P. 33(a) ............................ 15

S. Rep. No. 98-197, 98th Cong., 1st Sess. 52-54 (1983) .. 4

18 U.S.C. § 3143(b) ............................ passim

vi

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendants Ezri Namvar and Hamid Tabatabai were each convicted of four counts of wire fraud, in violation of 18 U.S.C. § 1343, for participating in a scheme to defraud four former clients (the "victims") who separately entrusted their money with Namco Financial Exchange Corp. ("NFE"), between April and September 2008.  On October 11, 2011, this Court sentenced defendant Namvar to 84 months imprisonment, a three-year term of supervised release, a special assessment of $400 and ordered him to pay $20,930,648 in restitution to the victims.  (CR 214.)[1] On that same day, this Court sentenced defendant Tabatabai to a term of 21 months imprisonment, a three-year term of supervised release, a special assessment of $400 and that he be jointly and severally liable with defendant Namvar for the $20,930,648 in restitution owed to the victims.  (CR 216.)[2]

On October 24, 2011, defendants each filed a motion for bail pending appeal.  (CR 235, 237.)  Both defendants' motions contain little to no analysis in support of their contention that this Court should grant their respective motions because they are not flight risks and their appeals present a "substantial" question of law.

Defendants' motions are without merit.  Accordingly, this Court should deny both defendant Namvar's and defendant Tabatabai's motions for bail pending appeal.  Defendants Namvar

---

[1] "CR" refers to the Criminal Docket entry number for each filing that is referenced followed, at times, by the applicable page number.

[2] Defendants were originally ordered to surrender on November 8, 2011.  The Court *sua sponte* changed this date to November 15, 2011.  (CR 239.)

1   and Tabatabai both fail to show that they are not an economic
2   danger to the community (defendant Tabatabai does not even
3   address this important factor in his papers).   Defendant
4   Tabatabai currently works as an accountant at a company that
5   engages in loan and investment transactions and has never
6   accepted responsibility for his participation in the crime for
7   which he was convicted.   Likewise, while defendant Namvar is not
8   currently employed, he has actively sought employment at the same
9   company defendant Tabatabai currently works (a request this Court
10  denied).   Defendant Namvar also indicated that he will continue
11  to seek employment in the very same industry in which he
12  committed the criminal conduct for which he was convicted, and
13  has also failed to accept full responsibility for his criminal
14  behavior.
15      Defendant Namvar has also failed to show by clear and
16  convincing evidence that he is not a flight risk.   Defendant
17  Namvar not only has overseas contacts (e.g., business interests
18  in Israel), but is now facing the certainty of a significant
19  amount of custodial time (seven years).   This changed
20  circumstance alone makes him more likely to flee than he might
21  have been prior to the imposition of a lengthy custodial
22  sentence.
23      In addition, both defendants have failed to carry their
24  burden of establishing that their appeal raises a substantial
25  question of law or fact.   At the August 22, 2011, hearing and on
26  October 6, 2011, this Court denied defendants' motions for
27  judgment of acquittal and new trial, respectively.   (CR 208.)   An
28  issue is only "substantial" when it is fairly debatable and is

1  more than merely non-frivolous.  <u>United States v. Handy</u>, 761 F.2d
2  1279, 1281-82 (9th Cir. 1985).  The mere fact that defendants
3  collectively raise many different allegedly appealable issues, in
4  and of itself, does not make an issue fairly debatable.
5  Defendants also ignore the more deferential standard of review
6  that the Ninth Circuit is required to apply to this Court's
7  denial of several of the issues raised in defendants' earlier
8  motions, incorporating instead, "by reference," the arguments
9  they made to this Court on direct review when all of the issues
10  were considered for the first time.  (<u>See, e.g.</u>, CR 235 at 4.)
11  Accordingly, this Court should deny both of defendants' motions
12  for bond pending appeal because neither has satisfied the very
13  stringent requirements for bail mandated in 18 U.S.C. § 3143(b).

14                          **II. ARGUMENT**

15  **A.   <u>Bail Pending Appeal Should Be Granted Only In Exceptional
        Circumstances</u>**
16
17       The Bail Reform Act of 1984 revised the statutory criteria
    governing bail on appeal.  Under 18 U.S.C. § 3143(b), defendants
18
    Namvar and Tabatabai must begin serving their sentences unless
19
    the Court finds by clear and convincing evidence:
20
21           (1) that the defendant is not likely to flee or pose a
             danger to the safety of any other person in the
22           community if released;

23           (2) that the appeal is not for the purpose of delay;

24           (3) that the appeal raises a substantial question of
             law or fact; and

25           (4) that if that substantial question is determined
             favorably to defendant on appeal, that decision is
26           likely to result in reversal or an order for a new
             trial of all counts on which imprisonment has been
27           imposed.

28  <u>Handy</u>, 761 F.2d at 1283.

                                3

The Bail Reform Act reflects a clearly stated legislative intent to make detention pending appeal the rule rather than the exception:

> Once guilt of a crime has been established in
> a court of law . . . there is no reason to
> favor release pending . . . appeal.

>                    *        *        *

> [T]he court must affirmatively find that the appeal is
> not taken for the purpose of delay and that [it]
> raises a substantial question of law or fact likely to
> result in reversal or an order for a new trial . . .
> The change in subsection (b) requires an affirmative
> finding that the chance for reversal is substantial.

>                    *   *   *

> The Committee intends that in overcoming the
> presumption in favor of detention the burden
> of proof rests with the defendant.

S. Rep. No. 98-197, 98th Cong., 1st Sess. 52-54 (1983).  Congress has recognized that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances."  H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970) (regarding model for current 18 U.S.C. § 3143, quoted in United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985) (holding that Congress enacted § 3143 "to reverse the presumption in favor of bail")).  The intent of Congress in passing the Bail Reform Act of 1984 was to "toughen the law with respect to bail pending appeal."  Handy, 761 F.2d at 1283.

Under the statute, a defendant bears the burden of proving that his appeal raises a substantial question of law or fact that will result in a new trial or reversal of his conviction.  See 18 U.S.C. § 3143(b); Fed. R. App. 9(c); United States v. Wheeler,

1   795 F.2d 839, 840 (9th Cir. 1986).  In Handy, the Ninth Circuit

2   held that a substantial question is one that is "fairly

3   debatable" or "fairly doubtful," thereby raising an issue "of

4   more substance than would be necessary to a finding that it was

5   not frivolous."  761 F.2d at 1283.  Accordingly, bail pending

6   appeal can only be granted if an appellate decision on a

7   substantial question presented by defendant is likely to result

8   in reversal or an order for a new trial of all counts on which he

9   was sentenced to imprisonment.  Id.; United States v. Hickey,

10  2006 WL 1867708 at *15 (N.D. Cal. July 6, 2006) (purported

11  infirmities that go only to certain counts but not all of them,

12  even if debatable, do not justify bail pending appeal); United

13  States v. Smith, 793 F.2d 85 (3d Cir. 1986) (even in the absence

14  of controlling precedent, the issue for appeal must be

15  significant in addition to novel).

16  **B.   Defendant Namvar And Defendant Tabatabai Fail To Establish
         By Clear And Convincing Evidence That They Are Not An**
17       **Economic Danger To The Community**

18       Whether a defendant poses an economic harm to the community

19  may be considered in bail pending appeal claims.  United States

20  v. Reynolds, 956 F.2d 192 (9th Cir. 1992) (danger to the

21  community may "encompass pecuniary or economic harm" in bail

22  pending appeal determinations); see United States v. Provenzano,

23  605 F.2d 85, 95 (3d Cir. 1979) (recognizing the Bail Reform Act

24  does not specify the "kinds of harm nor the particular factors to

25  be considered in determining whether a defendant poses a danger

26  to the community."); United States v. Madoff, 586 F.Supp.2d 240,

27  252 (S.D.N.Y. 2009) (economic harm may be considered in

28  evaluating danger to the community under the Bail Reform Act);

1   see also 18 U.S.C. § 3143(b).

2       Following their wire fraud convictions, both defendants have

3   failed to prove by clear and convincing evidence that they do not

4   constitute an economic danger to the community.  See Reynolds,

5   956 F.2d at 192 (defendant failed to show by clear and convincing

6   evidence that he did not constitute an economic danger to the

7   community after a jury had convicted him of mail fraud and

8   witness tampering).  In fact, neither defendant even attempts to

9   establish by clear and convincing evidence that he is not an

10  economic danger.  (CR 237, 235.)  Instead, defendant Namvar

11  argues that this Court concluded that he was not a danger to the

12  community when it permitted him to stay out on modified bond

13  pending his now modified November 15, 2011 surrender date.  (CR

14  235 at 7.)  Defendant Namvar's argument ignores this Court's

15  rejection of his prior request to work for the same employer as

16  defendant Tabatabai, (CR 183), and the fact that the legal

17  calculus changes fundamentally when a defendant is waiting a

18  couple of weeks to surrender versus more time for his appeal to

19  be resolved.  Likewise, defendant Tabatabai, focusing entirely on

20  the issue of flight risk, does not even attempt to negate the

21  issue of economic danger.  United States v. Motamedi, 767 F.2d

22  1403, 1406 (9th Cir. 1985) (defendant seeking appeal must "negate

23  both danger to the community and flight risk by clear and

24  convincing evidence.").[3]

25  _____

26      [3]  Defendant Tabatabai repeatedly states that the government
    "stipulated" to the fact that defendant was not a flight risk.
27  (See, e.g., CR 235 at 3.)  While the government does not rely
    currently on the fact that defendant is a flight risk to contest
28  his bail pending appeal motion, defendant Tabatabai has failed to
    prove by clear and convincing evidence any of the other
    requirements and should be required to start serving his
    sentence, as this Court ordered, on November 15, 2011.  If this

1    Notwithstanding both defendants' failure to address this

2  issue, the economic risk defendants pose is first demonstrated by

3  the seriousness of the offense in question.  As established at

4  trial, defendants engaged in a scheme to defraud four victims of

5  approximately $21 million dollars by actively misrepresenting to

6  the victims that their money would be held safely in an NFE bank

7  or savings account.  The continuing risk that both defendants

8  will re-offend is evident because, throughout this case and

9  including at sentencing, both defendants have refused to

10  acknowledge the criminal wrongfulness of their conduct.  Rather,

11  as this Court found at their respective sentencing hearings, both

12  defendants have maintained to the end that they were entitled to

13  move the four victims' money around as they wished and spend the

14  victims' money as they saw fit.  The fact that both defendants

15  have denied the criminality of their behavior should factor into

16  this Court's analysis of whether defendants could commit

17  subsequent similar crimes in the future.  <u>Provenzano</u>, 605 F.2d at

18  95.

19    Moreover, both defendants pose an economic danger to the

20  community because they are either actively engaged in or

21  attempting to actively engage in the very same types of conduct

22  that resulted in their criminal behavior.  Defendant Tabatabai

23  currently works as an accountant at Palisades Capital, LLC, a

24  company that engages in loan and investment transactions.  (CR

25  153.)  The fact that defendant Tabatabai remains employed as an

26  _____

27  Court grants defendant Tabatabai's motion over the government's
objection, however, the government would oppose the lifting of
any curfew and would likely ask for a different type and amount
28  of bond on the basis that different terms and conditions of bond
are required to ensure defendant's appearance under these changed
circumstances.

accountant at a company that engages in loan and investment transactions, where defendant Namvar also sought employment, constitutes an economic danger to the community particularly in light of the fact, as this Court found at his sentencing hearing, that defendant Tabatabai never accepted responsibility for his participation in the crime for which he was convicted.

Likewise, while defendant Namvar is not employed at the moment, he has sought employment as a business development and loan officer at the same company where defendant Tabatabai currently works (a fact he fails to mention in his present motion).  (CR 153.)  This request was denied by the Court (precisely because defendant Namvar is an economic danger to the community), but defendant Namvar has indicated that he intends to continue to seek employment with the very same pool of "people in the business community" that he ostensibly worked with at the same time he was committing the criminal conduct for which he was convicted.  (CR 199 at 22.)  Defendant Namvar's rejection of any responsibility for his criminal behavior, which was also noted by this Court at his sentencing hearing, suggests that defendant Namvar will continue to pose an economic danger to the community if permitted to work if out on bond pending his appeal, notwithstanding any pre-trial supervision conditions imposed by this Court, as the type of employment he seeks is complex, not readily conducive to this type of supervision, and, most importantly, would require defendant Namvar to make representations to various parties for whom he was brokering deals or identifying investment transactions.  (CR 153 at 5 ("The proposed work involves identifying and negotiating investment and

1  loan transactions for Palisades Capital, where Palisades Capital
2  would either be the lender or an investor, or would broker the
3  loan to another lender."); CR 153-2 at 23-25 (listing among his
4  duties identifying and negotiating real estate investment loans
5  as well as identifying real estate investment transactions).)

6  **C.   Defendant Namvar Has Also Failed To Establish By Clear
       And Convincing Evidence That He Does Not Pose A Flight Risk**
7
       Defendant Namvar also fails to establish that he is not a
8  flight risk.  To begin, defendant Namvar's reliance on the fact
9
   that, to date, he has complied with the conditions of his
10
   release, ignores that the balance of risk of flight changes after
11
   a defendant has been convicted and sentenced to a substantial
12
   period of incarceration.  Prior to sentencing, defendant may have
13
   considered it possible or even likely that he would not face a
14
   significant period of confinement (especially in light of his
15
   request for probation), and may have hoped that his compliance
16
   with his conditions of pre-trial release would have placed him in
17
   a more favorable light before this Court as it made its
18
   sentencing decision.  Such incentives and expectations are now
19
   gone, and defendant is confronted with the stark reality of the
20
   84-month sentence that this Court has actually imposed.  This
21
   change in the balance of risk is paralleled by the shifting of
22
   the burden of proof as to risk of flight from the government to
23
   the defendant now that the criminal case has moved from the pre-
24
   trial to the post-conviction phase.  Compare 18 U.S.C. § 3142(e)
25
   with 18 U.S.C. § 3143(b).  That defendant Namvar has made all his
26
   court appearances prior to, and including, sentencing, does not
27
   address the risk of flight now that his having to serve a
28

                                   9

1   substantial prison term is virtually certain.

2       This concern is more acute here given the fact that

3   defendant Namvar has business-related ties abroad.  The fact that

4   defendant Namvar has had business dealings in Israel (including

5   granting a $15,000,000 loan to an Israeli company owned by his

6   brothers that purchased and developed multiple properties in

7   Israel), for example, indicates that he is familiar with how to

8   conduct business outside the jurisdiction of the United States,

9   which could afford him ample financial opportunity and incentive

10  to flee if he so chooses.  Accordingly, defendant Namvar's

11  reliance on the fact that he previously complied with the

12  conditions of pre-trial release while he was awaiting sentencing

13  is not sufficient to sustain his burden of establishing that he

14  is not a flight risk.

15  **D.   Defendant Namvar And Defendant Tabatabai Also Fail To
         Establish By Clear And Convincing Evidence That There Is A**
16       **Substantial Question On Appeal**

17       Defendants' arguments that they have raised substantial

18  issues of law or fact also fall short of the showing required by

19  § 3143(b).  To begin, defendants ignore that the errors alleged

20  fall into distinct categories that are subject to different

21  standards of review on appeal than they were when this Court

22  considered them for the first time.  Careful review of each of

23  defendants' potential appellate challenges shows that none of

24  their five (or seven for defendant Tabatabai) identified issues

25  (which have all been extensively briefed and carefully considered

26  by this Court) rise to the level of a "substantial question"

27  within the meaning of 18 U.S.C. § 3143(b), likely to result in a

28  reversal of defendants' convictions on all counts or an order for

1 | a new trial.

2 |     Moreover, in their present motions, both defendants have
3 | failed to do anything more than "merely identify" the appellate
4 | claims they are seeking in a summary laundry list fashion.  (CR
5 | 235 at 4-5, 237 at 8, n. 2, 9, n. 3.)  In <u>United States v.</u>
6 | <u>Montoya</u>, the Ninth Circuit held that, in order for a defendant to
7 | meet his "substantial question" burden under <u>Handy</u>, he must not
8 | merely identify appellate claims, but must also provide
9 | sufficient argument in support of these claims to allow the court
10 | to determine whether those claims attain the requisite level of
11 | merit to satisfy the <u>Handy</u> standard of presenting a "fairly
12 | debatable" or "fairly doubtful" question.  908 F.2d 450, 450-51
13 | (9th Cir. 1990).  While it would be pointless to require each
14 | defendant to simply repeat the arguments that were already
15 | considered by the Court in each of their pleadings, (CR 135,
16 | 136), and at the August 22, 2011 hearing, defendants are
17 | nevertheless required to provide at least some explanation why
18 | there is a debatable question of law or fact, especially for the
19 | issues that are now subject to a significantly more deferential
20 | standard of review on appeal, given that Congress has placed on
21 | <u>defendants</u> the burden of establishing the conditions for bail
22 | pending appeal.  Defendants have therefore both failed to show
23 | that their appeals raise a substantial question of law or fact
24 | that will result in a new trial or reversal of their convictions.

25 |        1.   **<u>Defendants Fail To Establish By Clear And Convincing</u>**
26 |              **<u>Evidence That Their Rule 29 Motions Raise A Substantial</u>**<br>             **<u>Question Of Law Or Fact On Appeal</u>**

27 |     Defendants continue to maintain that there was insufficient
28 | evidence to show that either of them knowingly participated in a

11

1    scheme to defraud and/or acted with intent to defraud.  (CR 235,
2    237.)  Defendants' assertions, however, are premised on a
3    misapplication of the proper legal standard governing sufficiency
4    challenges as set forth by the Ninth Circuit and ignore the
5    reasonable inferences that arise from the evidence and support
6    the jury's guilty verdicts.  Accordingly, defendants' Rule 29
7    motions fail and do not present a substantial question of law or
8    fact likely to result in a reversal of their convictions on
9    appeal.

10       Defendants' motions relating to the sufficiency of the
11   evidence are subject to a *de novo* standard of review on appeal,
12   but the applicable test is exactly the same as that applied by
13   this Court in denying defendants' motions.  <u>United States v.</u>
14   <u>Hernandez</u>, 105 F.3d 1330, 1332 (9th Cir. 1997).  As the Ninth
15   Circuit recently held in <u>United States v. Nevils</u>, a reviewing
16   court must therefore: (1) consider the evidence in the light most
17   favorable to the government; (2) presume that the finder of fact
18   resolved all conflicting factual inferences "'in favor of the
19   prosecution'" and <u>defer</u> to that resolution; and then (3) set
20   aside the jury's verdicts <u>only</u> on those "rare occasions" in which
21   it concludes that "'<u>no</u> rational trier of fact could find guilt
22   beyond a reasonable doubt.'"  598 F.3d 1158, 1164 (9th Cir. 2010)
23   (en banc) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 317 (1979)
24   (emphasis added)).

25       As described by the government in extensive detail in its
26   prior filings, the evidence, viewed under this highly deferential
27   standard, was more than sufficient to support the jury's guilty
28   verdicts against both defendants.  (CR 175.)  With respect to

12

1  defendant Namvar, the evidence presented at trial showed that
2  defendant Namvar not only participated in the scheme to defraud
3  by making all decisions relating to how the victims' money was
4  spent and actively making some of the victims believe their money
5  would be kept safely with NFE (GX 4 at 312, 313, 12, 410, 427-28,
6  445, 448, 452; 5/4/11 RT 266:17-267:13; 5/11/11 RT 156:1-7,
7  158:9-15, 164:14-19; 5/12/11 RT 166:6-12, 167:18-168:9; 5/17/11
8  RT 207:4-208:8),[4] but knew that moving the victims' money without
9  their consent or authority was wrong (as evidenced by his very
10 own statements to the victims).  (5/4/11 RT 266:17-267:13;
11 5/10/11 RT 178:7-16; 5/11/11 RT 170:9-171:5; 5/13/11 RT 91:12-
12 92:11); see also United States v. Rogers, 321 F.3d 1226, 1230
13 (9th Cir. 2003) ("It is settled law that intent to defraud may be
14 established by circumstantial evidence.").

15     Similarly, there was sufficient evidence presented at trial
16 establishing defendant Tabatabai's guilt.  At trial the jury
17 learned, among other things, that defendant Tabatabai was the
18 person who signed all of the exchange agreements with the victims
19 promising to keep their money at a bank or savings account at NFE
20 (and nowhere else) and was familiar with its terms and
21 provisions.  (GX 101, 201, 301, 501; 5/17/11 RT 199:2-200:19,
22 201:11-202:5, 202:16-19, 203:10-13, 203:20-205:6.)  The evidence
23 at trial also showed that defendant Tabatabai was aware that, at
24 the time he entered into the exchange agreements with the victims

26 _____

27 [4]  "RT" refers to the Reporter's Transcript of Proceedings,
   preceded by the date and followed by the applicable page
   reference.  "GX" refers to government trial exhibits, which were
28 previously filed by the government in its consolidated opposition
   to defendants' Rule 29 and Rule 33 motions.  (CR 175, 176.)  "DX"
   refers to defense trial exhibits, which were previously jointly
   filed by defendants.  (CR 131.)

1    on behalf of NFE, the victim money would not stay in an NFE

2    account as evidenced by his own testimony and the fact that he

3    directed others to transfer money between NFE and NCG.  (5/6/11

4    RT 168:12-19, 187:16-18; 5/11/11 RT 21:24-22:3, 16-24, 23:23-25,

5    99:19-21, 99:22-100:22, 101:6-21; 5/17/11 RT 85:22-86:3, 86:5-13,

6    87:11-15, 207:4-208:8.)

7         The evidence adduced at trial also showed that defendant

8    Tabatabai engaged in other affirmative acts of deception, as

9    evidenced by an e-mail he forwarded to victim Richard August,

10   confirming that his money had been wired from one NFE bank

11   account to another NFE bank account at Wells Fargo.  (GX 452.)

12   At trial, August testified that when he received this e-mail from

13   defendant Tabatabai, he understood it to mean that his money

14   would stay in a Wells Fargo account belonging to NFE until he

15   requested it.  (5/13/11 RT 89:15-90:4, 113:24-114:2, 116:6-11.)

16   On cross-examination, defendant Tabatabai admitted that, at the

17   time he sent the e-mail and wrote the word "confirmation" to

18   August, he knew that the victims' money would not stay in the

19   Wells Fargo account.  (5/17/11 RT 205:7-16, 209:20-210:3.)

20   Nothing in the e-mail defendant Tabatabai admitted to sending,

21   however, indicated that the money would be transferred or used

22   anywhere else.  (GX 452; 5/13/11 RT 89:3-90:4, 15-18, 113:9-

23   114:2, 116:6-11.)

24        Accordingly, this Court properly denied defendants' motions

25   for judgment of acquittal because the evidence, when viewed in

26   the light most favorable to the verdict and drawing all

27   inferences in favor of the prosecution, was more than sufficient

28   to convict both defendants.  Defendants' sufficiency challenges

1 | are without merit and fail to raise a substantial question of law
2 | or fact warranting bail pending appeal.

3 |     **2.**   **Defendants Fail To Establish By Clear And Convincing**
            **Evidence That Their Rule 33 Motions Raise A Substantial**
4 |             **Question Of Law Or Fact On Appeal**

5 |     Rule 33 provides that "upon the defendant's motion, a court
6 | may vacate any judgment and grant a new trial if the interest of
7 | justice so requires." Fed. R. Crim. P. 33(a). Because a jury's
8 | verdicts are presumptively valid, a new trial motion should be
9 | granted only in those exceptional cases in which the evidence
10 | preponderates heavily against the verdict, such that the court
11 | feels that a serious miscarriage of justice may have occurred.
12 | <u>United States v. Kellington</u>, 217 F.3d 1084, 1097 (9th Cir. 2000);
13 | <u>United States v. Rush</u>, 749 F.2d 1369, 1371 (9th Cir. 1984).

14 |     Here, as the government briefed extensively in its papers,
15 | defendants fail to raise any arguments that would warrant
16 | overturning the presumptively valid verdicts in this case.
17 | Indeed, defendants have failed to show how they suffered any
18 | prejudice relating to any of the claims they now raise on appeal,
19 | and this Court did not abuse its discretion when denying
20 | defendants' claims. Even assuming *arguendo*, however, that this
21 | Court abused its discretion as to certain of these issues (which
22 | the government does not concede), defendants have not raised any
23 | argument likely to result in a new trial on appeal because they
24 | cannot establish that it was more probable than not that any of
25 | the alleged errors they assert affected the verdicts. Defendants
26 | therefore fail to raise a substantial question of law or fact in
27 | the denial of their Rule 33 motions.
28 | //

1       **a.   Evidentiary Objections**

2           The majority of the issues defendants raise in their Rule 33

3  motions are premised on non-constitutional rulings pertaining to

4  evidentiary matters, which are generally subject on appeal to an

5  abuse of discretion standard of review and stringent harmless

6  error analysis.  See, e.g., United States v. Pelisamen, 641 F.3d

7  399, 410 (9th Cir. 2011); United States v. Inzunza, 638 F.3d

8  1006, 1013 (9th Cir. 2011); United States v. Banks, 514 F.3d 959,

9  973 (9th Cir. 2008).

10          "Trial judges have wide discretion in determining whether

11 evidence is relevant." United States v. Alvarez, 358 F.3d 1194,

12 1205 (9th Cir. 2004) (internal quotation omitted).  On appeal,

13 reviewing courts consider whether the decision was based on

14 relevant factors and whether there was a "clear error of

15 judgment." Id. (internal quotation omitted).  "Reversal is

16 required if it is more probable than not that the error affected

17 the verdict." Id. (internal quotation omitted); United States v.

18 Alston, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (reviewing court's

19 role is limited to determining whether the district court clearly

20 and manifestly abused its discretion).  Defendants' evidentiary

21 objections failed on their merits on direct review and will also

22 necessarily fail under the highly deferential standard the

23 reviewing court must apply when considering the district court's

24 rulings.  (CR 135.)

25          To begin, defendants' assertion that they were entitled to

26 present intent to repay evidence is without merit and this Court

27 did not clearly and manifestly abuse its discretion when ruling

28 against defendants on this issue.  (CR 235 at 5; CR 237 at 9, n.

16

1    3.)  The fraud in this case related to defendants knowingly and

2    intentionally holding NFE out to the victims as a qualified

3    intermediary that would keep their 1031 exchange money in a bank

4    or savings account belonging to NFE until they were entitled to

5    collect it.  (See, e.g., GX 401, 448, 452.)  In reality, as

6    defendants knew all along, the victims' money would not stay at

7    an account belonging to NFE as they affirmatively represented to

8    the victims but would be used in a variety of different ways

9    (including to keep defendant Namvar's unaffiliated investment

10   company afloat) without the victims' authority or consent.  (See,

11   e.g., GX 12; 5/17/11 RT 205:7-16, 207:4-11.)  Accordingly,

12   whether defendants ultimately planned to repay the victims is

13   irrelevant in this case because the fraud had already been

14   completed at the point the victims' money was successfully

15   obtained and transferred without their consent or authority.

16   United States v. Treadwell, 593 F.3d 990, 996-97 (9th Cir. 2010);

17   United States v. Shipsey, 363 F.3d 962, 967-68 (9th Cir. 2004);

18   United States v. Molinaro, 11 F.3d 853, 863 (9th Cir. 1993).[5]

19        Defendants' contention that they were prevented improperly

20

21        _____

           [5]  Notwithstanding this Court's ruling, any error would, at
22   most, be considered harmless as defendants were still able to
     present to the jury evidence regarding intent to repay.  For
23   example, the jury heard that in 2008 defendant Namvar had
     interests in dozens of limited liability companies worth several
24   hundred million dollars (5/12/11 RT 116:6-12); that NCG had a lot
     of financial activity, that money moved back and forth between
25   NFE and NCG and that this was the companies' regular practice
     (5/13/11 RT 41:11-20, 189:23-190:1; 5/17/11 RT 92:18-93:1); that
26   the total value of exchanges processed by NFE was $2 billion and
     $160 million in 2008 (5/13/11 RT 174:13-18; 5/17/11 RT 77:2-4;
27   122:6-8, 17-21); that NFE managed hundreds of exchanges with a
     volume of over a hundred million dollars (5/13/11 RT 198:20-25;
28   5/17/11 RT 89:5-12); and that prior to the summer of 2008 there
     was never a time where NFE did not have funds available to
     complete the exchanges (5/13/11 RT 199:4-8; 5/17/11 RT 91:17-20).

                                    17

from offering evidence relating to conversations defendants had
with Joseph Mandelbaum regarding two other clients is equally
devoid of merit.   (CR 235 at 5, 237 at 9, n. 3)   Defense counsel
was only prevented from admitting three exhibits relating to two
transactional clients who were not among the victims impacted by
defendants' scheme to defraud in a period of time (2007) outside
the charged scheme.   (DX 1182-84.)   These exhibits were excluded
because they were irrelevant and not probative of defendants'
intent to defraud the four victims.   The government, however,
clarified that it would not object to any evidence pertaining to
Mandelbaum relating to the victims.   (5/17/11 RT 144:24-145:2.)

Tellingly, however, there was no evidence at trial
establishing that either defendant had discussions with
Mandelbaum about any of the victims' 2008 exchanges at issue, let
alone that either defendant believed that any of the victims had
been referred by Mandelbaum in 2008 in the first place which
might have rendered evidence relating to other Mandelbaum clients
potentially but only marginally relevant, at best.   (GX 101, 501;
5/4/11 RT 237:18-238:6; 5/6/11 RT 31:5-7, 192:2-5, 193:8-19,
197:12-15; 5/10/11 RT 32:3-4, 40:7-10; 5/17/11 RT 110:9-13,
115:19-24.)   On the contrary, the exchange agreements between NFE
and victim Paul Laska and NFE and victim Socorro Vasquez that
defendant Tabatabai admitted to signing, for example, made no
mention of Mandelbaum or the higher interest rate the victims
were allegedly supposed to receive in exchange for permitting
their money to be invested.   (GX 101, 501.)   And the evidence at
trial affirmatively indicated that at least one employee at NFE
was fully aware of the fact that Laska did not come through

1  Mandelbaum in 2008.  (GX 515, 518, 520; 5/4/11 (afternoon) RT
2  14:14-23; 5/16/11 RT 97:2-8.)[6]

3       The evidence at trial also negates defendants' assertion
4  that defendants believed at the time that Laska was a Mandelbaum
5  client fully aware of the fact that his money would be invested
6  (as opposed to staying in an NFE account).  Defendant Tabatabai
7  testified at trial that he did not work at NFE, (5/17/11 RT
8  153:18, 192:23-193:1), and did not know how much interest Laska
9  was supposed to receive in 2008.  (5/17/11 182:20-23.)  Likewise,
10 when Laska confronted defendant Namvar about his money's
11 whereabouts, defendant Namvar did not indicate an awareness of
12 Laska's supposed arrangement with Mandelbaum at all.  Instead,
13 defendant Namvar lied to Laska about the whereabouts of his money
14 stating that there was a "mix-up in the transaction" resulting in
15 a mistaken transfer and that Laska would get his money.  (5/4/11
16 RT 267:1-9.)[7]

17 _____

18      [6]  Notwithstanding the Court's ruling, the Court afforded
   defendants wide latitude to speak about Mandelbaum's extensive
19 relationship with NFE and defendant Tabatabai's own state of
   mind.  For example, the Court permitted testimony regarding not
20 only the routine transfer of money from NFE to NCG but the fact
   that defendant Tabatabai was aware that Mandelbaum referred over
21 a hundred clients to NFE and the approximate value of those
   referrals was over $100 million dollars.  (5/17/11 RT 108:7-9,
22 14-17, 23-25.)  The Court also permitted defendants to question
   Laska and Vasquez at length about their relationship with
23 Mandelbaum.  (See, e.g., 5/4/11 RT 235:21-23; 5/6/11 RT 30:17-
   31:4, 192:2-13, 193:17-19; 5/10/11 RT 21:16-23.)  Based on this
24 evidence, counsel for defendant Tabatabai argued in closing that
   Mandelbaum knew that all NFE money would be transferred to and
25 invested at NCG and that defendant Tabatabai was therefore
   entitled to assume that all of Mandelbaum's clients, including
26 Vasquez and Laska, knew that as well.  (5/18/11 RT 113:8-24.)  In
   their closing argument, counsel for defendants also argued that
27 Vasquez and Laska were both Mandelbaum clients in 2008.  (5/18/11
   RT 61:10-14, 72:6-10; 113:2).
28
        [7]  In any event, defendants' argument would have no bearing
   on their intent to defraud the remaining victims (Getlin,
   Russ/August) or the jury's decision to convict on those counts as

1      Finally, this Court's decision to preclude the testimony of
2 two former NFE clients who were not victims of the scheme to
3 defraud or otherwise similarly situated to the victims will
4 likely not be found to be an abuse of discretion by the Ninth
5 Circuit.  (CR 235 at 5, 237 at 9, n. 3.)  The evidence presented
6 at trial did not show that the two NFE clients defendant Namvar
7 wished to call were either impacted by the scheme to defraud or
8 even knowledgeable about the scheme itself.  United States v.
9 Ciccone, 219 F.3d 1078, 1082 (9th Cir. 2000) (testimony of
10 victims who were unaware of the scheme not relevant); see also
11 United States v. Thomas, 32 F.3d 418, 421 (9th Cir. 1994) (error
12 to exclude testimony of other witnesses also affected by scheme
13 to defraud).  Nor were these two particular NFE clients whose
14 testimony was excluded at trial similarly situated to the victims
15 as, unlike the victims, they were both long-term investors of
16 NCG.  (GX 371, 381, 383, 385; 5/4/11 RT 237:18-20, 283:7-10;
17 5/6/11 RT 198:13-16; 5/10/11 RT 60:22-24; 5/11/11 RT 131:7-18).

18      Accordingly, defendants' assertions that they are entitled
19 to a new trial based on any of the evidentiary objections
20 discussed above necessarily fails and they have not shown by
21 clear and convincing evidence that a substantial question of law
22 or fact exists on appeal with regard to these issues.
23 //

24

25 ───────────────────
26 there is no contention by defendants that these victims had any
   association at all with Mandelbaum.  See Handy, 761 F.2d at 1283
27 (bail pending appeal can only be granted if an appellate decision
   on a substantial question presented by defendants is likely to
   result in reversal or an order for a new trial of all counts on
28 which he was sentenced to imprisonment); Hickey, 2006 WL 1867708
   at *15 (purported infirmities that go only to certain counts but
   not all of them, even if debatable, do not justify bail pending
   appeal).

20

1          **b.    Defendant Tabatabai's Sixth Amendment Objections**

2          Defendant Tabatabai also previously argued that his

3    examination of several key witnesses was "severely" truncated

4    along with the topics he was permitted to testify to, violating

5    his constitutional rights.   (CR 136, 235 at 5.)   Defendant

6    Tabatabai's bald assertion that this Court's evidentiary rulings

7    rise to the level of a constitutional violation does not

8    transform any of these otherwise meritless claims into a

9    substantial question warranting bail pending appeal.

10         The Ninth Circuit reviews *de novo* whether the limitation on

11   cross-examination violated a defendant's right of confrontation.

12   United States v. Bensimon, 172 F.3d 1121, 1128 (9th Cir. 1999)

13   (citation omitted).   "The district court, however, has

14   considerable discretion in restricting cross-examination, and

15   this court will find error only when that discretion has been

16   abused."   Id. (citation omitted); United States v. Manning, 56

17   F.3d 1188, 1197 (9th Cir. 1995) (district court's decision to

18   limit the scope of cross-examination is reviewed for abuse of

19   discretion); see also Delaware v. Van Arsdall, 475 U.S. 673, 679

20   (1986) (adopting harmless error analysis and holding that "the

21   Confrontation Clause guarantees an opportunity for effective

22   cross-examination, not cross-examination that is effective in

23   whatever way, and to whatever extent, the defense might wish.").

24   As such, a limitation on cross-examination does not violate the

25   Confrontation Clause unless it limits relevant testimony and

26   prejudices the defendant, United States v. Shabani, 48 F.3d 401,

27   403 (9th Cir. 1995), and denies the jury sufficient information

28   to appraise the biases and motivations of the witness.   United

21

1   States v. Jenkins, 884 F.2d 433, 435-36 (9th Cir. 1989).  As
2   previously discussed, the Ninth Circuit reviews for an abuse of
3   discretion the district court's decision to exclude evidence
4   under Rule 403.  United States v. Martinez, 182 F.3d 1107, 1110
5   (9th Cir. 1999).

6       Defendant Tabatabai was not prejudiced by the alleged
7   limiting of any witness testimony.  The line of questioning
8   defendant Tabatabai wished to explore with witness David Judd,
9   mainly whether his salary at NCG was "low," was not only
10  irrelevant, but no foundation was laid at trial to establish that
11  Judd had any expertise to opine on the propriety of defendant
12  Tabatabai's compensation.  (5/12/11 RT 81:21-82:10, 148:7-9, 16-
13  22; 5/17/11 RT 50:21-51:2.)

14      Regarding defendant Namvar witness, Val Muraoka, all of the
15  topics that defendant Tabatabai argues he was unable to explore
16  with the witness actually came in during trial including the fact
17  that she was aware that money had been transferred from NFE to
18  NCG, (5/13/11 RT 189:19-190:1; 5/16/11 RT 30:15-19), the fact
19  that she had a law degree (5/13/11 RT 167:5-6; 5/16/11 RT 128:3-
20  4), and the fact that she believed there was nothing wrong with
21  transferring funds from NFE to NCG, (5/16/11 RT 48:2-9), among
22  others.

23      Likewise, defendant Tabatabai's assertion that he should
24  have been able to testify about otherwise irrelevant evidence is
25  also without merit.  Specifically, the fact that defendant
26  Tabatabai himself wanted to testify about defendant Namvar's
27  alleged efforts to repay and his own awareness of these efforts,
28  does not otherwise render irrelevant evidence admissible.

See, e.g., United States v. Vasquez-Landaver, 527 F.3d 798, 802 (9th Cir. 2008) ("While the constitutional right to testify permits a defendant to choose whether or not to take the witness stand, it does not authorize a defendant to present irrelevant testimony.") (citing United States v. Moreno, 102 F.3d 994, 999 (9th Cir. 1996)).

In any event, the record makes clear that defendant Tabatabai was, in fact, permitted to testify at trial that he believed that NFE or NCG had enough assets in the process of being sold to complete all of the exchanges, (5/17/11 RT 90:16-19), and that he believed that the exchange money was readily available to clients (including the victims) on demand and that the money was safe at all times.   (5/17/11 RT 90:7-13; 125:9-13; 126:2-12.)  He was therefore able to discuss with the jury the very evidence he now claims was categorically excluded rendering this Court's decision, at worst, harmless.  Accordingly, it is not debatable or doubtful whether defendant Tabatabai's right to cross-examine the witnesses or testify on his own behalf was so limited as to present a constitutional violation.

### c.   Eliciting False Testimony And Vouching Objections

Defendants previously argued that the government committed three separate acts of misconduct during trial, which include falsely eliciting testimony from victim Laska and presenting improper closing argument regarding the testimony of victims Laska and Larry Russ.  (CR 189, 235 at 4, 237 at 9, n. 3.)  At trial, neither defendant objected to the government's questions or Laska's testimony but did object to the government's closing

1   argument relating to these two witnesses.  (See 5/4/11 RT 238:22-
2   239:22, 241:1-3, 242:16-243:5; 5/6/11 RT 62:5-9; 5/11/11 RT
3   204:14-206:21; 5/18/11 RT 130:5-11, 152:18-154:14.)  Defendants'
4   assertions are without merit.

5        The Ninth Circuit reviews an assertion of prosecutorial
6   misconduct to which there was no objection at trial for plain
7   error.  United States v. Atcheson, 94 F.3d 1237, 1244 (9th Cir.
8   1996); United States v. Zuno-Arce, 44 F.3d 1420, 1422 (9th Cir.
9   1995), cert. denied, 516 U.S. 945 (1995).  In these circumstances
10  a reviewing court reverses only if, "viewed in the context of the
11  entire trial, the impropriety seriously affected the fairness,
12  integrity, or public reputation of judicial proceeding, or where
13  failing to reverse a conviction would result in a miscarriage of
14  justice."  United States v. Geston, 299 F.3d 1130, 1134-1135 (9th
15  Cir. 2002); Atcheson, 94 F.3d at 1245 (the court will "reverse
16  for plain error 'solely in those circumstances in which a
17  miscarriage of justice would otherwise result.'") (citation
18  omitted).

19       Allegations of vouching that were objected to at trial are
20  reviewed for harmless error under an abuse of discretion
21  analysis.  United States v. Hermanek, 289 F.3d 1076, 1097-1098
22  (9th Cir. 2002); United States v. Stinson, 647 F.3d 1196, 1211
23  (9th Cir. 2011); United States v. Sarkisian, 197 F.3d 966, 990
24  (9th Cir. 1999) (even if the prosecutor's statement was improper
25  vouching, the court will reverse only if the error was not
26  harmless).  In applying a harmless error analysis in the context
27  of vouching, the issue for determination is whether "it is more
28  probable than not that the prosecutor's conduct materially

1  affected the fairness of the trial." Hermanek, 289 F.3d at 1102.

2      Defendants asserted that the government elicited false

3  testimony from Laska when he stated that he had spoken to "Sasha"

4  in 2005 because "Sasha" did not work at NFE in 2005.  (CR 189.)

5  In order to prevail on a false testimony claim, a defendant must

6  show each of the following things: (1) the testimony was false;

7  (2) the prosecution knew or should have known the testimony was

8  false; and (3) the false testimony was material.  United States

9  v. Houston, 648 F.3d 806, 814 (9th Cir. 2011).  Defendants have

10  failed on all accounts, and will be unable to demonstrate on

11  appeal that Laska's testimony affected the fairness or integrity

12  of the judicial proceeding let alone that it constituted a

13  miscarriage of justice.

14      The Supreme Court has found that "[a] witness testifying

15  under oath or affirmation [commits perjury] ... [when he or she

16  acts] with the willful intent to provide false testimony, rather

17  than as a result of confusion, mistake, or faulty memory.  United

18  States v. Dunnigan, 507 U.S. 87, 94 (1993); see United States v.

19  Debrow, 346 U.S. 374, 376 (1953).  Accordingly, courts have found

20  that "mere inconsistencies in testimony by government witnesses

21  do not establish the government's knowing use of false

22  testimony."  United States v. Saadeh, 61 F.3d 510, 523 (7th Cir.

23  1995) (trial court did not abuse its discretion in denying

24  defendant's motion for new trial where there were inconsistencies

25  in witness testimony and where defendant had ample opportunity to

26  cross-examine and discredit witness during trial and expose any

27  alleged perjury).  And the Ninth Circuit has found that a

28  defendant's interpretation of a witness' testimony is not

1  definitive as to whether it should be considered false.   <u>Hayes v.</u>

2  <u>Ayers</u>, 632 F.3d 500, 520 (9th Cir. 2011).

3       As an initial matter, the record shows that Laska's

4  testimony was not false because it stemmed from confusion, faulty

5  memory, or mistake rather than an intent to provide false

6  testimony.   The evidence at trial showed (and defendants never

7  denied) that Laska had completed an exchange with NFE in 2005.

8  (<u>See, e.g.</u>, 5/4/11 RT 235:2-8; 5/4/11 (afternoon) RT 25:11-13.)

9  Moreover, both at trial and in prior interviews with the FBI,

10 Laska consistently stated that he had two separate telephonic

11 conversations with a person at NFE he remembered to be "Sasha" in

12 2005 and 2008, and that the person whom he had spoken with was

13 also the person who signed the exchange agreements with him.

14 (5/6/11 RT 54:14-18, 60:5-62:9; CR 189-1 at 98, 105.)   It was

15 therefore reasonable to believe, based on Laska's own assertions

16 and the evidence in this case, that Laska indeed had a telephonic

17 conversation in 2005 with someone but confused the identity of

18 that person.   It was also reasonable to believe that Laska's

19 testimony involved a misidentification, based on the fact that

20 Laska may have confused defendant Tabatabai (who worked at NFE in

21 2005 and whom Muraoka testified may have interacted with Laska

22 prior to 2008) with "Sasha," the only other male employee at NFE

23 and who was also a native Farsi speaker.   (5/6/11 RT 162:23-

24 163:6; 5/10/11 RT 181:15-16, 198:4-6, 16-18; 5/16/11 RT 56:16-

25 19).   This is an even more reasonable assumption in light of the

26 fact that Laska did not meet defendant Tabatabai until 2008 and

27 would have no way of knowing the particulars of when "Sasha"

28 started at NFE.   (<u>See</u> 5/4/11 (afternoon) RT 10:8-21); <u>see Hayes</u>,

632 F.3d at 520 (testimony is not false when it is consistent
with reasonable assumptions).

Second, even assuming *arguendo* that this testimony were
considered false (which the government does not concede), the
record shows that the government did not "knowingly use" perjured
testimony and corrected Laska's misidentification at first
opportunity.  Inconsistencies that are "fully explored and argued
to the jury" do not constitute eliciting false testimony.  <u>See</u>
<u>Houston</u>, 648 F.3d at 814.  Moreover, contrary to defendants'
assertions, the Ninth Circuit does not require a discrepancy to
be immediately corrected, so long as it is highlighted to the
jury at some point.  <u>See, e.g.</u>, <u>id.</u> at 814-815 (defendants failed
to show government knowingly presented false testimony of
jailhouse informant where informant's earlier omission that he
had spoken with defendant was fully explored and presented to
jury as prior inconsistent statement after informant testified at
trial that defendant had confided in him); <u>United States v.</u>
<u>Cervantes</u>, 542 F.2d 773 (9th Cir. 1976) (in conspiracy to
distribute controlled substance case, government did not elicit
false testimony in instance where there was full disclosure by
government that witness had testified in previous trial, and
defendant had ample opportunity to effectively cross-examine
witness).

The government never hid the fact that "Sasha" started
working at NFE in 2006 from opposing counsel (indeed, opposing
counsel chose to highlight but not correct this point numerous
times in his cross-examination of victim Laska).  (5/4/11
(afternoon) RT 32:9-18; 5/6/11 RT 14:5-17:8, 19:4-7, 28:22-29:4,

1  22-24, 33:19-22, 53:8-54:18; 5/10/11 RT 185:11-14.)  On re-
2  direct, the government explored this misidentification with Laska
3  by attempting to clarify what he meant by his assertion on cross-
4  examination that the person who signed the exchange agreements in
5  2005 and 2008 was also the person he had spoken with on the
6  phone.  (5/6/11 RT 54:7-18, 60:5-62:9.)  In addition, the
7  government consistently elicited facts from multiple witnesses
8  including "Sasha" himself, NFE employee Muraoka and even
9  defendant Tabatabai from which the jury could have inferred that
10 Laska had misidentified the person he had spoken with in 2005 as
11 "Sasha."  (5/6/11 RT 54:11-18, 60:5-62:9; 5/10/11 RT 181:15-16,
12 198:4-6, 15-18; 5/16/11 RT 56:16-19; 5/17/11 RT 185:18-188:10,
13 199:10-21.)  This misidentification was also fully explored in
14 closing argument by both sides.  (5/18/11 RT 47:24-48:1, 77:15-
15 79:8, 105:5-17, 153:15-154:14.)  As such, the government did
16 exactly what it was supposed to do by eliciting relevant
17 testimony from several percipient witnesses on the issue thereby
18 permitting the jury to draw appropriate and reasonable inferences
19 about whom Laska spoke with in 2005 and/or Laska's overall
20 credibility as a witness.[8]
21     In any event, even if the Ninth Circuit were to find that

---

[8] As noted in <u>Marshall v. United States</u>:

The prosecution has the best chance to stay within
prescribed narrow path of avoiding possible perjured
testimony by permitting the jury to hear testimony of all
persons of competent understanding who may seem to have
knowledge of the facts involved in the case, leaving the
credit and weight of such testimony to be determined by the
court, rather than by rejecting witnesses as incompetent.

355 F.2d 999, 1011 (9th Cir. 1966) (quoting <u>Rosen v. United
States</u>, 245 U.S. 467, 471 (1918)).

Laska's statement was false and was not sufficiently corrected
during testimony, it was still immaterial as there was no
"reasonable likelihood" that Laska's statements would have
affected the judgment of the jury.  Hayes v. Brown, 399 F.3d 972,
985 (9th Cir. 2005).  To begin, the person Laska spoke to in 2005
was, at best, a collateral point with only marginal relevance to
the issue at hand which was whether defendants Namvar and
Tabatabai intended to defraud Laska in 2008.  United States v.
Croft, 124 F.3d at 1109, 1119 (9th Cir. 1997) (district court did
not abuse its discretion in denying new trial based on allegation
of eliciting false testimony where inconsistencies in witness
testimony related to collateral matter); Saadeh, 61 F.3d at 523
(perjured testimony not cause for reversal if it was not
"directly related to the defendant's guilt or innocence.").[9]
Accordingly, it was not discussed by the government in its
summation as additional evidence the jury should rely on when
assessing defendant Tabatabai's guilt, (5/18/11 RT 14:3-42:18),
and was only referenced by the government after defense counsel
for defendant Namvar raised the issue of Laska's credibility in
his own closing argument.  (5/18/11 RT 77:18-79:8, 153:15-
154:14.)

In addition, as previously discussed, the jury was also
fully apprised of Laska's potential "fabrication" by both defense
attorneys and was even asked to believe that the government had
intentionally allowed Laska to perjure himself.  (5/18/11 RT

---

[9]  Contrary to defendant Tabatabai's assertions, the
evidence at trial showed that defendant Tabatabai made active
misrepresentations in 2008 to each of the victims by representing
to them that their money would stay at an NFE account through the
Exchange Agreements he signed on NFE's behalf.

77:15-79:8.)  Accordingly, the jury could fairly and accurately
assess the credibility of the witness again at that time.
Houston, 648 F.3d at 814 (inconsistent witness statements not
material when they were fully explored and argued to the jury).
Because defendants have failed to prove any of the three
requirements required to prevail on a Napue/Mooney claim, they
cannot show any likelihood that the Ninth Circuit will find that
the Court plainly erred when it rejected defendants' argument
and/or that a miscarriage of justice occurred due to this
allegation.

Likewise, defendants' assertions that the government vouched
or otherwise committed misconduct at closing argument when
referencing the testimony of victims Laska and Russ are equally
unsubstantiated.  (CR 135, 136, 189, 235 at 4, 237 at 9, n. 3.)
"Vouching consists of placing the prestige of the government
behind a witness through personal assurances of the witness's
veracity, or suggesting that the information not presented to the
jury supports the witness's testimony."  United States v.
Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  The government
did no such thing in this case.

As explained at length in prior briefing, the government was
well within the bounds of fair advocacy when it suggested in
rebuttal, only after defendant Namvar's counsel argued that Laska
was a liar, that an alternate explanation for Laska's testimony
was that he may have had a phone conversation in 2005 with
defendant Tabatabai.  (5/18/11 RT 77:15-79:8.)[10]  Far from

---

[10]  The government never suggested in close, however, that
Laska had spoken to anyone other than "Sasha" in 2008, the period
of time in which the criminal conduct occurred.

1  misleading the jury, the government's argument properly marshaled
2  the evidence presented at trial including Laska's own statement
3  that the person he believed he had spoken with on the phone in
4  2005 and 2008 was also the person who had signed the agreements
5  with him (5/6/11 RT 54:14-18), the fact that his 2005 and 2008
6  exchange agreements with NFE were both signed by defendant
7  Tabatabai (5/6/11 RT 61:2-9), the fact that "Sasha" did not work
8  at NFE in 2005 (5/10/11 RT 185:11-14), and an NFE employee's own
9  testimony that it was possible that defendant Tabatabai spoke to
10 Laska prior to November 2008. (5/16/11 RT 56:16-19.)

11     Likewise, defendants' assertion that the government
12 committed misconduct when it argued in its rebuttal that victim
13 Russ told defendant Namvar he did not want his money to be
14 invested was also fairly supported by the evidence presented at
15 trial.  Russ testified unequivocally and repeatedly at trial that
16 he understood that his money would be kept at a bank or savings
17 account belonging to NFE and that he would have never entrusted
18 his money with NFE if he discovered his money would be
19 transferred or used for unrelated investments.  (5/11/11 RT
20 147:8-148:4, 153:3-13, 5/12/11 RT 18:2-12, 19:4-7.)  In support
21 of his belief, Russ and his business and investment partner,
22 August, asked defendant Namvar numerous times to transfer their
23 money to a Wells Fargo or Bank of America account belonging to
24 NFE because they believed it would be safer there than at
25 Security Pacific Bank.  (GX 427-28; 5/11/11 RT 153:3-154:2,
26 155:9-12, 158:22-159:15, 160:12-19.)  These requests would
27 arguably not have made sense for Russ to make if he believed his
28 money was going to get swept over to NCG and used for defendant

1    Namvar's own investments.

2        On cross-examination, Russ also denied knowing that, at the

3    time he entered into the exchange agreement with NFE in 2008, NFE

4    transferred money over to NCG and used it.  (5/11/11 RT 204:14-

5    20, 205:9-21.)  Russ further clarified that he had discovered

6    this fact only after he failed to receive his money back from

7    NFE.  (5/11/11 RT 205:9-21); see United States v. Griley, 814

8    F.2d 967, 971 (4th Cir. 1987) (inconsistencies in testimony of

9    two government witnesses was for jury to weigh; it did not

10   establish perjury by one witness).

11       Based on this record, the government was entitled to argue

12   that Russ did not believe his money was going to get transferred

13   over to NCG and spent.  The government was also entitled to argue

14   in rebuttal that, even assuming Russ had lied about his knowledge

15   of these practices, he had made clear to defendant Namvar that

16   this was not how he wanted his money to be used (as evidenced by

17   his repeated efforts and requests to defendant Namvar asking for

18   the transfer of his money to another NFE bank or savings

19   account).  This Court did not abuse its discretion when it denied

20   defendants' request for a new trial based on the government's

21   closing argument.  Defendant's prosecutorial misconduct

22   assertions therefore do not present a substantial question of law

23   or fact warranting bail pending appeal.[11]

24

25       [11]  In any event, even assuming arguendo that either
     argument the government made in rebuttal was improper in any way
26   (which the government does not concede), the jury was properly
     instructed on how to consider closing argument and thus no
27   prejudice to defendants resulted.  Specifically, during the
     government's rebuttal argument, the Court, in response to both
28   objections relating to Laska and Russ, reminded the jury that
     closing argument was simply argument and that their memory of the
     evidence must control.  (5/18/11 RT 153:3-6, 154:1-4.)  At the
     conclusion of the trial the Court also properly instructed the

1              **d.    Trial Exhibit Objection**

2          Finally, defendants' faulty assertion that the inadvertent

3   failure to bring the defense exhibits back to the jury rises to

4   the level of a constitutional violation (or was alternatively

5   prejudicial) does not otherwise transform their claim into a

6   substantial question warranting bail pending appeal.  (CR 235 at

7   4, 237 at 9, n. 3.)

8          There is no constitutional right that the jury receive

9   exhibits.  <u>United States v. DeCoito</u>, 764 F.2d 690, 695 (9th Cir.

10  1985); <u>Shayne v. United States</u>, 255 F.2d 739, 743 (9th Cir. 1958)

11  (sending indictment and exhibits to jury is a matter within

12  discretion of trial court); <u>see also</u> <u>United States v. Biggs</u>, 491

13  F.3d 616, 623 (7th Cir. 2007) (appellate courts give "special

14  deference" to district court's handling of exhibits).

15  Accordingly, the failure to submit trial exhibits to a jury have

16  been treated as non-structural errors[12] by other circuits subject

17  _____

18  jury that "[q]uestions, statements, objections, and arguments by
    the lawyers are not evidence."  (CR 121 at 7.)  The alleged
19  misconduct was, therefore, at most harmless.

20      [12]  An error is "'structural,' therefore 'requir[ing]
    automatic reversal,' only when 'the error necessarily render[s] a
21  criminal trial fundamentally unfair or an unreliable vehicle for
    determining guilt or innocence.'"  <u>Rivera v. Illinois</u>, 129 S. Ct.
22  1446, 1455 (2009) (quoting <u>Washington v. Recuenco</u>, 548 U.S. 212,
    218-19 (2006)).  "But 'structural errors' are 'a very limited
23  class' of errors that affect the 'framework within which the
    trial proceeds,'" usually involving the denial of counsel or a
24  biased or improperly constituted adjudicator <u>Marcus</u>, 130 S. Ct.
    at 2164-2165 (quoting <u>Johnson</u>, 520 U.S. 461, 468 (1997)).  "'[I]f
25  the defendant had counsel and was tried by an impartial
    adjudicator, there is a strong presumption that any other errors
26  that may have occurred' are not 'structural errors.'"  <u>Id.</u> at
    2166 (quoting <u>Rose v. Clark</u>, 478 U.S. 570, 579 (1986)).
27  Accordingly, the list of structural errors is extraordinarily
    narrow.  In <u>Johnson</u>, 520 U.S. at 468-469, and <u>Neder v. United</u>
28  <u>States</u>, 527 U.S. 1, 8 (1999), the Court identified six examples
    of structural error: (1) a biased trial judge, <u>see</u> <u>Tumey v. Ohio</u>,
    273 U.S. 510 (1927); (2) the complete denial of counsel, <u>see</u>
    <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963); (3) the denial of

                                33

1  to the harmless error analysis.  See, e.g., United States v.
2  Collins, 604 F.3d 481 (7th Cir. 2010); United States v. Hofer,
3  995 F.2d 746 (7th Cir. 1993) (harmless error analysis); United
4  States v. Garza, 574 F.2d 298 (5th Cir. 1978) (abuse of
5  discretion analysis); United States v. Krug, 2010 WL 4054155
6  (M.D. Tenn. Oct. 15, 2010).[13]

7      Nor is defendants' prior baseless assertion that the failure
8  of the defense exhibits to go back to the jury room created an
9  "appearance" of Court bias otherwise render the error structural.
10  (CR 189.)  To begin, the record unequivocally shows (and neither
11  party disputes) that the Court did not intentionally withhold the
12  defense exhibits from the jury room -- the exclusion of the
13  exhibits was therefore not the result of an intentional decision
14  by this Court.  In any event, even if the absence of defense
15  exhibits in the jury room (or note written by the Court) gave the

16  _____

17  self-representation at trial, see McKaskle v. Wiggins, 465 U.S.
   168 (1984); (4) the denial of a public trial, see Waller v.
18  Georgia, 467 U.S. 39 (1984); (5) racial discrimination in the
   selection of a grand jury, see Vasquez v. Hillery, 474 U.S. 254
19  (1986); and (6) the administration of a defective reasonable-
   doubt instruction, see Sullivan v. Louisiana, 508 U.S. 275
20  (1993).  And in United States v. Gonzalez-Lopez, 548 U.S. 140
   (2006), the Court added to this list the deprivation of the right
21  to counsel of one's choice.

22      [13]  Indeed, the failure to receive exhibits in the jury room
   is less prejudicial than the erroneous inclusion of unadmitted
23  exhibits or extraneous information to the jury because, as here,
   the jury was only deprived of looking at the exhibits one last
24  time as opposed to considering improper evidence.  This arguably
   more egregious error does not automatically result in reversal.
25  Rather, the Ninth Circuit reviews it for harmless error.  United
   States v. Harber, 53 F.3d 236, 243 (9th Cir. 1995) (harmless
26  error analysis); United States v. Prime, 431 F.3d 1147, 1156-1158
   (9th Cir. 2005); United States v. Tebha, 770 F.2d 1454 (9th Cir.
27  1985) (harmless error analysis applied when jury took to jury
   room exhibit which had not been admitted into evidence); United
28  States v. Friedland, 660 F.2d 919, 928 (3d Cir. 1981) ("When
   exhibits not in evidence reach the jury, a new trial should not
   be ordered unless it is shown that the evidence was so
   prejudicial that the defendant was denied a fair trial.").

1   jury the "appearance" of impartiality as defendants contend, the

2   case law makes clear that the proper analysis in these instances

3   is harmless error.  United States v. Van Griffin, 874 F.2d 634

4   (9th Cir. 1989) (recusal errors based on appearance of bias do

5   not implicate structural constitutional right and should be

6   analyzed pursuant to harmless error review).  Defendants

7   therefore cannot escape the harmless error analysis.

8        Likewise, defendants' previous assertion that the Court's

9   note[14] would necessarily be construed by a jury to mean either:

10  (1) that none of the defense exhibits had been received into

11  evidence; or (2) that the defense exhibits existed but the Court

12  thought the jury should only use and consider the government

13  exhibits in their deliberations, is similarly baseless.  (CR

14  189.)  The note itself was neutral as it described both types of

15  exhibits in the same way.  And the note did not either implicitly

16  or explicitly tell the jury to only consider the government

17  exhibits.

18       Moreover, as defense counsel for defendant Namvar admitted

19  at the hearing, there were many different conclusions that could

20  be reached regarding how the jury might have perceived the Court

21  note and the reasons they might have failed to follow-up after

22  the note was received.  Accordingly, the Supreme Court has

23  cautioned against attempting to speculate what transpired in the

24

_____

25      [14]  The Court note stated:

26          All exhibits have been given to the jury.  All the
            exhibits are marked.  The Government's exhibits are
27          numbered zero to 1000, and the defense exhibits are
            numbered 1000 and above.  Each exhibit should have
28          an exhibit tag, which may be on the back of the
            first page of the text.

(5/18/11 RT 206:25-207:5.)

1   jury room, focusing instead on whether defendants were prejudiced

2   by the error as there is an implicit presumption that jurors have

3   followed the law.   Yeager v. United States, 129 S.Ct. 2360, 2368

4   (2009) (courts should not speculate about what transpired in the

5   jury room, and should avoid such explorations into the jury's

6   "sovereign space," the reason being that the "jury's

7   deliberations are secret and not subject to outside

8   examination."); United States v. Powell, 469 U.S. 57, 67 (1984)

9   (courts generally will not inquire into the jury's deliberations;

10  jurors take an oath to follow the law as charged and are expected

11  to follow it); Sivak v. Hardison, 2011 WL 3907111 at *17 (9th

12  Cir. Sept. 7, 2011) (rejecting defendant's argument that verdicts

13  established he did not personally commit the charged crime,

14  noting that defendant's argument "rests entirely on impermissible

15  'guesswork,' 'conjecture,' and 'speculation.'") (quoting Yeager,

16  129 S. Ct. at 2368); United States v. Mills, 280 F.3d 915, 921

17  (9th Cir. 2002) (inquiry as to whether extrinsic material caused

18  prejudice is objective; court need not ascertain whether

19  extrinsic evidence actually influenced any specific juror);

20  United States v. Bagnariol, 665 F.2d 877, 884-85 (9th Cir. 1981)

21  (jurors may not be questioned about the deliberative process or

22  subjective effects of extraneous information, nor can such

23  information be considered by the trial or appellate courts);

24  United States v. Vasquez, 597 F.2d 192, 193 (9th Cir. 1979)

25  (trial judge should reach judgment of reasonable probability of

26  harm on its own without benefit of jury opinions which might

27  negate or affirm conclusion of actual harm).

28        Defendants were not prejudiced by the failure of the defense

exhibits to go back to the jury room.   The error was therefore
harmless.   During the course of this relatively short trial, the
jury not only heard through live testimony but also saw
repeatedly the fourteen admitted defense exhibits, several of
which were also referenced by number and discussed in closing
argument.   DX 1116, which defendant Tabatabai had previously
called the "pillar of his defense," was an e-mail that a juror
would have readily remembered: the body of the e-mail is only one
sentence long and the e-mail and attached form were addressed and
displayed to the jury more than any other single exhibit at trial
(and displayed as recently as a day before the case was submitted
to the jury for deliberation).   All parties also discussed DX
1116 and referenced it by number in closing argument, the same
day the jury began deliberations.

       The absence of the admitted defense exhibits in the jury
room did not prevent the jury from considering defendants'
evidence and arguments because the fourteen admitted defense
exhibits contained information that was not overly complicated or
technical and which the jury could have readily recalled without
the aid of the exhibits themselves.   The fourteen defense
exhibits were also grounded in defense arguments that were
repeatedly conveyed to the jury throughout the course of trial
through witness testimony and again in closing argument.   In
addition, defendants' argument here fails because the very
exhibits defendants assert supported their case were only
marginally relevant and did not undermine the government's case.
See United States v. Harber, 53 F.3d 236, 241 (9th Cir. 1995) (if
evidence is not relevant to the guilt or innocence of the

1   defendant, there is no reasonable possibility that it could have

2   affected the verdict).   Indeed, the majority of the exhibits

3   stood for facts or propositions that neither party disputed.

4        The jury note indicated that the jury was aware of the

5   admitted defense exhibits (which were orally acknowledged by the

6   Court every time they were received into evidence) and knew how

7   to ask for them if they wanted to see them.   The rapidity with

8   which the jury returned unanimous verdicts against both

9   defendants evidences the fact that the jury did not need to pore

10  over the exhibits but was able to recall all the exhibits much in

11  the same way a jury is required to recall witness testimony

12  without the benefit of a readback or transcript.   Moreover, this

13  is not a case where the jury was exposed to unadmitted exhibits

14  or outside information resulting in the consideration of improper

15  evidence.   Rather, at most, the jury was denied the chance to re-

16  review in the jury room the defense exhibits, which they had

17  already seen and heard about extensively during trial.   In sum,

18  the jury was able to evaluate the evidence fairly and accurately

19  before reaching verdicts in this case.   Defendants were not

20  prejudiced by the absence of the exhibits in the jury room

21  because the error was harmless and they are not entitled to a new

22  trial on this ground.   Accordingly, both defendants have failed

23  //

24  //

25  //

26

27

28

to establish by clear and convincing evidence that this issue presents a substantial question of law or fact.

### V. CONCLUSION

Because defendants do not meet the statutory requirements for bail pending appeal their motions for bail pending appeal should be denied.

DATED:   October 31, 2011         Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


                    _____/s/_____
MONICA D. MANGE
Assistant United States Attorney

Attorneys for Plaintiff
United States of America